1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,
                                    Criminal Action No.
4            Plaintiff,            1:23-cr-0036

5        vs.                       Washington, DC
                                    September 19, 2024
6   WILLIAM DUNFEE,
                                    10:21 a.m.
7            Defendant.
    _____/
8

9             TRANSCRIPT OF SENTENCING
        BEFORE THE HONORABLE REGGIE B. WALTON
10            UNITED STATES DISTRICT JUDGE

11
    APPEARANCES:
12
13  For the Government:    **WILL WIDMAN**
                            DOJ-CRM
14                          1301 New York Avenue, NW
                            Washington, DC 20530
15                         **KATHRYN BOLAS**
                            USAO-DC
16                          601 D Street, NW
                            Washington, DC 20530
17
18  For the Defendant:     **THOMAS KIDD**
                            Thomas W. Kidd, LLC
19                          PO Box 231
                            Harveysburg, OH 45032

20                         **CURT HARTMAN**
                            Law Firm of Curt C. Hartman
21                          7394 Ridgepoint Drive, Suite 8
                            Cincinnati, OH 45230
22

23  Court Reporter:        **JEFF HOOK**
                            Official Court Reporter
24                          U.S. District & Bankruptcy Courts
                            333 Constitution Avenue, NW
25                          Washington, DC 20001

1                          **I N D E X**

2   **WITNESS**                                           **PAGE**

3   JOHN DOUGLAS WRIGHT

4     Direct Examination by Mr. Widman                    6

5     Cross-Examination by Mr. Hartman                   18

6     Redirect Examination by Mr. Widman                 30

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  This is criminal matter 23-36,

3   United States of America v. William Dunfee.  On behalf of

4   probation, we have Crystal Lustig.  May I have counsel

5   approach the lecturn and state your appearance for the

6   record, beginning with the government.

7          **MR. WIDMAN:**  Good morning, Your Honor.  Will

8   Widman for the United States.  I'm joined by AUSA Kathryn

9   Bolas, our paralegal Jennaie Bashay, and in the gallery U.S.

10  Capitol Police Officer Lieutenant David VanBenschoten.

11  Thank you.

12         **THE COURT:**  Good morning.

13         **MR. WIDMAN:**  Good morning.

14         **MR. KIDD:**  Good morning, Your Honor.  Tom Kidd

15  with co-counsel Curt Hartman.  We're here on behalf of the

16  defendant, William Dunfee.

17         **THE COURT:**  Good morning.  This matter is here for

18  sentencing.  In preparation for the sentencing, there was a

19  voluminous amount of material I had to review, but I did in

20  preparation for this sentencing.  And the reason we were

21  delayed today was because I only received the response to

22  the government's sentencing memorandum this morning when I

23  came to court, because I wasn't at the courthouse yesterday

24  because I am on a military committee and I had to be in a

25  committee meeting yesterday all day.  So I wasn't available

1  to review what was submitted since it was just submitted on

2  the 18th, so I needed time this morning to review that.

3          But in preparation for this sentencing, I did,

4  again, review the indictment; also, the final presentence

5  investigation report; also, the probation department's

6  sentencing memorandum; the United States' request for an

7  accounting and the filings in reference to that.  And in

8  that regard, I did not look at the videos, so if the

9  government wants me to view the videos in reference to that

10  issue, obviously you can do that during this hearing.

11          Also, the memorandum in response to the

12  government's motion for an accounting; and also, my order

13  that I issued on September 11th, 2024 in reference to that

14  accounting issue; also, the defendant's sentencing

15  memorandum; also, attachment A which were character letters,

16  which amounted to 22 letters; also, attachment B which

17  related to the elements regarding the stipulation between

18  the parties; also, the government's sentencing memorandum.

19  And again, there were a number of attachments, including

20  videos.  Again, if the government wants me to review those

21  videos, you can do that during the course of this hearing.

22          Also, the government's notice of filing of some

23  attachments -- or video attachments pursuant to Rule 49.

24  Again, there were several.  Again, if the government wants

25  me to review those, then you can play those during the

1    hearing.  Also, the Pretrial Services Agency report dated

2    September 17th, 2024; and also the defendant's response to

3    the government's sentencing memorandum which was filed, I

4    think, yesterday, along with eight attachments.

5            Is there anything else I should have reviewed in

6    preparation for the sentencing?

7            **MR. WIDMAN:**  Your Honor, I believe that's all of

8    it.

9            **THE COURT:**  Defense?

10           **MR. KIDD:**  Nothing further on behalf of

11   Mr. Dunfee.  We believe that's a complete record, Your

12   Honor.

13           **THE COURT:**  Very well.  In reference to the

14   report, there were several disputes that were not ultimately

15   resolved with the probation department.  First I'll deal

16   with the government's objections which, first, were to

17   paragraph 74 and paragraph 71 relating to whether the

18   defendant qualified as either an organizer or a leader of

19   the criminal activity that occurred on that day involving

20   five or more participants or otherwise was extensive.

21           I'll hear from government counsel.

22           **MR. WIDMAN:**  Yes, Your Honor.  We would like to

23   call a witness, Mr. John Douglas Wright, with respect to

24   this leadership enhancement.

25           **THE COURT:**  Very well.

1          **MR. WIDMAN:**  Thank you.

2          **DEPUTY CLERK:**  You can remain standing.  Please

3    raise your right hand.  Do you solemnly swear or affirm that

4    the testimony you are about to give will be the truth, the

5    whole truth, and nothing but the truth?

6          **THE WITNESS:**  Yes.

7          **DEPUTY CLERK:**  You may be seated.

8          **DIRECT EXAMINATION OF JOHN DOUGLAS WRIGHT**

9    **BY MR. WIDMAN:**

10        **Q.**   Good morning.  Could you please state your full

11   name.

12        **A.**   John Wright.

13              **THE COURT:**  Wright, W-R-I-G-H-T?

14              **THE WITNESS:**  Yes.

15   **BY MR. WIDMAN:**

16        **Q.**   Is your name John Douglas Wright?

17        **A.**   It is.

18        **Q.**   Mr. Wright, were you charged with violations of

19   the criminal law for your activities at the United States

20   Capitol on January 6th, 2021?

21        **A.**   Yes.

22        **Q.**   And specifically, Mr. Wright, were you charged

23   with obstruction of an official proceeding, among other

24   crimes, in this United States District Court?

25        **A.**   Yes.

1      Q.   And in fact, you pled guilty to obstruction of an

2   official proceeding; is that correct?

3      A.   Yes.

4      Q.   After pleading guilty, you understood that you

5   were admitting that you did in fact commit the crime of

6   obstructing the certification of the 2020 election?

7      A.   Yes.

8      Q.   And did you plead guilty pursuant to a plea

9   agreement between you, yourself and the government?

10      A.   Yes.

11          MR. WIDMAN:   Your Honor, if I may approach the

12   witness?

13          THE COURT:   Yes.

14   BY MR. WIDMAN:

15      Q.   Mr. Wright --

16          THE COURT:   What exhibit is this going to be?

17   BY MR. WIDMAN:

18      Q.   I'm showing you what's been marked as

19   Exhibit 1100, Mr. Wright.  Is this the plea agreement that

20   you entered into with the United States Government?

21      A.   Yes.

22          THE COURT:   What, if anything, happened to his

23   case as a result of the Fischer decision?

24          MR. WIDMAN:   He is currently incarcerated in the

25   Federal Bureau of Prisons for 49 months.  There have been no

1    filings with respect to that decision in Mr. Wright's case

2    thus far.

3            **THE COURT:**  Okay.

4            **MR. WIDMAN:**  May I approach the witness?

5            **THE COURT:**  Yes.

6    **BY MR. WIDMAN:**

7        **Q.**    Mr. Wright, I'm showing you what's been marked as

8    Government's Sentencing Exhibit 1101.  This is the statement

9    of offense that you signed that describes your offense

10   conduct on January 6th at the United States Capitol?

11       **A.**    Yes.

12       **Q.**    On March 6th, 2023, you were sentenced by Judge

13   Kollar-Kotelly in this courtroom -- in this courthouse,

14   excuse me, to 49 months incarceration followed by 36 months

15   supervised release; is that correct?

16       **A.**    Yes.

17           **MR. WIDMAN:**  May I approach the witness?

18           **THE COURT:**  Yes.

19   **BY MR. WIDMAN:**

20       **Q.**    Mr. Wright, I'm showing you what's been marked as

21   Government's Exhibit 1102.  Is this the judgment from your

22   conviction reflecting your sentence of 49 months followed by

23   36 months probation?

24       **A.**    Yes.

25       **Q.**    Supervised release, excuse me?

1    **A.**    Yes.

2    **Q.**    Thank you, Mr. Wright.  Mr. Wright, do you have

3    any agreement with the government about what benefit you or

4    anyone else would receive in exchange for your testimony

5    today?

6    **A.**    No.

7    **Q.**    That being said, your testimony today is

8    motivated, at least in part, by hopes of receiving a reduced

9    sentence in your federal case?

10    **A.**    Yeah.

11    **Q.**    Where are you from, Mr. Wright?

12    **A.**    Ohio.

13    **Q.**    Are you currently an inmate in the Federal Bureau

14    of Prisons?

15    **A.**    Yes.

16    **Q.**    Where?

17    **A.**    Elkton.

18    **Q.**    Prior to your incarceration, what did you do for

19    work?

20    **A.**    I owned a charter bus company -- I still do.

21    **Q.**    Mr. Wright, you can move that microphone a little

22    bit closer to you.  Can you answer the question again, what

23    did you do for work?

24    **A.**    Charter bus company owner.

25    **Q.**    And based on what you said about being charged,

1  you were present at the Capitol on January 6th, correct?

2  You were present at the United States Capitol on January

3  6th?

4      **A.**   Yes.

5      **Q.**   And on that day, where did you go when you arrived

6  in Washington, D.C.?

7      **A.**   To the east side of the Capitol -- well, we parked

8  at Union Station and then walked to the east side of the

9  Capitol.

10     **Q.**   So you went directly from Union Station to the

11 east side of the Capitol?

12     **A.**   Yes.

13     **Q.**   You didn't attend the rally that day?

14     **A.**   No.

15     **Q.**   Your Honor, I'm going to show Mr. Wright a trial

16 exhibit.  I'm hooked into this screen, this monitor, but I

17 don't see any image coming up.  Thank you.

18         Mr. Wright, do you see the image that's displayed

19 on your screen there?

20     **A.**   Yes.

21     **Q.**   This is Exhibit 403 from trial.  Do you recognize

22 this man, Mr. Wright?

23     **A.**   Yes.

24     **Q.**   And can you point him out in the courtroom today?

25     **A.**   Right there in the middle.

1          **MR. WIDMAN:**  Let the record reflect that

2    Mr. Wright has identified the defendant, Mr. William Robert

3    Dunfee.

4          **THE COURT:**  The record will so reflect.

5    **BY MR. WIDMAN:**

6      **Q.**   Thank you, Your Honor.  Mr. Wright, did you come

7    into contact with Mr. Dunfee on January 6th?

8      **A.**   Yes.

9      **Q.**   How?

10     **A.**   I was standing up by the barriers, and the

11   gentleman come up and approached and said he wanted to speak

12   to me.

13     **Q.**   Can you describe the gentleman that approached

14   you?

15     **A.**   He was an older gentleman, and I believe he had on

16   like a khaki jacket.  That's about all I can remember.

17     **Q.**   What happened next?

18     **A.**   We walked over, and he asked -- said when he gave

19   a prayer, could we breach the barriers when he began his

20   prayer.  And that was about the end of the conversation,

21   that was pretty much it.

22     **Q.**   So --

23         **THE COURT:**  The person said what to you?

24         **THE WITNESS:**  Oh, he asked when he began to do a

25   prayer, that we could breach the barriers.

1    BY MR. WIDMAN:

2        **Q.**    Were you the only individual in the group?

3        **A.**    No.

4        **Q.**    How many others were there?

5        **A.**    There were six, like six total.

6        **Q.**    Did the defendant also ask that you spread

7    yourself out along the barricade line?

8        **A.**    Yes.

9        **Q.**    Why?

10        **A.**    I don't know why, but there was two of us that

11    were going to -- that were in the middle, and the other ones

12    were at the other two ends.

13        **Q.**    Was one of the others in the group your friend,

14    Mr. Clay Norris?

15        **A.**    It was.

16        **Q.**    And how did you know that the defendant also asked

17    these other men for assistance in breaching barricades?

18        **A.**    We were all there together.

19        **Q.**    Did Mr. Dunfee give you any further instructions

20    on January 6th?

21        **A.**    No.

22        **Q.**    Did you know --

23            **THE COURT:**  You've jumped something.  I didn't

24    hear that it was Mr. Dunfee who he was speaking to.

25            **MR. WIDMAN:**  Oh, I thought that --

1          **THE COURT:**  It was just a man he said.

2    BY MR. WIDMAN:

3        Q.   I thought that was clear, Your Honor.  To be

4    clear, Mr. Dunfee was the man --

5        A.   Yes.

6        Q.   -- who asked you to breach barricades?

7        A.   Yes.

8        Q.   And told you that the signal to breach would be a

9    prayer?

10       A.   Right.

11       Q.   Did you know the defendant prior to January 6th?

12       A.   No.

13       Q.   Your Honor, if I could show Mr. Wright what was

14   marked as Trial Exhibit 411.

15            Mr. Wright, do you recognize yourself in this

16   picture?

17       A.   I do.

18            **THE COURT:**  Let me just clarify.  What are you

19   saying exactly he said about breaching the barriers?  What

20   were his words that he used in reference to breaching the

21   barriers, if you recall?

22            **THE WITNESS:**  He asked that when he started to say

23   a prayer, could we breach the barriers at that point.

24            **THE COURT:**  When he started to say a prayer?

25            **THE WITNESS:**  Yeah.

1            **THE COURT:**  And what did he say in reference to

2    that prayer?

3            **THE WITNESS:**  Do you mean what did he --

4            **THE COURT:**  What did he say in the prayer?

5            **THE WITNESS:**  I have no idea.  It was very loud, I

6    really don't remember.

7            **THE COURT:**  But what exactly do you remember him

8    saying?

9            **THE WITNESS:**  I don't know, I wasn't at the

10   barriers when it -- I stepped back.

11           **THE COURT:**  So you didn't hear what he said?

12           **THE WITNESS:**  I didn't hear, no, what his prayer

13   was, no.

14           **THE COURT:**  Did you hear anything he said?

15           **THE WITNESS:**  Only what he said to me.

16           **THE COURT:**  And what did he say to you?

17           **THE WITNESS:**  Just it was he asked us if we would

18   breach the barriers when he started his prayer.

19           **THE COURT:**  Okay.

20   **BY MR. WIDMAN:**

21      **Q.**   I'm showing you what is marked as Government's

22   Trial Exhibit 411.  Do you recognize yourself in this

23   picture, Mr. Wright?

24      **A.**   I do.

25      **Q.**   Your monitor is actually a touchscreen.  If you

1    could touch it and circle yourself in this picture.

2        (Witness complies)

3        Q.    Thank you.  And what are you doing in this

4    picture, Mr. Wright?

5        A.    Holding on to the barrier.

6        Q.    In your statement of offense from your plea, you

7    acknowledge that you grabbed this barrier in an attempt to

8    breach; is that correct?

9        A.    Yes.

10       Q.    I'm circling an individual here.  Is this

11   individual the defendant, Mr. Dunfee?

12       A.    Yes.

13       Q.    And are you and Mr. Dunfee both on that barricade

14   line pushing metal fencing against law enforcement together?

15       A.    Yes.

16       Q.    I'm going to show you, Mr. Wright, what was marked

17   as Government's Exhibit 412.  Mr. Wright, do you recognize

18   yourself in this picture?

19       A.    Yes.

20       Q.    Can you circle yourself.

21       (Witness complies)

22       Q.    Is this Mr. Dunfee, the same pastor, who asked for

23   your assistance breaching barricades?

24       A.    Yes.

25       Q.    I'm going to show Mr. Wright trial Exhibit 415.

1    Do you see yourself in this picture?  Do you recognize

2    yourself in this picture?

3        **A.**    Yes.

4        **Q.**    Can you circle yourself.

5        (Witness complies)

6        **Q.**    Thank you.  I've circled an individual who is

7    holding a bullhorn.  Do you recognize that individual as the

8    defendant?

9        **A.**    Yes.

10       **Q.**    And what are you doing at this time in this image?

11       **A.**    Holding on to the barrier -- or leaning on it.

12       **Q.**    Mr. Wright, in January of this year, did you

13   previously give the same testimony regarding the defendant

14   before the grand jury here in the District of Columbia?  Did

15   we sit down in front of the grand jury and you testified to

16   these facts back in January?

17       **A.**    Yes.

18       **Q.**    What did you do after pushing that metal fencing

19   against those police officers?

20       **A.**    I went and sat back down.  I went back by the wall

21   and sat down.

22       **Q.**    Why?

23       **A.**    I was out of breath.

24       **Q.**    Why?

25       **A.**    Because I've got COPD and just not good health.

1    Q.    What happened after you took a rest?

2    A.    I walked up to the building and went up the steps.

3    Q.    Did you eventually enter the U.S. Capitol building

4    on January 6th?

5    A.    I did.

6    Q.    And you've said before you were arrested for your

7    conduct on January 6th, right?

8    A.    Yes.

9    Q.    Did you initially tell the FBI that you did not

10    enter the Capitol building?

11    A.    Yes.

12    Q.    Was that true?

13    A.    No.

14    Q.    And were you charged with the crime of making

15    false statements to the FBI?

16    A.    Yes.

17    Q.    Why did you tell the FBI that you didn't go inside

18    the Capitol?

19    A.    I was shocked when they came, and I was scared.

20    Q.    Was the false charges statement dismissed -- the

21    false statements charge dismissed as part of your plea

22    agreement?

23    A.    Yes.

24    Q.    What has been my only request to you throughout

25    this process?

1      **A.**   To tell the truth.

2      **Q.**   Have you told the truth about the defendant's

3   interaction with you today?

4      **A.**   Yes.

5           **MR. WIDMAN:**   I'd tender the witness, Your Honor.

6           **THE COURT:**   One moment.   Cross-examination.

7   <u>**CROSS-EXAMINATION OF JOHN DOUGLAS WRIGHT**</u>

8   **BY MR. HARTMAN:**

9      **Q.**   Mr. Wright, can you explain how you ended up

10  coming to Washington, D.C. on or about January 6th, 2021?

11     **A.**   Physically how, I drove a charter bus, yes.

12     **Q.**   You drove a bus?

13     **A.**   Yes.

14     **Q.**   Is it your bus company?

15     **A.**   Yes.

16     **Q.**   So you own the bus company?

17     **A.**   Yes.

18     **Q.**   And somebody chartered that bus company to drive a

19  group to Washington, D.C.?

20     **A.**   No, I actually sold the seats.

21     **Q.**   Okay.   You sold seats, so you're doing this as --

22  strike that.

23          So you wanted to come to Washington, D.C.,

24  correct?

25     **A.**   Yes.

1      Q.    You, in a sense, organized people to come to

2   Washington, D.C., correct?  I didn't hear you.

3      A.    What was the question again?

4      Q.    You organized people to come --

5      A.    Yes.

6      Q.    -- to Washington, D.C.?

7      A.    Yes.

8      Q.    Try to make sure I finish asking my questions,

9   even though you might know what I'm asking, so the court

10   reporter can get everything down.

11          And when you were coming to Washington, D.C., was

12   it your intent just to have a peaceful protest?

13      A.    Yes.

14      Q.    Isn't it true that on January 5th, you issued a

15   statement on social media to the effect of:  We are going to

16   have to fight the blue tomorrow?

17      A.    I believe it said "we may have to."

18      Q.    Okay, I'll get to that in a minute here.  Did you

19   also text on social media:  "From what I've seen tonight,

20   the tempers will be up tomorrow and police lines will be

21   breached"?

22      A.    Yeah.

23      Q.    You texted that, correct?

24      A.    I did, yes.

25      Q.    This is in your statement of offense --

1    **A.**    Yes.

2    **Q.**    -- that you agreed to as part of your plea

3    agreement, you understand that?

4    **A.**    Yes.

5    **Q.**    So prior to even meeting Mr. Dunfee or anybody on

6    January 6th, you're already anticipating fighting the

7    police:  We're going to have to fight the blue tomorrow,

8    correct?

9    **A.**    I said it was possible.

10    **Q.**    Well, I'll get you a copy here.  You have a copy

11    of your statement of offense up there -- yes.  What exhibit

12    number is that?  It's 1101.

13    **A.**    Yeah, 1101.

14    **Q.**    If you can, turn to page five of seven.

15        **THE COURT:**  Page what?

16        **MR. HARTMAN:**  Page five of seven of Exhibit 1101.

17        **THE COURT:**  Page 507?

18        **MR. HARTMAN:**  Five of seven.

19        **THE COURT:**  Oh, okay.

20    **BY MR. HARTMAN:**

21    **Q.**    I'm looking at paragraph 16 of the statement of

22    offense.  Do you have that in front of you?

23    **A.**    I do.

24    **Q.**    And if I'm reading it correctly, it says that on

25    or about from January 5th through January 8th, you posted

1    the following messages to your Facebook account.

2            Do you see that?

3        A.    Uh-huh.

4        Q.    What is the first statement that you posted on --

5    that it indicates?

6        A.    "We are going to have to fight the blue tomorrow."

7        Q.    You didn't say "we may have to," you said it as an

8    affirmative statement, that you were going to have to -- you

9    were going to fight the blue tomorrow, correct?

10        A.    We're going to have to, it says.

11        Q.    Right.  It was an affirmative -- and you had not

12    met Mr. Dunfee at any time when you made that post, correct?

13        A.    No.

14        Q.    And what's the second statement that you admitted

15    through your plea agreement to making?

16        A.    "From what I've seen tonight, the tempers will be

17    up tomorrow and police lines will be breached."

18        Q.    Will be breached.  You had not met Mr. Dunfee at

19    that time, had you?

20        A.    No.

21        Q.    And you were already talking about breaching the

22    police lines, correct?

23        A.    It says that they -- it doesn't say I'll breach

24    them, it says they will be breached.

25        Q.    Well, what made you even think that on January 5th

1   about the police lines being breached?

2       **A.**   It was all over social media.

3       **Q.**   So you indicate, if I understood you, that you met

4   with Mr. Dunfee and a group of -- six other people or five

5   other people?

6       **A.**   Five other people.

7       **Q.**   So there was a total of six of you, and you

8   remember that number specifically?

9       **A.**   Yeah.

10      **Q.**   How?

11      **A.**   Because there was two in the middle and two on

12  either end.

13      **Q.**   Where on the east side of the Capitol did you --

14  did this meeting take place?

15      **A.**   There was a raised area, I think it was a

16  flowerbed, it was right in front of that.

17      **Q.**   And were you the last person to come into this

18  group of six or were there already five people there and you

19  got pulled in or were they -- were you one of the first

20  people that got approached?  Strike that.

21          I'm trying to figure out, how did you come to be

22  amongst that group of six people?

23      **A.**   A gentleman asked me and a friend of mine that he

24  wanted to speak with us.

25      **Q.**   So somebody, you don't know who, says somebody

1    wants to speak with you two?

2         **A.**   Yes.

3         **Q.**   Out of all the people in the crowd, they chose you

4    and your friend?

5         **A.**   Yes.

6         **Q.**   So they bring you to this area.  Are the four

7    people already there waiting for you?

8         **A.**   Oh, I don't know if they were already there or if

9    they came at the same time or after me.

10        **Q.**   So you don't know if somebody got you there, you

11   had to wait for other people maybe to come up because they

12   had to get other people or you were the last person, you

13   have no clue?

14        **A.**   I don't know.

15        **Q.**   And the only thing you say Mr. Dunfee said was:

16   "When I begin a prayer, begin to breach the barricade," is

17   that your testimony?

18        **A.**   That was what he said.

19        **Q.**   Did he say anything else?

20        **A.**   Not that I can recall, no.

21        **Q.**   Did he say:  We're going to do it in five minutes,

22   we're going to do it in 10 minutes?

23        **A.**   No, he did not say.

24        **Q.**   So how was this group of six supposed to know when

25   they needed to be at the barricade on the ready waiting for

1    that prayer?

2            **THE COURT:**  I don't know if he's competent to say

3    how what was said impacted other people.

4    **BY MR. HARTMAN:**

5        **Q.**  Okay.  How did you know when you had to be at that

6    barricade on the ready waiting for that prayer?  Was it

7    going to be a minute from then, five minutes, 30 minutes

8    from then?  How did you know when to be there?

9        **A.**  We were already at the barrier.  We were at the

10   barriers when they come to get us.

11       **Q.**  No, you just testified earlier you were back at

12   the raised plant areas.  You didn't say you were at the

13   barricade, you said --  I asked you where you were, and --

14       **A.**  I said we were at the barriers when the man came

15   to get us.

16       **Q.**  Okay.

17       **A.**  So that we went right back to the barriers.

18       **Q.**  So the gentleman takes you away from the

19   barricades, and you're able to -- nobody fills your spot at

20   the barricade, and you're able to just waltz right back

21   where you were before?

22       **A.**  Yeah.

23       **Q.**  And what was the prayer that triggered it?

24       **A.**  I didn't hear a prayer.

25       **Q.**  You didn't hear a prayer.  So far as you know,

1    Mr. Dunfee never made a prayer or said a prayer?

2        **A.**    I couldn't tell you.

3        **THE COURT:**  I'm still a little confused about what

4    was said.  Are you saying that he said:  Once we breach the

5    barrier, that I will -- there will be a prayer; or did he

6    say:  I'm going to give a prayer, and then we're going to

7    breach the barrier?

8        **THE WITNESS:**  He said when he began the prayer, he

9    wanted us to breach.

10        **THE COURT:**  Okay.

11   **BY MR. HARTMAN:**

12       **Q.**    The prayer was going to be the signal to start

13   pushing to breach the barricade?

14       **A.**    Correct.

15       **Q.**    But that never happened, correct, that prayer

16   never happened?

17       **A.**    I don't know if it did or didn't.

18       **Q.**    So Mr. Dunfee did not -- so -- strike that.

19           So your pushing of the barricade and effectuating

20   the breach wasn't premised upon Mr. Dunfee making a prayer,

21   correct, because you didn't hear a prayer?

22       **A.**    Correct.

23       **Q.**    You did it all on your own volition of when you

24   started to push the barricade, correct?

25       **A.**    In my position, I had to push the barricade

1    because I had people behind me.  It was either that or get

2    run over.

3         Q.   Okay.  But it wasn't Mr. Dunfee directing you or

4    controlling your pushing of the barricade, it was the people

5    behind you controlling you and pushing you into the

6    barricade, correct?

7         A.   Yeah.  I didn't say that -- I just said that he

8    asked us to start breaching when he gave the prayer.

9         Q.   And you saw Exhibit 411, the first photograph that

10   the government showed you.  It had a picture of -- you

11   identified yourself on the right and Mr. Dunfee a few people

12   down from you, correct?

13        A.   Uh-huh.

14        Q.   I mean, he was a couple of people from you.  If

15   the prayer was the signal, you were close enough you would

16   have heard the prayer, would you not have thought?

17        A.   I don't know when that photo was taken, I don't

18   know at what time it was taken.

19        Q.   Fair point.  Now, historically, there were like

20   two breaches, one about 1:45 and one at 2:00 o'clock.  My

21   understanding is you were only up there at that first time,

22   the first broach that kind of got recovered, correct?

23        A.   Say it again.

24        Q.   There were two breaches of the barricade on the

25   east front that day --

1          **THE COURT:**  Do you know that that's the case, that

2     there were two separate breaches?

3          **THE WITNESS:**  Okay.

4          **THE COURT:**  Do you know that that happened?

5          **THE WITNESS:**  No.

6     BY MR. HARTMAN:

7          **Q.**   Okay.  So you said you went back down to take a

8     rest after the pushing that you were involved in?

9          **A.**   Yes.

10         **Q.**   Had the barricades been breached -- at that time,

11    had the barricades been breached or did the police kind of

12    restore the barricade line?

13         **A.**   I don't think they were totally breached when I

14    was there.

15         **Q.**   But by the time you got up and you said you walked

16    up to the buildings and took a rest at the steps --

17         **A.**   No, I went backwards and took -- away from the

18    building and took a rest for about 15 minutes.

19         **Q.**   And by the time you came back up, it was open,

20    people were already at the Capitol?

21         **A.**   That's correct.

22         **Q.**   Were there still people just initially running up

23    to the Capitol building at that time?

24         **A.**   Yes.

25         **Q.**   If I may have just a moment, Your Honor.

1          (Brief interruption)

2          **Q.**   Mr. Wright, just a few more questions.  In terms

3    of your case right now, you were convicted of 1512,

4    obstructing official proceedings, correct?

5          **A.**   Yes.

6          **Q.**   And nothing has been done in your case in terms --

7    in light of the United States Supreme Court decision in

8    Fischer?

9          **A.**   No.

10         **Q.**   That is correct, that nothing's been done?

11         **A.**   That is correct.

12         **Q.**   I don't want to get into attorney-client

13   communications that you might have had with your attorney,

14   but do you know -- do you have any plans to file any motions

15   in light of the Fischer decision which may result in a

16   resentencing on your behalf?

17            **MR. WIDMAN:**  Your Honor, I would object.  This

18   goes directly to potential attorney-client conversations

19   Mr. Wright's had with his attorney.

20            **MR. HARTMAN:**  I'm asking what his plans are as an

21   individual.

22            **THE COURT:**  Overruled.

23            **THE WITNESS:**  No.

24   BY MR. HARTMAN:

25         **Q.**   You have no plans to revisit your sentence in

1    light of the Fischer decision?

2        **A.**    No.

3        **Q.**    Do you understand what I'm talking about, the

4    Fischer decision?

5        **A.**    I do.

6        **Q.**    That's the Supreme Court case that ruled on the

7    1512 offense?

8        **A.**    Yes.

9        **Q.**    You have no plans to revisit that sentence because

10    of that?

11        **A.**    No.  It's my understanding that I can't because I

12    pled to it, I didn't get found guilty by a jury, which gives

13    up some of my rights.

14        **Q.**    And so you don't have any plans to file a habeas

15    corpus petition in that regard?

16            **MR. WIDMAN:**  Objection.

17            **THE COURT:**  I think he's already said he doesn't

18    intend to file --

19            **MR. HARTMAN:**  Thank you, I'll leave it at that.

20            **THE COURT:**  Very well.

21    BY MR. HARTMAN:

22        **Q.**    Oh, just for the record, what is your scheduled

23    outdate?

24        **A.**    Right now, it's June of '26.

25        **Q.**    June of 2026?

1          **A.**    Yes.

2                **MR. HARTMAN:**  Very good.  Thank you, Your Honor.

3     No more questions.

4                **THE COURT:**  Redirect.

5          **REDIRECT EXAMINATION OF JOHN DOUGLAS WRIGHT**

6     BY MR. WIDMAN:

7          **Q.**    Very briefly, Your Honor.  Mr. Wright, I'm showing

8     you Government's Exhibit 413.  Do you recognize this

9     individual here?

10         **A.**    Yes.

11         **Q.**    Who is that?

12         **A.**    That's Clayton Norris.

13         **Q.**    And is Mr. Norris one of your friends?

14         **A.**    Yes.

15         **Q.**    Did Mr. Norris ride on one of your charter buses

16    with you to Washington, D.C.?

17         **A.**    Yes.

18         **Q.**    Can you describe Mr. Norris' hat?

19         **A.**    It says Trump 2020, and it's red, white and blue.

20         **Q.**    Do you see yourself in this picture?

21         **A.**    Yes.

22         **Q.**    Can you circle yourself.

23         (Witness complies)

24         **Q.**    And what are you doing in this picture?

25         **A.**    Pardon?

1    Q.   What are you doing in this picture, in this

2    exhibit?

3    A.   Picking up a barrier.

4    Q.   I'm going to show you Exhibit 411.  I showed you

5    this exhibit on direct.  Do you see this hat here?

6    A.   Yes.

7    Q.   Is this Mr. Norris directly next to you, your

8    friend, on the barricade line holding that megaphone?  It's

9    the same hat, same person?

10    A.   I would say yes.

11    Q.   No further questions -- oh, excuse me, Your Honor.

12         Mr. Norris was one of the six men you testified

13    Mr. Dunfee asked for assistance?

14    A.   Yes.

15         THE COURT:  I think he said five.

16         MR. WIDMAN:  Five men?

17         THE COURT:  He said five or six, and then he said

18    five.

19    BY MR. WIDMAN:

20    Q.   And Mr. Norris was one of the five?

21    A.   Myself and five others.

22         THE COURT:  So six, okay.

23    BY MR. WIDMAN:

24    Q.   And he was one of that group?

25    A.   Yes.

1        **MR. WIDMAN:**  No further questions, Your Honor.

2        **THE COURT:**  Let me just ask, sir, you said that

3   after the defendant said something to the effect that after

4   a prayer, there was going to be a breach of the police line,

5   and you said you didn't hear what was said after that.

6   Could you tell whether he was saying anything after that

7   statement?

8        **THE WITNESS:**  No.

9        **THE COURT:**  Okay.  Thank you, sir.

10       **THE WITNESS:**  There was lots of noise.

11       **THE COURT:**  Just you could hear a lot of noise,

12  but you couldn't tell whether he was speaking?

13       **THE WITNESS:**  No.

14       **THE COURT:**  Okay.  Thank you, sir.

15     (Witness excused)

16       **THE COURT:**  Government.

17       **MR. WIDMAN:**  Your Honor, the government would like

18  to be heard in argument on the leadership enhancement, and

19  AUSA Bolas --

20       **THE COURT:**  Yeah, we'll address that issue and

21  move on to the next issue after that, but go ahead.  I'll

22  address them in turn.

23       **MR. WIDMAN:**  Sure, thank you.

24       **MS. BOLAS:**  Thank you, Your Honor.  So on January

25  6th, the defendant led the breach of the barricades on the

1    east front.  And the government is advocating for a

2    four-point increase under 3B1.1(a) as a leadership

3    enhancement due to the defendant's leadership.

4            There was a hierarchical structure to the

5    defendant's plan to breach the barricades and make it into

6    the Capitol, Your Honor.  The first is that you have the

7    defendant acting as sort of a general, and then underneath

8    him are these emissaries.  The first one is the unidentified

9    male that was discussed by Mr. Wright who goes out into the

10   crowd to find people to bring back to Mr. Dunfee to engage

11   in that barricade breach.  And then the second is a

12   Associate One, who we've named in our sentencing memo.  And

13   Associate One was also -- the government alleges, was also

14   directed to gather individuals to breach the barricades as

15   well.  Importantly about --

16           **THE COURT:**  You said he was what?

17           **MS. BOLAS:**  Directed to gather individuals to

18   breach the barricades as well.

19           **THE COURT:**  By whom?

20           **MS. BOLAS:**  By the defendant.

21           **THE COURT:**  What's the evidence that supports

22   that?

23           **MS. BOLAS:**  Your Honor, some of this evidence was

24   actually shown at the trial, so it was Associate One going

25   over to the Proud Boys, speaking to them.  And in the

1  exhibit -- and I believe it's Exhibit 301, Your Honor, you

2  can hear Associate One saying to this group of men:  "Take

3  that building."  And then he immediately goes back to

4  Mr. Dunfee, gets Mr. Dunfee and brings him to the group.

5  And we don't have audio of what was said, but it does appear

6  that the defendant and Associate One engage in a

7  conversation with the Proud Boys at that time.

8       And then the defendant goes back around to the

9  flowerbed perch where he had been standing, and he

10  immediately says to the crowd:  "What is the purpose of

11  these gates?  It's to keep you away from your House."  And

12  an individual in the crowd says:  "Let's go in," to which

13  the defendant responds:  "We intend to take it."  So there's

14  a little bit more evidence that Associate One is acting as

15  an emissary here, Your Honor.  I'd point to the fact that we

16  believe that Associate One, given that he is on the

17  defendant's church website, seems to be part of his

18  congregation.  So they're already coming into January 6th

19  with this hierarchical relationship where the defendant is a

20  leader, and Associate One is sort of a follower.

21       And we'd note that two days after January 6th, on

22  January 8th, Associate One in fact talks about the

23  defendant's role in a podcast on January 6th describing him

24  as a leader, and saying that he acknowledges that he,

25  Associate One, and the defendant were working the crowd to

1  get them ready to breach the barricades.

2         **THE COURT:**  One moment.

3       (Discussion off the record)

4         **THE COURT:**  Sorry.

5        **MS. BOLAS:**  No, it's okay.  And we're happy to

6  play that clip for Your Honor, if it will be helpful?

7         **THE COURT:**  You may.

8       (Video played)

9        **MS. BOLAS:**  And so, Your Honor, the individual who

10  was speaking, the one on the right of your screen, is

11  Associate One.  We'd also note that on January 6th, there

12  are a number of exhibits that were introduced at trial

13  showing Associate One near the defendant, including

14  Exhibit 204 where you have the defendant sort of near the

15  barricades speaking to the crowd.  And Associate One is back

16  towards that flowerbed area repeating the defendant's words

17  saying things like:  "This is what Pastor Bill is doing."

18  So in that sense, there was that hierarchical relationship,

19  an element of control, that is required for the 3B1.1

20  enhancement.

21         **THE COURT:**  Is there a video of that?

22        **MS. BOLAS:**  Yes, Your Honor.  We'll bring it up,

23  it's Exhibit 204.

24        **MR. WIDMAN:**  The Court's indulgence.

25       (Video played)

1    **MS. BOLAS:**  So Your Honor, the individual speaking

2    on the megaphone is who the government is alleging is

3    Associate One.  So again, you see him repeating the words of

4    the defendant to the crowd who may not be able to hear at

5    the front, because as Mr. Wright said, it's very noisy.  So

6    that's the first layer of control:  You have the

7    unidentified male that Mr. Wright identified and then

8    Associate One.

9        So then the next layer of the control are the

10   individuals who the defendant sought out to breach the

11   barricades.  So this is Wright, and then as Mr. Wright

12   identified, Mr. Norris.  And both Wright and Norris are

13   shown in Exhibit 411 at that 1:45 push.  And now, Your

14   Honor, I obviously will acknowledge that Mr. Wright and

15   Mr. Norris don't agree necessarily that they pushed the

16   barricades because of the defendant.  But certainly the

17   defendant's words are -- you know, at least in their heads,

18   it's no coincidence that they're on the barricade line at

19   the same time as the defendant.

20       And then below that, Your Honor, we have this sort

21   of third layer of people that the defendant is exercising

22   control over, and that's the crowd itself.  The government

23   believes that, like Associate One, there were members of the

24   crowd who were part of the defendant's congregation there.

25   So we know that Mr. Norris, as shown as attachment B to the

1    sentencing memo, Norris texted two individuals prior to his

2    arrest talking about the defendant.  And he specifically

3    says that the defendant's congregation was there, and that

4    there were 40 people -- and I'm quoting here, under his

5    command.  So again, there is that hierarchical relationship

6    within that group, because you have sort of this leader and

7    then the followers.  They come into January 6th with that

8    established hierarchical relationship.

9         We'd also note that the crowd itself was in part

10   certainly controlled by the defendant.  As you'll note in a

11   number of exhibits that were shown at trial, people quieted

12   down to listen to the defendant.  They said things like:

13   Listen, listen.  At one point, a rioter in fact says -- sort

14   of gives the defendant the right, if you will, to negotiate

15   with the police on their behalf.  And you obviously see a

16   lot of individuals responding to the defendant:  When the

17   defendant starts chants, individuals follow suit.

18        There's also times when the defendant would say

19   things like -- and I believe I've said this before, "What

20   are the purpose of these gates?"  And another member of the

21   crowd says:  "Let's go in," to which the defendant responds:

22   "We intend to."  So there's really people looking to the

23   defendant to breach those barricades.

24        **THE COURT:**  I know you played some of these

25   recordings during the trial, but it would be helpful,

1   because it's been a while, to refresh my recollection by

2   showing them to me again.

3         **MS. BOLAS:**  Absolutely, Your Honor.  So we'll

4   start with -- the Court's indulgence, we're just bringing

5   these up.

6         (Brief interruption)

7         **MS. BOLAS:**  I think it's connected.  We'll go

8   ahead and play what was marked at trial as 307A.

9         (Video played)

10        **MS. BOLAS:**  So in that clip, Your Honor, you see

11  the defendant imploring the crowd to listen to him, and then

12  a few unidentified members of the crowd saying:  "Listen to

13  him, at least listen to him before you decide that you don't

14  like what he's saying."  We'd also point to -- and we can

15  bring this up as well, 203 -- excuse me, yes, 203C.

16        (Video played)

17        **MS. BOLAS:**  So Your Honor, you see the defendant

18  saying:  "We're going to our House," with a crowd member

19  responding:  "It looks like they're going to the Capitol."

20  There are a number of these statements, Your Honor, and

21  we're happy to keep playing them.

22        **THE COURT:**  Yes.

23        **MS. BOLAS:**  203E at time code zero.

24        (Video played)

25        **MS. BOLAS:**  So Your Honor, there's another example

1    of the defendant starting a chant.  And you'll notice in

2    these videos, the defendant is standing on that flowerbed.

3    So he's literally above the crowd directing them.  We'll

4    play 301A at time code zero.

5        (Video played)

6        **MS. BOLAS:**  So then again, Your Honor, you see the

7    crowd engaging with the defendant, looking to the defendant

8    to guide them to the Capitol building.  And so for those

9    reasons, we would argue that the 3B1.1(a) enhancement does

10   apply here.

11        **THE COURT:**  Okay.  Anything else on that?

12        **MS. BOLAS:**  No, Your Honor.

13        **THE COURT:**  Response from the defense.

14        **MR. KIDD:**  Good morning, Your Honor.  Your Honor,

15   in regard to the aggravating role enhancement, I think the

16   first thing we want to point out is that note four says that

17   the adjustment does not apply to a defendant who merely

18   suggests committing the offense.  There is --

19        **THE COURT:**  Was it just a suggestion here?  I

20   mean, it seems to me he was talking about something

21   immediately occurring.  And in reference to what he was

22   saying, that did in fact occur.

23        **MR. KIDD:**  But the issue is control.  And in

24   regard to the leadership enhancement -- which is without

25   control --

1      **THE COURT:**  You don't have to have control.  I

2   mean, it seems to me that if your words cause people to act

3   consistent with what you're saying to them, why isn't that

4   leadership?

5      **MR. KIDD:**  Your Honor --

6      **THE COURT:**  For example, you know, you're in war,

7   and you've got a lieutenant who is head of the battalion.

8   But he gets shot and he's out of the way, so now it's a

9   sergeant.  And the sergeant then says things, and the things

10   that he says, the other soldiers comply consistent with

11   that.  Why isn't that leadership?

12      Even though he wasn't initially in a leadership

13   role, if he takes over and does -- and says things, and then

14   his fellow soldiers act consistent with what he's saying,

15   why isn't that leadership?

16      **MR. KIDD:**  Your Honor, in regard to the case law

17   on this, we would point out a recent decision and an older

18   one.  United States vs. Johnson from the D.C. Circuit, 64

19   F.4th 1348.  Where I'm going from is 1352 to 1353.  It does

20   say:  "A manager or supervisor must exercise some control

21   over others."  The cite that they use for that is United

22   States v. Bikundi, 926 F.3d 761, again, a D.C. Circuit.  So

23   we would disagree in regard to the fact that control is a

24   requirement for an aggravating role, whether it's the

25   four-point, the three-point or the two-point.  Here, there

1   is no --

2        THE COURT:  You may be right about a manager or

3   supervisor, but what about an organizer or leader?

4        MR. KIDD:  Your Honor, we would posit that it

5   applies equally to that in regard to that.  For an organizer

6   or leader, that's a higher level of an enhancement.  So

7   there would have to be, in regard to that, that same control

8   element, it's just to a greater extent.

9        THE COURT:  So if I meet with a group of people,

10  and I take on the role of articulating what the objective of

11  that meeting is, and then subsequent to that meeting, the

12  people in conjunction with myself then carry out what I was

13  speaking about, you're saying that that's not a leadership

14  position?

15       MR. KIDD:  Your Honor, if it was --

16       THE COURT:  In none of those circumstances, there

17  may be no direct indication of control.  But if people act

18  consistent with what I said to them, why isn't that

19  sufficient to show control?

20       MR. KIDD:  If it was merely a suggest, no, and

21  that's what the note says.  And I think Mr. Wright is a

22  great example of this.  Mr. Wright came to town before ever

23  meeting Mr. Dunfee saying:  "We are going to have to fight

24  the blue tomorrow."  He came to town without ever having met

25  Mr. Dunfee saying:  "From what I seen tonight, the tempers

1    will be up tomorrow and police lines will be breached."

2    Assuming the Court believes Mr. Wright's testimony -- which,

3    again, I think is not credible -- and I'll also just

4    briefly -- right now, in regard to the fact that his

5    testimony is not credible.  What we have from Mr. Wright is

6    we have him saying that it was him and five others that

7    Mr. Dunfee wanted -- was talking with.  Yet he had no

8    idea -- and I appreciate the fact that he testified as he

9    did.  He didn't know if he was the first there, if he was

10   the second, the third, the fourth.  He didn't know who he

11   was there when he got there.  So that's a detail --

12        **THE COURT:**  But he did say when Mr. Dunfee was

13   speaking that there were at least five other people there in

14   his presence.  He does say that.

15        **MR. KIDD:**  He did say that, but he can't --

16   having -- stating a factual assertion without being able to

17   provide the details that make up to it, I think you call

18   that factual assertion into question.  He also says -- I

19   think the U.S. Attorney stated that he was worked up by

20   Mr. Dunfee throughout the day.  I think the question -- his

21   comments before belie otherwise.  I think also the fact that

22   before -- you know, Mr. Wright says that before he even

23   talked to Mr. Dunfee, he was already on the front line.  So

24   this was not somebody that, after he had contact with

25   Mr. Dunfee, decided I've got to work my way up there, he had

1  been up there.  He said, if you recall, that he immediately

2  returned back -- my co-counsel asked:  "And that spot was

3  just still there waiting for you with all that crowd?" and

4  he said:  "Yep."  So he was there, he had never -- he had

5  all those statements on social media beforehand, and the

6  government would like for you to believe that was Mr. Dunfee

7  that was controlling him.

8         He even said himself:  "No, Mr. Dunfee didn't

9  control me."  And it would seem like he is kind of going

10 backward on accepting responsibility for his own actions.  I

11 think he said that he was forced to go through by people

12 behind him.  So again, we would argue that his testimony is

13 not credible to begin with.

14         On the whole issue of the prayer, you know, I

15 don't know how -- again, according to him, Mr. Dunfee

16 ordered two in the middle, two on the left, two on the

17 right.  I don't know how Mr. Dunfee, being in the same

18 location -- at least as was shown by the government in their

19 exhibits, could do a prayer and have everybody -- have the

20 other four accomplices on the end hear a prayer.  And again,

21 to Mr. Wright's credit, he said:  "Yeah, I never heard a

22 prayer."  He just did it on his own.

23         Now, he wasn't the only one who did it on his own.

24 But what we have here is not a hierarchy, we have a huge

25 number of people who were acting because they wanted to act.

1    Yes, the Court saw evidence of Mr. Dunfee.  Mr. Dunfee had a

2    megaphone that day, clearly.  He may have been the loudest,

3    the most vocal person there, I don't know.  There were other

4    people with megaphones as well.  But again, just speech in

5    and of itself is not criminal.

6        THE COURT:  It depends on the nature of the

7    speech.

8        MR. KIDD:  Yes, but there is speech that -- I

9    mean, it has to actually evolve into conduct.  And saying --

10   you know, making pro Trump statements --

11       THE COURT:  He did more than that.  I mean, he was

12   saying things that were consistent with the crowd breaching

13   the police line.  And he seemed to have been encouraging

14   that that take place.

15       MR. KIDD:  Your Honor, but he was not on the line

16   when he was making those speeches.  And frankly, it wasn't

17   being -- when he was speaking, at that time the line wasn't

18   being breached.

19       THE COURT:  Yeah, but according to what the

20   government has presented, he clearly was saying things

21   indicating his desire for the police line to be breached.

22   And then subsequent to him making those statements, there

23   was a breach.

24       MR. KIDD:  But again, in regard to the actual

25   timeline, I have no disagreement with that.  There were

1    speeches, there was a breach.  I would disagree with the

2    nexus there, and that Bill's speech was the nexus to the

3    conduct.  Otherwise, it's protected speech.  There's a case,

4    U.S. v. Lemon, out of the D.C. Circuit in '83, it's an older

5    case.  It talks about that activity -- that a sentence based

6    on any degree on activity or belief by the First Amendment

7    is constitutionally infirmed.

8        THE COURT:  You have a right to speak, and I

9    obviously cherish the First Amendment right to free speech.

10   But it's just like, you know, the saying from the Supreme

11   Court case that says that you can't scream "fire" in a

12   crowded theater.  You know, can you in a crowd of people

13   suggest that something -- not just suggest, but encourage

14   that something be done of a criminal nature, and then claim

15   that you weren't in fact engaging in illegal conduct?

16       MR. KIDD:  I would suggest that suggesting and

17   encouraging there are synonyms.

18       THE COURT:  I don't think the law does encourage

19   people to encourage others to engage in wrongful, illegal

20   conduct and they not be held accountable for that behavior.

21       MR. KIDD:  The --

22       THE COURT:  I mean, what's the difference between

23   sitting down with a group of people and saying:  We should

24   go rob that bank; and then as a result of that statement,

25   subsequent to that, the group that he's with, along with

1    him, go and rob the bank?

2         **MR. KIDD:**  Well --

3         **THE COURT:**  Are you saying that that's a First

4    Amendment right, and therefore you can't be held culpable

5    for having made those statements in connection to that bank

6    robbery?

7         **MR. KIDD:**  Well, the conduct and the hierarchy

8    would both be differentiated.

9         **THE COURT:**  He may not be in a hierarchy position,

10   but if he's with a group of people, it's not clear who is in

11   control.  But if one of the group says:  Hey, we should go

12   rob that bank, and then subsequent to that, that group then

13   goes and robs the bank, you're saying that that statement

14   "we should go rob the bank" is protected by the First

15   Amendment?

16        **MR. KIDD:**  Well, what I'm saying is that there are

17   a number of different factors besides the First Amendment

18   that lead into whether or not there's a leadership role.

19   Control is the necessity in regard to that.  Other things

20   that are required -- again, it comes from the note, are

21   issues like proceeds, a larger share of the proceeds.

22   Obviously not applicable in this situation.  So even outside

23   the speech issue, in that situation --

24        **THE COURT:**  But if you're making statements

25   indicating committing a crime, and the statements that you

1    make in that regard have been repeated by the people that

2    you're speaking to --

3            **MR. KIDD:**  Well, but that's not political speech.

4    That's not political speech, that's not religious speech.

5            **THE COURT:**  But talking about breaching a police

6    line that was legitimately in place, I mean, how is that not

7    encouraging criminal behavior?

8            **MR. KIDD:**  Again, what we have from Mr. Wright, I

9    think, could be replicated time and time over.

10            **THE COURT:**  Well, just not what Mr. Wright said,

11    but it's also the images that were depicted on the films

12    that were shown by the government.  So there's more than

13    just Mr. Wright's testimony.

14            **MR. KIDD:**  Right, correct.  But again, I would say

15    the vast majority of that, indeed, was just speech that was

16    not -- that would have been protected by the First Amendment

17    without the actions that followed.  Again, in regard to the

18    situation generally, the rule, of course, requires control.

19    One thing that Mr. Norris is not here to testify -- but it

20    was brought up so I'll bring it up, is that he had 40 people

21    under his control from his church or that he brought.  You

22    know, I guess I would say two things.  How does Mr. Norris

23    know that -- and, of course, he's not here to testify.  And

24    secondly, that logically really doesn't make sense.  If he

25    had 40 people that he was going to control, that was under

1    his control, why did he need six more.  If there's really

2    this hierarchy that centered around Mr. Dunfee and his

3    church, then why was he going out looking for outsiders

4    supposedly.

5          THE COURT:  I mean, I don't think I have anything

6    before me at this point that would indicate that when he was

7    speaking, that those people he came with from Ohio were in

8    that group.  I don't know if that's the case or not, but

9    there's nothing that would indicate that that was in fact

10   the case.

11         MR. KIDD:  And what I'm saying, even that

12   entire -- why would he have to seek six if he had 40 at his

13   disposal.  Again, it goes to the --

14         THE COURT:  Well, I don't know who those six were.

15   I mean, they conceivably could have been --

16         MR. KIDD:  I agree, they're not named.

17         THE COURT:  They conceivably could have been a

18   part of his congregation, but I don't know if that's the

19   case or not.

20         MR. KIDD:  But six is a lot less than 40, is what

21   I'm getting at, if he is actually seeking out others to

22   control, when apparently he had all these to control.  And

23   of course a church is not a criminal activity either, just

24   having people that came with him from his church -- and I

25   don't know how many there were or not in regard to that.

1    But again, the case law that we think is most determinative

2    is U.S. v. Graham, 162 F.3d 1180, which says that not all

3    hierarchical distinctions among offenders matter for

4    sentencing.  And what we already quoted in regard to United

5    States v. Bikundi or United States v. Quigley as well, 373

6    F.3d 133.  Again, the most recently one was a 2023 case I

7    already mentioned.

8         So no control, no aggravating role.  We would ask

9    for the Court not to decide to split the baby and give the

10   two-point enhancement -- which the government has as their

11   fallback, frankly.  Because again, no control, no role in --

12        **THE COURT:**  There wouldn't be any difference,

13   would there, regarding the control element between (a) and

14   (c)?

15        **MR. KIDD:**  Exactly.

16        **THE COURT:**  It's just the number of people?

17        **MR. KIDD:**  Exactly.  So I think in asking for that

18   fallback, the government's acknowledging that, well, maybe

19   there aren't six here.  If so, you know, fall back on the

20   two-point.  The issue is control.  We would agree there's

21   not six that have been identified or that there's testimony

22   toward.  But we would say that no control, no aggravating

23   role.  And for that reason, we're asking that the Court deny

24   the leadership enhancement under 3B1.1 for the aggravating

25   role.

1          **THE COURT:**  Any reply from the government?

2          **MS. BOLAS:**  Yes, Your Honor, briefly.  Your Honor,

3   I'd like to address the case law point.  I'd note that the

4   case law does say that control is important, but it also

5   says it's not the only thing.  United States v. Brodie, 524

6   F.3d 259, while plainly control is one factor in determining

7   whether someone qualifies as an organizer or leader, the

8   guidelines include several other factors including the

9   exercise of decision making authority; the nature of the

10  participation in the commission of the offense; the

11  recruitment of accomplices; the claimed right to a larger

12  share of the fruits of the crime; and the degree of

13  participation in planning or organizing the offense.

14         Defense counsel's right, there are cases that say

15  that control is very important as well.  But I don't think

16  Your Honor has to decide whether control is the most

17  important factor, because there is plainly control here.

18  And I'd point to, again, the unidentified individual that

19  went and got Mr. Wright, and Associate One who the

20  government has presented additional evidence on.

21         And then I'd also point to the defendant's effect

22  on the crowd and his control of the crowd.  It's notable,

23  Your Honor, that although Mr. Wright testified that, sure,

24  he was worked up, riled up, that may be one of the reasons

25  that the defendant went -- wanted him to be part of the six,

1    he was ready to go.  And notably, Mr. Wright and Mr. Norris

2    breached at the time the defendant breached, and not a

3    moment before.  So while Mr. Wright may have been fired up,

4    it was at the time of the breach that he -- it was at the

5    time that the defendant breached that Mr. Wright breached as

6    well.  So again, we do recognize that control is important,

7    we just recognize it's also present here.

8              THE COURT:  Thank you.

9              MS. BOLAS:  Thank you.

10             THE COURT:  Well, I would agree with the

11   government that control is an important factor, but also

12   would agree that it's not the only factor, and there are

13   other factors that come into play in deciding whether

14   someone qualifies as either an organizer or a leader.  Here,

15   the evidence would indicate that clearly the defendant came

16   to the scene -- I think it can be reasonably inferred, with

17   a bullhorn.  Obviously if somebody comes to a scene with a

18   bullhorn, that's an indication that they intend to

19   communicate to a large number of people, and people who may

20   not be in immediate proximity of them.  Otherwise, why would

21   you need a bullhorn.

22             I think what is most important here are the words

23   that were spoken by the defendant, and what he was saying

24   should be done, and that was breaching the line that the

25   police had set up.  And obviously, a breach of that line

1    would amount to a criminal offense in that it would cause

2    individuals to go into a restricted area that the police had

3    decided needed to be protected.  Again, I think what is very

4    important is when he makes certain statements, the other

5    crowd -- the other members of the crowd chime in and repeat

6    it.  And it was subsequent to him making those statements,

7    and that crowd clearly indicating that they heard what he

8    said, that the subsequent breach occurred.

9         It seems to me under those circumstances, you do

10   put yourself in a leadership position when you take on the

11   role of telling other individuals that they, along with you,

12   should commit a crime, and then that crime ends up being

13   committed by not only yourself but the others.  And I think

14   under those circumstances, the guideline clearly was

15   intended to apply to make you at least the leader, and maybe

16   an organizer, to the extent that the crowd acts consistent

17   with the words that you communicated to them.

18        Here, as far as whether section (a) or section (c)

19   should apply, which relates to the number of individuals who

20   you were leading, it seems to me that clearly not only based

21   upon Mr. Wright's testimony -- which maybe alone would not

22   have been sufficient to conclude that there were at least

23   five people.  But just looking at the crowd that was

24   depicted on the tapes that were shown, coupled with the

25   words that were being spoken by that group -- which was

1    clearly a large number of people who were saying words

2    consistent with what the defendant was communicating to

3    them, I would have to conclude that there were in fact more

4    than five people -- five or more people in that group who he

5    was speaking to who ultimately acted consistent with the

6    words that he conveyed to them.

7         So over objection -- and the probation department

8    obviously didn't have all of the information that has been

9    presented during this hearing and that was presented in the

10   government's submissions, but I would conclude that the

11   guideline does in fact intend to apply.  And therefore, I

12   would conclude that 3B1.1(a) does apply, and therefore a

13   four-point enhancement would be appropriate.

14        I'll take a recess to give the court reporter a

15   10-minute break, and probation can recalculate what the

16   guidelines would be.  We still have to address the other

17   issue as to whether the enhancement applies.  We'll take a

18   10-minute recess and proceed with that at that time.

19        (Recess taken at 11:41 a.m.)

20        (Back on the record at 11:51 a.m.)

21        **THE COURT:**  Okay, we have the other issue

22   regarding whether the defendant should receive a reduction

23   based upon acceptance.  I'll hear from government counsel.

24        **MR. WIDMAN:**  Your Honor, the government agrees

25   with probation that the defendant in this matter has not

1    clearly demonstrated acceptance of responsibility, and is

2    not entitled to the two-point reduction.  This comes from

3    several different places.  Firstly, as the Court has heard,

4    at trial and now here today, defense is making arguments

5    that are undercut by the evidence in this case:  That the

6    defendant didn't encourage people to act, that his speech

7    didn't have an effect on others.  And this is inconsistent

8    with relevant conduct to both the 231 and the 1752.

9         At trial, there was a dispute as to whether or not

10   he encouraged this breach of the barricades; arguments that

11   the west front breach was actually the one that was

12   important; that the east front breach -- that calling for

13   reinforcements from the east front to go to the west front

14   was not encouragement of others to help rioters fighting on

15   the west front against law enforcement at that time.  And at

16   trial, the Court disputed that characterization saying he

17   was clearly encouraging others to act.

18        The defendant argued at trial that he only wanted

19   to go to the steps and protest, did not intend to further

20   interfere with law enforcement in the midst of a civil

21   disorder.  Again, the Court found at trial this was not a

22   correct characterization.  The defendant went up the stairs,

23   pushed past law enforcement, was pushed back, pushed back to

24   the door again where he found the door to be locked,

25   returned to the crowd and said:  "It's locked, we can't get

1    in right now." So he clearly intended to go beyond the

2    steps, based on his actions, and that's what the Court found

3    at trial.

4              THE COURT: But what about -- I mean, the events

5    that occurred leading up to the stipulated trial, does he

6    not agree that he is accountable for all the conduct other

7    than the obstruction count, which ultimately the Supreme

8    Court held did not apply in this situation?

9              MR. WIDMAN: Yes, Your Honor. The government

10   would agree with defense counsel, that the facts in the

11   stipulated facts presented to the Court meet the elements of

12   231, civil disorder, and 1752(a)(1) in that pleading that

13   was submitted to the Court. However, there were certain

14   stipulations that were not agreed to. Primarily, those

15   concerning the testimony that the Court heard from

16   Mr. Wright today; that Mr. Dunfee had emissaries in the

17   crowd finding others to breach barricades; that those

18   emissaries, like Associate One, like this unidentified male

19   in the beige coat --

20             THE COURT: And that relates to what count, the

21   civil disorder?

22             MR. WIDMAN: The intent to interfere with law

23   enforcement in the midst of a civil disorder, that he's

24   recruiting others to also interfere. And moreover, there is

25   another stipulation with regards to the breaches on the east

1    front, and there being a nexus between the breach of that

2    barricade and the Secret Service's decision to move the vice

3    president to a secure location.  And we went back and forth

4    about that, and ultimately decided that we needed to call a

5    Secret Service agent to say:  This was reactive, we could no

6    longer implement our action plan because the motorcade was

7    moved.  Why?  Because of the breaches on the east front.  So

8    that cause and effect was not stipulated to, and we called a

9    witness to get that testimony in the record.

10            We've now called a witness, Mr. Wright, to get the

11   encouragement, that leadership piece of the story.  These

12   are -- this is relevant conduct under comment one.  Now, so

13   under the comment to the enhancement, Mr. Dunfee is not

14   required to volunteer or affirmatively admit relevant

15   conduct.  He can remain silent on it.  But if he falsely

16   denies or frivolously contests relevant conduct that Your

17   Honor deems to be true, then he should not get credit for

18   acceptance of responsibility.

19            And finally, I'll just --

20            **THE COURT:**  So are you suggesting that if a

21   defendant doesn't totally agree and acknowledge the

22   allegations as made by the government, but nonetheless does

23   admit that the crime was in fact committed and therefore is

24   guilty of that crime, you're saying that the person is not

25   entitled to the adjustment under those circumstances?

1          **MR. WIDMAN:**  If he remains silent on it or doesn't

2     argue counter to that relevant conduct as existing relevant

3     conduct under 1B1.3, if he says no, that didn't happen --

4     not just that it's not relevant, but no, that didn't happen,

5     I think Your Honor would be within his discretion to deny

6     that credit.

7              Finally, I'll just end and say a piece of this is

8     also expressions of remorse.  I'll note that this defendant

9     has a lack of remorse.  Prior to and after arrest, he made

10    numerous statements denying these charges, use of physical

11    force, which he denied at trial and continues to deny in his

12    papers.  And in fact, claimed to be a victim.

13         **THE COURT:**  So do you have authority that says

14    that if -- even if a person is acknowledging the elements of

15    a crime but is not prepared to acknowledge some of the

16    relevant conduct the government has in support of the

17    alleged commission of the crime, that because the person is

18    not willing to agree to the relevant conduct, that that

19    deprives them of the reduction?

20         **MR. WIDMAN:**  I would point the Court to comment

21    one of 3E1.1 of the guidelines.  At the end of that comment:

22    "A defendant who falsely denies or frivolously" --

23         **THE COURT:**  Let me see, which one are you talking

24    about?  You're talking about commentary?

25         **MR. WIDMAN:**  Yes, Your Honor.  Comment one, it's

1   the last paragraph of the comment beginning with "however."

2           **THE COURT:**  I'm trying to find what you're

3   referencing.  That's 1B1.1 you said?

4           **MR. WIDMAN:**  3E1.1.

5           **THE COURT:**  3E?

6           **MR. WIDMAN:**  Yes, Your Honor, relevant conduct is

7   described in section 1(b) --

8           **THE COURT:**  Let me find it.  3E --

9           **MR. WIDMAN:**  1.1.

10          **THE COURT:**  Okay.  You're referencing what

11  language now -- you said where it starts "however"?

12          **MR. WIDMAN:**  Yes, Your Honor, at the end of the

13  first comment:  "However, a defendant who falsely denies or

14  frivolously contests relevant conduct that the Court

15  determines to be true has acted in a manner inconsistent

16  with acceptance of responsibility."

17          **THE COURT:**  Okay.

18          **MR. WIDMAN:**  Thank you, Your Honor.

19          **THE COURT:**  Defense.

20          **MR. KIDD:**  Your Honor, on June 29th of 2023, Bill

21  Dunfee offered to plead to civil disorder.  This would have

22  been done at that point.  The U.S. Attorney rejected it on

23  July 26th, insisting on the 1512.  By that point in time,

24  when we made the offer to plead to civil disorder and not

25  the obstruction charge, the appellate decision on Fischer

1   had already come out.  That was April 7th, 2023.  It was

2   clear that this was going to be a real issue.  Most court

3   watchers --

4           THE COURT:  You don't have to convince me on that,

5   I totally agree with your assessment, that if the only

6   reason your client did not plead guilty was because of the

7   obstruction charge and considering what ultimately the

8   Supreme Court ruled in reference to that charge, I think

9   that obviously was a legitimate reason not to acknowledge

10  culpability regarding that.  And therefore, that would not

11  alone be a predicate or a basis for denying the reduction.

12          MR. KIDD:  And I appreciate that, Your Honor.  And

13  you mentioned --

14          THE COURT:  So I think the only issue here is

15  whether the government's position is correct, that there's

16  relevant conduct that he wasn't agreeing to, and therefore

17  because of that, he's not entitled to the reduction.

18          MR. KIDD:  Your Honor, again, with the

19  stipulations, we made full stipulations to both facts and

20  the elements of, and that the facts consisted and satisfied

21  the elements of civil disorder we made complete.  Here

22  today, it seems what the government's trying to argue is

23  because we contested a sentencing issue where we still

24  believe --

25          THE COURT:  You're saying a sentencing issue, what

1    are you referencing?

2         MR. KIDD:  Well, the role enhancement, that he did

3    not go out recruiting people, that he was not a leader.  To

4    me, their argument is that, well, you contested that, you

5    did not accept responsibility, in what is we believe a very

6    good faith argument that Mr. Dunfee had no control.  And

7    that we have case law that says that is --

8         THE COURT:  But I've -- I may be wrong --

9         MR. KIDD:  I get that.

10         THE COURT:  -- but I've ruled otherwise.

11         MR. KIDD:  I understand that.  And we could be

12    wrong, but that's the point.  In reading further in that

13    note, it says:  "But the fact that a defendant's challenge

14    is unsuccessful does not necessarily establish that it was a

15    false denial or frivolous."  That's where we are.  We

16    disagree with that enhancement.  We disagree with the

17    characterization that just speech that did subsequently --

18    you know, that preceded action is sufficient for that

19    enhancement.

20         THE COURT:  But the government's position is that

21    even though you may have a good faith basis for raising

22    that, if the Court rejects that position, then you are

23    not -- or your client's not fully accepting responsibility

24    for his conduct, because it is relevant conduct that he's

25    not agreeing to.

1        **MR. KIDD:**  And I would say the last clause in that

2    sentence says to the contrary:  "But the fact that a

3    defendant's challenge is unsuccessful does not necessarily

4    establish that it was either a false denial or frivolous."

5    And that is what is required to get where the government

6    wants to go, a false denial or frivolousness.  So it's not

7    there.

8        Your Honor, it sounds like you're very familiar

9    with the record from all the letters that we submitted, all

10   the times that we tried to say hey, let's just do this with

11   a 231 and be done with this.  We came here a month before

12   the trial date asking for a continuance because of the

13   precise issue of acceptance of responsibility.  It was right

14   after cert had been granted, and we asked this Court to

15   continue it so that we could -- if it came out the way that

16   we didn't think it was going to come out, that we could

17   resolve this with a plea.

18       Mr. Dunfee wanted to accept responsibility.  He

19   disagrees with a sentencing enhancement.  Your Honor, not

20   only do we think we should get two points -- which I think

21   there is an argument to get the third point, because we

22   think the government is wrongly withholding that third point

23   under 3E1.1(b).

24       So again, Your Honor, unless you have further

25   questions regarding the timeline, this just comes down to

1    legal advocacy in regard to the application of the

2    guidelines.

3        THE COURT:  And you say you're entitled to that

4    additional one point why?

5        MR. KIDD:  Well, again, if we look at the -- that

6    the government can only refuse that third point -- the

7    government can give that third point to avoid preparing for

8    trial, and permitting the government and the Court to

9    allocate their resources efficiently.  We gave them an

10   opportunity to reallocate their resources to avoid trial now

11   15 months ago, seven months before the stipulated trial.

12   Note six says that the government should not withhold such a

13   motion based on interests not identified in 3E1.1.  And that

14   is the issue of scarce resources and reallocation; in other

15   words, pleading right before trial.  We did everything we

16   could to plead this out well before trial.

17       THE COURT:  Okay, I think I understand.  If I need

18   to have you respond to the government, I'll do that.

19       MR. KIDD:  Thank you, Your Honor.

20       THE COURT:  Government counsel, what about the

21   fact that counsel says that if somebody in good faith takes

22   a position inconsistent with the relevant conduct the

23   government is relying upon, that that's not a sufficient

24   reason to deny the reduction?

25       MR. WIDMAN:  I think that depends on --

1          **THE COURT:**  I mean, because isn't it

2    conceivable -- I mean, I think -- and I ruled accordingly

3    regarding the role enhancement, that under the

4    circumstances, the evidence, in my view, clearly did show

5    that he took on a leadership position based upon the things

6    that he was saying to the crowd and the crowd's response to

7    him, and their subsequent actions consistent with that.  It

8    is my view that he did take on a leadership role.

9          But what if somebody, you know, does things that

10   the Court concludes did in fact amount to leadership

11   activity, but the person in good faith doesn't believe that

12   they in fact did do something that encouraged it?  I mean,

13   is that frivolous under the circumstances that we have here?

14         **MR. WIDMAN:**  No, Your Honor, I wouldn't argue it

15   was frivolous, I would argue that it's a false denial.  It's

16   the same denial that this defendant has made since he was

17   arrested, and two years later still to probation in February

18   of this year downplaying, minimizing his own conduct.

19         **THE COURT:**  We only previously talked about what

20   took place that day.  What are you saying happened after the

21   event that would indicate that he's not really fully

22   accepting responsibility?

23         **MR. WIDMAN:**  Yes, Your Honor,.  So in May of 2021,

24   months after January 6th, Mr. Dunfee tells his congregation:

25   We did nothing wrong on January 6th; there were many

1    patriots there; I can tell you we weren't going to let this

2    election be stolen.  Two years later, after he's arrested,

3    he publishes an article in the Wisconsin Christian News

4    where he goes on to say:  "I did nothing wrong.  I've been

5    targeted by the FBI.  There was no violence."  He makes a

6    statement on a podcast to the same effect, asking the

7    audience for help with his legal fees saying:  "I've done

8    nothing wrong.  I didn't interfere with law enforcement."

9    In fact, he goes so far to say:  "I helped prevent

10    barricades from being breached."

11         We engaged in plea negotiation with defense

12    counsel.  At that point, in this court, 14 other judges had

13    decided that 1512 obstruction is being applied in an

14    appropriate manner in these cases.  We decided to proceed

15    with trial when plea negotiations were unsuccessful.  Less

16    than a week prior to trial, once we have prepared six

17    witnesses --

18         **THE COURT:**  The fact that myself and others took

19    the position that we took in regards to whether we think

20    that was the right position or not, we're controlled by what

21    the Supreme Court ultimately decided.

22         **MR. WIDMAN:**  Of course, Your Honor.  But at that

23    point, we were prepared to proceed under the legal landscape

24    as it existed then, and we prepared for trial.  Six

25    witnesses we were going to call.  A week prior to trial,

1  after all this extensive trial preparation, Your Honor has

2  seen there are dozens and dozens of exhibits that were

3  prepared, clipped, enhanced.  Trial preparation was

4  extensive, and it is in our discretion to withhold that

5  other point.

6       THE COURT:  But he was -- it seems to me, he was

7  reasonably challenging having to either plead guilty or

8  stipulate to the obstruction charge.  And it was the

9  opposition to pleading guilty or -- or stipulating in

10  reference to that charge that was the impediment for him

11  entering a plea of guilty.

12       MR. WIDMAN:  And we did have those discussions

13  about having a fully stipulated bench trial, like the Court

14  had in Watson where everything was on the papers, that all

15  the elements are met, facts and elements meeting the 1512

16  standard, if in fact the Supreme Court were to rule in his

17  favor.  What has happened is that sentences are being

18  vacated and remanded to the district court.

19       THE COURT:  But were there not things that he was

20  alleging -- advocating besides the obstruction charge that

21  resulted in a modification of what originally the government

22  was proposing by way of stipulations?

23       MR. WIDMAN:  Yes, Your Honor, it was some of the

24  same objections that we've had to litigate here before Your

25  Honor about encouraging others, recruiting others.

1          **THE COURT:**  But were there any changes or

2     agreements to change anything regarding the stipulations

3     other than what was stipulated regarding the obstruction

4     charge?

5          **MR. WIDMAN:**  Defense counsel can correct me if I'm

6     wrong, but the same objections that existed during our

7     initial conversations continued through the trial about

8     encouragement and recruitment of others to breach

9     barricades.  That's why we called witnesses --

10          **THE COURT:**  But were never willing, as I

11     understand, to let him plead guilty to the other charges

12     other than just -- other than the obstruction?

13          **MR. WIDMAN:**  The most serious felony charge was

14     1512 obstruction, and that was what we --

15          **THE COURT:**  And you weren't willing to let him

16     plead unless he was pleading to that offense or at least was

17     stipulating to the facts regarding that offense?

18          **MR. WIDMAN:**  That's correct, Your Honor.

19          **THE COURT:**  Okay.  Defense, do you want to address

20     what government counsel raises in reference to your client's

21     post-event conduct, and why that conduct would indicate that

22     he's not and was not and has not, fully taken responsibility

23     for his conduct?  Because there is case authority that says

24     that someone's conduct that they engage in after the event

25     can prohibit them from receiving the reduction if what they

1    did after the event is not consistent with acknowledgement

2    of culpability.

3           **MR. KIDD:**  Your Honor, I think what I would say is

4    I think that proves too much.  I think what the U.S.

5    Attorney is saying in that situation is that there is

6    absolutely nothing Mr. Dunfee could have done to receive

7    acceptance of responsibility after he made statements before

8    counsel was involved, before anything; that those statements

9    in and of itself remove him from the realm of acceptance of

10   responsibility.  I don't think that's a decision that the

11   Court -- that would be appropriate for Mr. Dunfee or anybody

12   coming in and trying to resolve a matter where acceptance of

13   responsibility is a major factor in regard to moving forward

14   with plea negotiations, sentencing guidelines.

15           If statements made months afterward fully omit

16   that person have having the opportunity to receive

17   acceptance of responsibility, my understanding, as far as I

18   know, that since we have been representing Mr. Dunfee, he

19   has not been making public statements.  He has not been a

20   point person or challenging the wrongfulness of his plight

21   in any statement, either before the offer to plea while we

22   were on the case or after the stipulated trial.  So again,

23   if it's a situation where anybody who commits an offense

24   makes a statement denying their culpability, then -- or

25   denying the rightness of their prosecution and that person's

1    always denied acceptance of responsibility, then maybe

2    that's an argument.  But I don't think anybody -- any court

3    has ever gone there, where somebody cannot have acceptance

4    of responsibility if they made a statement after an offense.

5          Now, if after pleading they go back and deny and

6    say:  Yeah, I'm still being targeted, I'm still being

7    persecuted, that is when that applies is our argument.

8          **THE COURT:**  I'll let you respond, but government

9    counsel, what's your position on that, that a person can't

10   be denied the two-point reduction if after the event they do

11   or say things that are indicating their non-culpability, but

12   then subsequent to that they do in fact indicate their

13   willingness or their indication of culpability?  Does that

14   post-event conduct where they are saying things that are

15   inconsistent with accepting culpability, does that deny the

16   two-point reduction if subsequent to that they then admit

17   their willingness to accept culpability for their conduct?

18         Are there any cases that deal with that?  Because

19   counsel seems to be suggesting that -- and I would tend to

20   agree with you, that there were things that the defendant

21   did after the event that was not accepting responsibility

22   for his conduct in some degree.  But subsequently, it seems

23   to me in reference to the negotiations that were taking

24   place, that other than the obstruction count, he seems to

25   have been willing to acknowledge his culpability.  And

1    regarding the relevant conduct argument that you make, it

2    does seem to me that he was expressing or taking a

3    legitimate good faith position regarding that relevant

4    conduct, and at the same time was not denying that he was

5    culpable for the other crimes other than the obstruction

6    offense.

7            So do you have any case authority that contradicts

8    what defense counsel's saying, that under the circumstances

9    here, even though after the event he was saying things that

10   would clearly indicate he was not admitting his culpability,

11   but subsequently does, if I were to agree with the defense

12   position that he subsequently does acknowledge the conduct

13   other than the obstruction as having amounted to a violation

14   of the law?

15           MR. WIDMAN:  Your Honor, I cannot point the Court

16   at this moment to --

17           THE COURT:  Why don't you come up here so the

18   court reporter can hear you.

19           MR. WIDMAN:  I cannot point the Court to a

20   particular case that's on point with regards to Your Honor's

21   question.  Your Honor, I believe, is asking what happens

22   when somebody makes these statements and goes out and

23   publicly disputes the crime with which they've been charged.

24           THE COURT:  Right.

25           MR. WIDMAN:  And then later speaks to counsel and

1    rolls that back.  I think in those circumstances, acceptance

2    of responsibility is appropriate.  Here, we have a defendant

3    who continued to argue:  I was simply expressing my First

4    Amendment rights; this was mere speech, I wasn't encouraging

5    others -- these arguments were made at trial, and they've

6    been made here again today -- who does not agree that the

7    4C1.1 enhancement should not apply because arguing:  I was

8    not violent; my actions were not forceful, they were not

9    violent, they weren't on the level.  That's simply not true

10   based on the evidence in this case.

11         So we have those statements, the defendant's

12   arguments.  Whether or not the Court finds those to be

13   reasonable, demonstrably false, that's in the Court's

14   discretion.  The government would argue that they are.  I'll

15   also point the Court to the defendant's statement to

16   probation where he's quoted saying:  "The events of January

17   6th did not turn out as I expected.  My intentions were

18   solely to exercise my First Amendment right.  I sincerely

19   regret my actions of pushing into the bicycle racks and

20   interfering with Capitol police officers and their ability

21   to control the crowd.  My sincere apologies to any and all

22   law enforcement who felt threatened by my actions."

23         Your Honor, this is a weak apology.  This

24   defendant does not have the remorse consistent with

25   acceptance of responsibility.  This sounds more like "I'm

1  sorry you felt threatened" than "I'm sorry I threatened

2  you."  Thank you.

3        **THE COURT:**  I think it's a very close question as

4  to whether he's entitled to the two-point reduction.

5  However, it seems to me without some case authority

6  suggesting otherwise, that maybe human nature is such that

7  after someone engages in criminal behavior -- and you see it

8  happen all the time, there's a denial of having committed

9  the crime, but then subsequently after obtaining counsel or

10 having an opportunity to reevaluate the situation, decides

11 that they are in fact going to admit culpability and plead

12 guilty or resolve the case by way of a stipulated trial or

13 otherwise.  It seems to me that absent case authority

14 suggesting otherwise, that under those circumstances a

15 person is entitled to the two-point reduction.

16       And then the question becomes, in this situation

17 regarding the relevant conduct argument, whether the fact

18 that he took the position that he took, whether those were

19 reasonable positions, and therefore because they were

20 reasonable, does not deny him the right to receive the

21 two-point reduction.  And I would conclude that even though

22 it's my view that his position in reference to that relevant

23 conduct was not borne out by the evidence, I'm not prepared

24 to say that his position in that regard was totally

25 unreasonable.  And therefore, under the circumstances that

1    we have here where essentially he was acknowledging guilt of

2    the offenses he ultimately was found guilty of, but was not

3    willing to either agree to the stipulated facts or to agree

4    to the commission of the obstruction charge, I would have to

5    conclude that that was an appropriate position to take as

6    borne out by the ultimate decision made by the Supreme

7    Court.

8         And accordingly, even though I think it's a close

9    case, I would -- and I would say troubling, and it's

10   something that I will take into account in deciding what the

11   appropriate sentence is.  Because I think besides the issue

12   of whether an acceptance reduction is appropriate, I do find

13   it very troubling for somebody to convey to others that they

14   didn't do anything wrong and did not commit a crime.  And I

15   think it's especially troubling when a minister tells his

16   flock that he didn't commit a crime, and therefore gets

17   people -- because at least in one of the letters, I read

18   clearly one of his parishioners was saying:  Well, he didn't

19   do anything wrong, and he's being railroaded.  Obviously

20   that's troubling, because it undermines the credibility of

21   our justice system.  If we don't have a viable justice

22   system, we do have anarchy.

23        Nonetheless, despite that -- which, as I say, is a

24   factor I will take into account in deciding what the

25   sentence should be, I would conclude that he is entitled to

1   the two-point reduction, and therefore would grant that to

2   him.

3        In reference to the one-point reduction, again, it

4   seems to me that he was taking reasonable positions in

5   reference to the negotiations that were taking place about

6   what the stipulation would be.  And therefore to the extent

7   that the government had to expend additional resources in

8   addressing his desire in reference to what he was willing to

9   stipulate to, I would conclude that that is not the type of

10  expenditure caused by a defendant that precludes him from

11  the additional one-point reduction.

12       So over objection, I will award him that one-point

13  reduction, which means that the guidelines need to be

14  calculated indicating a one-point increase based upon my

15  determination regarding the role that he played, but with

16  the three-point reduction given to him.  Even though I

17  applied the four-point reduction regarding the role

18  involvement, that would only result in a one-point increase.

19  So we need to recalculate the guidelines based upon that.

20       **MR. WIDMAN:**  Your Honor --

21       **THE COURT:**  Any issue on that?

22       **MS. LUSTIG:**  No, Your Honor.

23       **THE COURT:**  Yes.

24       **MR. WIDMAN:**  Your Honor, I believe the one-point

25  reduction is upon the motion of the government.

1          **THE COURT:**  It is?

2          **MR. WIDMAN:**  Yes, Your Honor.

3          **THE COURT:**  Let me see.  You're right and I'm

4    wrong.

5          **MR. WIDMAN:**  It's that 3E1.1 section (b) there in

6    the middle.

7          **THE COURT:**  Section (b)?

8          **MR. WIDMAN:**  Yes, Your Honor.  If I may check the

9    guidelines calculation, because it's dependent on level 16

10   or greater.  So as calculated with the Court's enhancement

11   of the four points, we were at 17.  So at a level 16, it

12   would need to be then --

13         **THE COURT:**  Okay, I'm still trying to find that

14   language that says it has to be pursuant the government's

15   request.

16         **MR. WIDMAN:**  3E1.1 subsection (b).  And then:  "If

17   the defendant qualifies for a decrease under subsection

18   (a)" --

19         **THE COURT:**  How many lines down -- oh, I'm sorry,

20   if the defendant qualifies.  Okay.  Where is the language?

21   I'm trying to see where it says it has to be pursuant to the

22   government's --

23         **MR. WIDMAN:**  "If a defendant qualifies for a

24   decrease under subsection (a)" -- which the Court has found,

25   "and the offense level determined prior to the operation of

1    subsection (a) is level 16 or greater, and upon motion of

2    the government stating a defendant has assisted authorities

3    in the investigation, prosecution of his own misconduct," et

4    cetera.

5         **THE COURT:**  Defense.

6         **MR. KIDD:**  Yes, Your Honor, that is an accurate

7    statement of the rule itself.  What we referred was note six

8    of the guidelines.  If you look at the paragraph, the middle

9    paragraph, it says:  "Because the government is in the best

10   position to determine whether the defendant has assisted

11   authorities in a manner that avoids preparing for trial, an

12   adjustment under subsection (b) may only be granted upon a

13   formal motion by the government at the time of sentencing."

14   But it goes on to say in that last sentence:  "The

15   government should not withhold such a motion based on

16   interests not identified in 3E1.1."

17        They give an example, such as whether the

18   defendant agrees to waive his or her right to appeal.  The

19   consideration in subsection (b) is that:  "Upon motion of

20   the government stating that the defendant has assisted

21   authorities in the investigation or prosecution of his own

22   misconduct by timely notifying authorities of his intention

23   to enter a plea of guilty" -- we did that in June of '23 --

24   "thereby permitting the government to avoid preparing for

25   trial, and permitting the government and the Court to

1    allocate the resources efficiently."

2            So our argument is that under note six, that last

3    paragraph, that the government indeed is withholding such a

4    motion based on interests not identified in 3E1.1, because

5    we did timely notify and they could have reallocated their

6    resources.  We could have been done with this months ago.

7            **THE COURT:**  Okay.

8            **MR. WIDMAN:**  Your Honor, if I could respond

9    briefly?

10            **THE COURT:**  Yes.

11            **MR. WIDMAN:**  Your Honor, the government would

12    dispute several characterizations, primarily the arguments

13    made by defense counsel about the timeliness.  I think what

14    defense counsel -- what he's referring to is a plea to a

15    231, which at the time was not a plea to the most proveable,

16    highest felony offense the defendant was charged with.  Now,

17    it might be what he's being sentenced on today, but it's

18    counterfactual to say we could have handled this back in

19    June.

20            **THE COURT:**  But you're talking about the

21    obstruction charge?

22            **MR. WIDMAN:**  Correct, Your Honor.

23            **THE COURT:**  But how can I hold that against him

24    when he's not prepared to plead guilty or stipulate to the

25    facts regarding that offense considering what the Supreme

1    Court ultimately concluded?

2          **MR. WIDMAN:**  So he's not receiving a higher

3    guidelines calculation for this very reason, because he's

4    not being sentenced on that charge.  The government still

5    had to prepare to try the defendant on that charge given the

6    legal landscape as it existed at the time where Fischer was

7    a viable option.

8          **THE COURT:**  Yeah, but you wouldn't have -- I mean,

9    ultimately at the time you may have had a good faith basis

10   for proceeding against him on that charge, but ultimately

11   the Supreme Court held that that charge did not in fact

12   cover the conduct in question.  So how can I hold that

13   against him?

14         **MR. WIDMAN:**  It is the -- so the timeliness

15   argument, what the government would argue is a full trial

16   preparation occurred in this case, six witnesses were

17   prepared.  It was on the eve of trial, less than one week

18   prior, that the defendant agreed to some stipulations for

19   which the government has now agreed at sentencing to dismiss

20   some additional counts.

21         **THE COURT:**  But he was -- as I understand it, he

22   was agreeing to move forward before that because of the

23   insistence that he plead guilty to the obstruction charge.

24               Well, I've got to give my staff a lunch break, so

25   we'll break until 1:30, and we'll come back and continue

1    with this discussion.

2         **MR. WIDMAN:**  Thank you, Your Honor.

3         (Recess taken at 12:30 p.m.)

4         (Back on the record at 1:31 p.m.)

5         **THE COURT:**  Defense, do you have something that

6    supports your position that the government doesn't have to

7    make a motion in order for your client to get the one point

8    under section (b)?

9         **MR. KIDD:**  Your Honor, we did research the issue

10   during the lunch hour.  We found something on point

11   addressing it one way or the other in the D.C. Circuit.  We

12   did find a case -- and we understand this is not binding

13   upon this Court.  It's a district court case out of the

14   District of New Mexico, U.S. vs. Villaba, 86 F.Supp.3d 1252,

15   where they basically said the government abused its

16   discretion in not moving for a 3E1.1(b) adjustment.  And

17   that was a plea after a motion to suppress, and the court

18   ordered the government to move for that motion.  Other

19   options that decision said, the court could sua sponte vary

20   in regard to that one point.

21        So in regard to case law in the D.C. Circuit, we

22   found nothing addressing the issue.  We continue to focus

23   our argument on the note, and the fact that the note says it

24   should not be -- the government should not withhold such a

25   motion based on interests not identified in 3E1.1.  And

1   that, again --

2          THE COURT:  But is that referencing (a) or (b) or

3   both?

4          MR. KIDD:  Well, there's only -- I think it would

5   have to reference (b), because --

6          THE COURT:  What page are we on now?

7          MR. KIDD:  3E1.1.  The note that I referred to was

8   the middle paragraph of note six, the last sentence.  And in

9   (b), it talks about:  "If the defendant qualifies for a

10  decrease under subsection (a)" -- which the Court has

11  addressed, "and the offense level determined prior to the

12  operation of subsection (a) is level 16 or greater" -- it

13  would be 17, as Mr. Widman stated already.  And then it goes

14  on to say:  "And upon motion of the government stating that

15  the defendant has assisted authorities in the investigation

16  or prosecution of his own misconduct by timely notifying

17  authorities of his intention to enter a plea of guilty,

18  thereby permitting the government to avoid preparing for

19  trial, and permitting the government and the Court to

20  allocate their resources efficiently."

21          So our argument is those are the reasons that you

22  make the motion.  You should not withhold that motion if

23  indeed we gave them that opportunity -- which we did

24  multiple times.  And even the U.S. Attorney keeps on saying

25  that it was a week before.  Your Honor, we were in this

1    courtroom in December a month before, and we asked for a

2    continuance for this precise issue.  The government did not

3    need to prepare.  And we asked Mr. Widman to join in that

4    motion to continue.  He refused to join it.  Not only did he

5    refuse to join it, he opposed that motion.  To now not make

6    that motion is an abuse of discretion.  He's making it

7    because our client refused to plead to a count that he's not

8    guilty of.

9         THE COURT:  Okay, and I've agreed with you on

10   section (a).  I'm just trying to see what language you're

11   relying upon that says that I can overlook the government's

12   failure to file a motion and grant the additional one point.

13        MR. KIDD:  Your Honor, you're not going to see

14   that language precisely there, okay.  What you will see in

15   that note is that the government should not withhold it.  We

16   would argue that --

17        THE COURT:  Where is that?

18        MR. KIDD:  Second paragraph, note six.

19        THE COURT:  Second paragraph, note six, okay.

20        MR. KIDD:  Last sentence.

21        THE COURT:  Maybe my eyes are getting bad, I just

22   don't see it.  I just don't see language consistent with

23   what you're indicating.

24        MR. KIDD:  Again, I think the argument is that the

25   government moves for that -- should move for that final

1  point when -- and this is the condition, when the defendant

2  timely notifies authorities of his intention to enter a plea

3  of guilty, thereby permitting the Court to avoid preparing

4  for trial, and permitting the government and the Court to

5  allocate their resources efficiently.  So that's when the

6  government should move under 3E1.1(b).

7          Our argument is that that is exactly what we

8  gave -- what we did.  We gave them a plea to the civil

9  disorder in June of '23.  We reiterated it.  We came back in

10  December after cert was granted and said:  Join us in asking

11  the Court to continue this so we can see what happens with

12  Fischer.  That was part of the colloquy that we had in

13  regard to the acceptance of responsibility originally, is

14  that -- that's why we wanted it continued, was so that we

15  could get Fischer and we could get the full acceptance of

16  responsibility.

17          **THE COURT:**  But how do you reconcile what the

18  comment says down at the bottom of page 282, which is the

19  second paragraph of comment six, which says:  "Because the

20  government is in the best position to determine whether the

21  defendant has assisted authorities in a manner that avoids

22  preparation for trial, an adjustment under section (b) may

23  only be granted upon a formal motion of the government at

24  the time of sentencing."

25          **MR. KIDD:**  Your Honor, again, I would say there is

1    some conflict between those two sentences, okay.  Because it

2    then goes on to say the government should not withhold such

3    a motion.  So is that --

4         **THE COURT:**  Excuse me, should not, I'm missing

5    that, I can't find it.

6         **MR. KIDD:**  It's the very next sentence.

7         **THE COURT:**  Maybe you're looking at a different

8    version than what I have.  Are you looking at the --

9         **MR. KIDD:**  I am looking at the 2021 --

10        **THE COURT:**  -- the 2023 version?

11        **MR. KIDD:**  -- version, but I did not think that it

12   had been changed.  I am not looking at the 2023 version, I'm

13   looking at the 2021, but I'm not --

14        **THE COURT:**  The next sentence, which is a full

15   paragraph, doesn't say anything consistent with what you're

16   just indicating.  I'll look at the other version.

17        **MR. KIDD:**  Your Honor, may I approach with my

18   guidelines just so you can see?

19        **THE COURT:**  Yeah, I have the '21 version.

20        **MR. WIDMAN:**  Your Honor, I'm looking at the

21   2018 --

22        **THE COURT:**  I'm not seeing that.

23        **MR. WIDMAN:**  I'm looking at 2018, and it's there.

24        **THE COURT:**  2018?

25        **MR. WIDMAN:**  2018 it is there.  2023 it is not

1    there.

2              **THE COURT:**  You're talking about the statute?

3              **MR. WIDMAN:**  The comment to the guidelines under

4    3E1.1., I'm not seeing it in 2023.

5              **THE COURT:**  And you're referencing what?

6              **MR. WIDMAN:**  So 3E1.1, comment six.  This clause

7    defense counsel is referring to is present in the 2018

8    version of the guidelines, but not in 2023.

9              **THE COURT:**  Or in 2021?

10             **MR. WIDMAN:**  Or in 2021.

11             **THE COURT:**  I'm looking at 2021, it's not there,

12   and it's not in 2023.

13             **MR. KIDD:**  Your Honor, I have the 2021 edition.

14             **THE COURT:**  I have the 2021 edition.

15             **MR. KIDD:**  Your Honor, it would appear that it was

16   changed.  I do have it in the 2021 edition which, of course,

17   would have been in effect at the time of Mr. Dunfee's

18   conduct.

19             **THE COURT:**  I don't even see it in -- maybe I'm,

20   again, missing it, but I don't even see it in the 2021

21   edition.

22             **MR. KIDD:**  May I approach in regards to the 2021?

23             **MR. WIDMAN:**  I have 2018.  Do you have 2023?

24             **THE COURT:**  I have the 2021 version also.

25        (Brief interruption)

1      **THE COURT:**  So there's a difference between what

2   you're showing me and what I have, which I have both the

3   2021 and the 2023 version of 3E1.1, comment six.  I don't

4   see the language that's in your version in my version,

5   either the '21 version or the '23 version.  I don't see it.

6   I don't know, one of the editions is wrong, I guess.

7      **MR. KIDD:**  It's peculiar.

8      **THE COURT:**  Yeah, I don't know.

9      **MR. KIDD:**  All I can say is this is the 2021

10   edition it states, you know, the sentencing guidelines.

11      **THE COURT:**  Who produces that?  Because mine is

12   directly from the sentencing commission, they send it to us.

13      **MR. KIDD:**  The United States Sentencing Commission

14   is what it says.

15      **MR. WIDMAN:**  There may very well have been an

16   update to revise the guidelines --

17      **THE COURT:**  Okay, talk to me.

18      **MR. WIDMAN:**  I'm sorry, Your Honor.  There may

19   very well have been a revision to the guidelines that

20   occurred during that year removing this language.  But Your

21   Honor, it does not appear in the current 2023 guidelines

22   manual.

23      **THE COURT:**  Yeah, it's not there.

24      **MR. KIDD:**  We would agree it's not in the '23

25   guidelines.  We would still state that the 2021 would be in

1     effect at the time of the offense.  Again, it's a note.  We

2     all understand that notes are not binding in the same way

3     that the guidelines themselves are binding.  I do think the

4     argument is there in the manual that was in effect at the

5     time of Mr. Dunfee's offense conduct.

6             THE COURT:  I guess as to which version applies,

7     it seems to me I couldn't conclude that it's the version at

8     the time of his arrest -- or at the time of the commission

9     of the crime, because the events that would then lead up to

10    whether he's entitled to the reduction would obviously have

11    to occur at the time of his sentencing.  And if the prior

12    version is no longer in effect and it's the new version

13    that's in effect at the time of the sentencing, then I think

14    it's the new version that would apply.

15            MR. KIDD:  And I understand that logic, Your

16    Honor.  We would just note our disagreement for the purpose

17    of the record.

18            THE COURT:  Okay.  Well, I would have to conclude,

19    despite what I was about to rule based upon the government's

20    objection, that I'm not entitled to give an additional

21    one-point reduction because the government has not made a

22    motion that I do so.  So I'd have to deny that request, but

23    I will, for the reasons I previously indicated, require that

24    he be given the two-point reduction.

25            Are there any other issues now at this point

1    regarding the guidelines?

2           MR. KIDD:   Only one, and that's going to be very

3    brief.

4           THE COURT:   Okay.

5           MR. KIDD:   That goes to refusing to give the

6    4C1.1, the zero-point offender reduction in regard to the

7    situation.   Just briefly, our argument would be obviously we

8    know now that the Court found that he has an aggravating

9    role.   In and of itself, that's sufficient for the Court to

10   rely on denying the 4C1.1 reduction.   For purpose of

11   argument, what our argument would have been without that is

12   that the requirement of violence was not met or threats of

13   violence was not met.

14          One thing we do want to correct in the record,

15   because I think it's been said by the government multiple

16   times, that our client has denied making physical contact.

17   We actually agreed to that plus three specific offense

18   enhancement, so our client clearly has not denied physical

19   contact here.   We fully accepted that, we're not challenging

20   that.   Our client acknowledges that, that the contact of him

21   pushing constitutes that.   Our argument is that physical

22   contact is not the same as violence.   Again, there's not a

23   whole lot of actual case law out of the D.C. Circuit

24   regarding this.   There have been some district court cases

25   that have been mentioned.

1          Most of them seem to have adapted -- or adopted as

2    a definition of violence Black's Law definition of 2019 --

3    this is found in Yang and some others, which is that the use

4    of physical force -- and this is how violence is defined:

5    The use of physical force usually accompanied by fury,

6    vehemence, outrage and especially physical force, but

7    physical force unlawfully exercised with the intent to harm.

8          So our argument -- again, recognizing that the

9    finding on the aggravating role is sufficient, but we still

10   want to make the argument that if that would not have been

11   found, that he should have received this reduction.  Because

12   while he engaged in physical contact, he did not engage in

13   violence or threats of violence.  Obviously we know that

14   there were conditional statements that Mr. Dunfee said, we

15   know that.  And we know the government will say -- and that

16   that could be construed as being threats of violence.

17         We would say what that should be construed as is

18   exactly what happened, is Mr. Dunfee using his back, using

19   parts of his body to move barriers, but not being violent

20   toward anyone.  Not punching, not kicking, not even

21   personally touching.  His contact was indirect -- which,

22   again, is sufficient for the physical contact.  But that

23   would be our argument under the 4C1.1 that we just want to

24   continue to present to the Court, recognizing that, again,

25   the aggravating role provides another reason to deny.  But

1  we do not think that violence or threats of violence were

2  sufficiently proved that Mr. Dunfee should not have received

3  that reduction.

4            **THE COURT:**  Government.

5            **MS. BOLAS:**  Thank you, Your Honor.  We would agree

6  with defense counsel that 4C1.1, the defendant is no longer

7  eligible for that reduction under 4C1.1(a)(10) because of

8  the aggravating role.  However, we also believe that the

9  defendant is not eligible for the reduction due to

10 4C1.1(a)(3), and that's the violence or credible threat of

11 violence.

12         To begin with, Your Honor, the defendant used

13 violence.  On two separate occasions, he pushed through

14 barricades to try and get to the U.S. Capitol building.  And

15 Your Honor found the defendant to be using force, and to be

16 physically violent at trial.  To quote Your Honor during

17 trial:  "And the fact that he used force to try and get past

18 the police so he could get close to the building."  Your

19 Honor also said:  "He is clearly forcibly acting against the

20 police."

21         And then, again, Your Honor said:  "But here, I

22 just don't know how you can conclude when somebody travels

23 all the way from Ohio with the intent of stopping the

24 Electoral College vote from occurring, they get here, they

25 get on a megaphone and rile up the crowd in reference to

1    going to the building and taking the House if their desired

2    result is not achieved, and then engage in actual physical

3    violence to get past police who are clearly there to try and

4    stop them from gaining access to grounds and also to the

5    Capitol itself."

6         Your Honor has found violence for the 4C1.1 such

7    that the 4C1.1 reduction does not apply in similar cases:

8    United States vs. Arthur Reyher, et al, that's 23-cr-138.

9    This was a situation in which the two defendants, Mr. Reyher

10   and his wife, pled to the 231 offense for their engaging in

11   what the government's often referred to as the heave-ho

12   pushing in the tunnel.  And Your Honor concluded:  "If you

13   are cognizant of the fact that the police are seeking to

14   inhibit the movement of a crowd and you participate in that,

15   obviously the only way you're going to get past police --

16   since they're not permitting you to do so, the only way

17   you're going to get past them is through violence.  You

18   can't, you know, it seems to me, take the position:  I did

19   not intend to engage in violence, when the objective of

20   trying to get where you wanted to go would necessitate the

21   use of violence to accomplish that objective."  And that's

22   exactly what the defendant was doing here, Your Honor.

23        We'd also say that, quite frankly, the defense has

24   not really said anything about credible threats of violence.

25   I know this has been an issue at trial and here today, that

1    this was political hyperbole.  He said -- and I'm quoting

2    here:  "You can fight us," as he pushed through the

3    barricades the second time.  He also told officers:  "For

4    safety's sake, get us to the steps."  Whose safety?  It was

5    the officers' safety he's referring to.  And then finally,

6    Your Honor, he also said:  "Mr. Police Officers, we want you

7    to understand something.  We want you to understand

8    something.  We want Donald Trump, and if Donald Trump is not

9    coming, we are taking our House."  In these instances, he's

10   directly by name threatening the police officers.  And

11   that's not to say anything of his other violent -- or his

12   other credible threats of violence to the crowd.

13            Finally, Your Honor, we'd just note briefly that

14   Yang is not on point.  In Yang, the defendant grabbed an

15   officer's wrist briefly, and then grabbed a baton as he was

16   falling away from the officer, as I understand it, holding

17   someone back.  And we'd also note that in Yang, there's no

18   evidence, I believe, of anything he had said to officers, so

19   none of the sort of credible threats of violence that we

20   have in this case.

21            So for that reason, we find -- we'd also note that

22   another judge in this district for Mr. Wright, when

23   sentencing him, found that the barricade pushing was

24   violent.  So we'd just ask that Your Honor find that 4C1.1

25   is not applicable based on (a)(3) as well as (a)(10).  Thank

1    you.

2         **THE COURT:**  Well, I think the ruling that I made

3    earlier, which addresses subsection (10), that in and of

4    itself would preclude this reduction applying.  But I would

5    agree with the government, for the reasons indicated, that

6    section (3) also precludes that reduction applying.  Because

7    it is my view that when the police are obviously seeking to

8    try and protect the United States Capitol, and they set up a

9    barrier with fencing, and if somebody is pushing against

10   that fencing in order to get past them, it seems to me the

11   only way you accomplish that is through violence, which is

12   what occurred.  And so I would conclude that for those two

13   reasons, he's not entitled to that reduction.

14         So the reduction he's entitled to, based upon my

15   rulings, are a two-point reduction from what was previously

16   indicated based upon my determination about the four-level

17   increase minus the two level decrease.

18         Anything else regarding the guidelines?

19         **MR. WIDMAN:**  Your Honor --

20         **THE COURT:**  And has probation figured out what the

21   guideline would be based upon my rulings?

22         **MS. LUSTIG:**  Yes, Your Honor.

23         **THE COURT:**  So the offense level would be now what

24   level?

25         **MS. LUSTIG:**  The total offense level would now be

1    15 with a guideline range of imprisonment of 18 to 24

2    months, and a fine range of $7,500 to $75,000.

3         THE COURT:  Okay, thank you.  Allocution from the

4    government.

5         MR. WIDMAN:  Yes, Your Honor, thank you.  Your

6    Honor, the Court has found that this defendant, William

7    Robert Dunfee, was a leader on January 6th during the attack

8    on the United States Capitol; a violent attack that forced

9    the interruption of the certification of the 2020 Electoral

10   College vote, threatened the peaceful transfer of power

11   after an election, injured more than a hundred police

12   officers, and resulted in over $2.9 million in losses.

13         I'd like to provide the Court with a brief summary

14   of the defendant's conduct preceding, during and following

15   January 6th.  I want to show the Court a selection of

16   exhibits consisting of still images and videos.  We've

17   watched some of these already this morning, I'll show you a

18   few more.

19         THE COURT:  Okay.

20         MR. WIDMAN:  And finally, I will discuss why the

21   3553 factors -- which -- how they apply, and why a departure

22   or a variance of 48 months incarceration is appropriate

23   given the facts of this case.

24         THE COURT:  Okay.

25         MR. WIDMAN:  In December 2020, the defendant told

1   his congregation:  "We haven't given them a reason to fear

2   us," referring to elected officials.  He then asked

3   rhetorically:  "You settle your differences at the ballot.

4   How'd that work out for us?"  Ominously he answered:  "It's

5   not over," referring to the 2020 election, and asked his

6   congregants to join him in Washington, D.C. on January 6th.

7   Clearly the defendant thought that democratic means had

8   failed, and that he needed to take matters into his own

9   hands.

10          As early as 9:25 on January 6th a.m., the

11   defendant was located on a raised flowerbed on the east

12   front of the Capitol grounds where he spoke to a crowd

13   gathered there through the megaphone.  He told the crowd

14   that the election had been stolen, that today was the day

15   that elected officials have to realize that we, referring to

16   the crowd, are no longer playing games.  He started a

17   #StopTheSteal chant, and stated that elected officials

18   needed to fear us.

19          (Video played)

20          MR. WIDMAN:  One way or another, through fear,

21   intimidation and ultimately physical violence with police

22   officers, the defendant was set on interfering with the

23   certification and persuading as many others as he could to

24   his cause.  At approximately 1:45 a.m., one of the

25   defendant's associates, which is referred to as Associate

1    One in the government's sentencing materials, approached

2    members of the Proud Boys who had gathered on the east

3    front.  Associate One can be heard speaking with these

4    members using phrases like:  "Take that building."

5        At approximately 11:47, Associate One returned to

6    the defendant's location by the flowerbed, and then brought

7    the defendant to meet with members of the Proud Boys.  While

8    it is unknown what was said between the defendant and

9    members of this group, during the trial of Mr. Ethan

10   Nordean, a Proud Boys member Travis Nugent testified he was

11   approached by Associate One, identified Associate One by his

12   distinctive hat, and asked for assistance in breaching the

13   barricades, but ultimately Proud Boys leaders declined this

14   request.

15        As the Court heard this morning, this mirrors the

16   account of Mr. Wright, who was located by one of the

17   defendant's emissaries and also asked to breach barricades.

18   Immediately after meeting with the Proud Boys, the defendant

19   returned to the flowerbed with his bullhorn.  At 11:55 a.m.,

20   the defendant asked the crowd:  "What is the purpose of

21   these gates right here?  To keep you away from our House,"

22   foreshadowing his orchestration of not one, but two breaches

23   of the east front barricades.

24        This is Exhibit 301A, which the Court saw this

25   morning.  Would the Court like to see that exhibit again?

1          **THE COURT:**  Yes.

2      (Video played)

3          **MR. WIDMAN:**  As the Court heard in Exhibit 301A,

4      an individual in the crowd calls out to the defendant:  "We

5      should take it," to which the defendant responds:  "We're

6      going to, we're going to, we intend to take it."  For

7      context, Your Honor, the defendant told this to the crowd

8      before former President Trump's speech.  The defendant

9      already had a plan to breach gates and take the Capitol

10     building.

11         At approximately 1:10 p.m., former President

12     Trump's speech was broadcast by means of sound application

13     to the crowd on the east front.  Thereafter, the defendant

14     resumed his orations.  At 1:21 p.m., the defendant directly

15     addressed Capitol police officers telling them:  "If they

16     let us down," referring to members of Congress, "we are

17     going to our House.  We are going to our House," referencing

18     the crowd pushing past those officers and taking over the

19     Capitol building.

20         At 1:26 p.m., the defendant called for

21     reinforcements from the east front to go to the other side

22     of the Capitol, the west front, stating:  "Reinforcements

23     around back.  If you are able to move around back, they need

24     some support around back."  At that time, rioters were

25     violently fighting police officers for control of the

1    barricade on the west front.  As a ground commander on the

2    east front, the defendant encouraged others in his crowd to

3    go to the other side and join the fight.

4         One rioter recalled -- as one rioter, Clay Norris,

5    recalled, the defendant had brought an entire congregation

6    of church followers with him up on the Hill, and the

7    defendant had as many as 40 people with him under his

8    command.  The defendant may dispute these facts.  However,

9    what cannot be disputed is that many in the crowd were

10   listening and spurred into action by the defendant's words.

11   As the Court has found this morning, he did enjoy a

12   leadership role and was in control of others on that date.

13        At 1:30 p.m., the defendant told his audience:

14   "Donald Trump is leading the crowd," ostensibly in a march

15   to the Capitol.  And the defendant started a chant of:

16   "Fight for Trump," which many in the crowd began to repeat.

17        **THE COURT:**  One moment.

18      (Discussion off the record)

19        **THE COURT:**  Sorry.

20      **MR. WIDMAN:**  Yes, Your Honor.  At approximately

21   1:35, the defendant directly addressed Capitol police

22   officers stating:  "We want you to understand something.  If

23   Trump isn't coming, we're taking our House.  Give us Trump

24   or give us our House."

25      (Video played)

1          **MR. WIDMAN:**  The defendant wanted rioters to

2     physically take over the Capitol, even if that meant

3     fighting police officers.  He was ready, and he had mentally

4     prepared the crowd, at that point, he had control over to

5     breach barricades.  This fact was made even more clear by

6     Mr. Associate One's statements on a podcast made two days

7     after the Capitol riot.  Now, this is attachment D to the

8     government's sentencing memo, which Your Honor heard this

9     morning.

10         Would Your Honor like to hear it again?

11         **THE COURT:**  Yes.

12     (Video played)

13         **MR. WIDMAN:**  As the Court heard from Associate

14    One, these people were looking for a leader.  And as the

15    Court has recognized, he was one.  He stood on that

16    flowerbed and pumped them up for hours.  When it was time to

17    knock the gates over, they were ready, ready to interfere

18    with law enforcement in the midst of a civil disorder.

19         At approximately 1:45, as shown in numerous

20    exhibits at trial, the defendant did in fact push barricades

21    on the east front against police officers.  These officers

22    were protecting the Capitol building itself, but also

23    members of Congress and the vice president gathered inside

24    as well as countless staff who just worked there, like any

25    other day.  The Capitol police were protecting these people

1    from the mob on the east front that had been whipped into a

2    frenzy by the defendant; a mob which, for the first time on

3    the east front of January 6th, had become violent.  And the

4    defendant was at the very center of that effort.

5         (Video played)

6         **MR. WIDMAN:**  As the Court can hear in this

7    exhibit, others in the crowd cheered on the defendant and

8    his wrecking crew saying that the gates had been breached

9    and hold the line, just the like defendant had said moments

10   before.

11        The defendant had a goal to interfere with police

12   officers and breach barricades, but he had help.  The Court

13   heard this morning from Mr. Wright.  According to

14   Mr. Wright, the defendant told him and five other men that

15   they should spread themselves out across the metal fencing

16   and engage in a coordinated effort to push against police

17   officers and breach barricades.  According to Mr. Wright,

18   the defendant advised him and these five other men that the

19   signal to the group to begin pushing against barricades

20   would be a prayer.

21        During the first breach, the defendant was one of

22   the handful who actually did break through into the

23   restricted area.  Capitol police officers like Lieutenant

24   VanBenschoten, who was present this morning in court, were

25   heroic in their efforts to hold back the mob.  They managed

1  to resecure barricades and marshal rioters, like the
2  defendant who had entered the restricted area, to return
3  back behind the line.

4         After the defendant returned behind the
5  barricades, the defendant would not be deterred in his goal
6  to take the Capitol, even after breaching barricades and
7  entering the restricted area.  As shown in Exhibit 303, the
8  defendant attempted to negotiate with police officers to let
9  the crowd past the barricade line.  These are the same
10  officers who had just been attacked, and whose job it was to
11  protect the Capitol and those inside.  Like they would ever
12  let that happen.

13        During this period, the defendant held himself out
14  to others in the crowd as the crowd's representative.  And
15  the evidence shows that others in the crowd asked him to
16  speak on their behalf with police.  One interaction with a
17  police officer in riot gear, the defendant threatened:  "We
18  will push if we've got to push," telegraphing his intent to
19  physically breach barricades again.  The defendant continued
20  ominously telling another officer:  "For safety's sake, let
21  us to the steps."  Whose safety, you might ask?  The police
22  officers' safety, of course.  To the defendant, everyone on
23  this side of the fence is listening to me, and you police
24  officers over there, you should start listening to me, too.
25  If you value your safety, you'll comply with my orders, not

1    the other way around.

2              Sure enough, at approximately 2:00 p.m., as the

3    Court saw at trial, the defendant pushed against barricades

4    on the east front against officers for a second time.

5         (Video played)

6         **MR. WIDMAN:**  The defendant had interfered with law

7    enforcement in the midst of a riot again.  This time the

8    Capitol police, vastly outnumbered, were unable to resecure

9    the line, and the mob rushed the building.  Your Honor could

10   see in that video officers retreating.

11             Words are powerful evidence in this case.  And as

12   the Court has found at trial, the defendant's actions were

13   more powerful evidence of his corrupt intent.  The defendant

14   was one of the first rioters to enter the restricted grounds

15   during the second breach.  He was immediately met by an

16   officer in riot gear when he entered the restricted area.

17   This officer put his hands on the defendant to try to stop

18   him from advancing further.  The defendant sidestepped this

19   officer twice.  As the defendant advanced across this east

20   plaza area where the vice president's motorcade had been

21   parked minutes beforehand, he turned to the crowd, raised

22   his arms above his head in victory walking backwards towards

23   the building.

24             The defendant proceeded up the stairs to a barrier

25   chain where an improvised police line had formed.  Less than

1    10 minutes afterwards, the mob overwhelmed officers on the

2    steps and marched up to the Rotunda door.  The defendant was

3    very near the front of the mob, and his interference with

4    law enforcement was not over.  The defendant was at the

5    front of a group that approached the Rotunda doors.  Going

6    to the steps to protest was never the sole aim, otherwise he

7    would have stopped there and done just that.  Continued

8    interference and preventing the certification was what the

9    Court found at trial.

10        (Video played)

11        **MR. WIDMAN:**  As the Court saw in this video, the

12   defendant was pushed back by a police officer, but he

13   continued to press forward to the Rotunda doors.  There, he

14   tried the door, it was locked.  He turned to the crowd

15   relaying this information.  The defendant remained near the

16   Rotunda doors observing other rioters trying to break

17   windows there.  There, the defendant and others were pepper

18   sprayed by law enforcement, who were trying to do anything

19   they could to deter rioters from getting inside, including

20   the defendant, who had repeatedly thwarted, threatened and

21   interfered with law enforcement.

22        The government has not been able to locate

23   evidence that the defendant ever entered the Capitol

24   building on January 6th.  But he didn't need to, he had

25   accomplished his goal of obstructing, impeding, delaying the

1    certification of the election, and doing so through this

2    civil disorder.  Congress had recessed, the vice president

3    had been taken to a secure location.  At that point,

4    certification was impossible.

5         (Video played)

6         **MR. WIDMAN:**  As the Court has heard, the defendant

7    addressed a rioter who had just been inside the Capitol

8    building, asking the rioter:  "Did you get in?" to which the

9    rioter replied:  "We did our jobs, we shut them all down."

10   The defendant responded:  "Hallelujah, mission

11   accomplished."  Mission accomplished, police officers had

12   been bulldozed by the defendant's wrecking crew, and the

13   certification had been obstructed.  The defendant remained

14   in the restricted area of the Capitol building for at least

15   an hour after that 2:00 o'clock breach celebrating.  At one

16   point, the defendant high-fived someone in a gas mask who

17   was leaving the building, which at that time was overrun.

18        Months after the defendant returned to Ohio, he

19   expressed pride in his actions to his congregation.  In

20   May 2021, the defendant stated:  "We show up January 6th to

21   the Capitol building, right, to let it be known that we are

22   not going to stand back and let this election be stolen."

23   The defendant expressed zero remorse about his interference

24   with police officers or having incited a mob on the east

25   front to take over the building.  The defendant stated:  "I

1    can tell you, having been there, we were surrounded by

2    patriots, many, many, many patriots.  And I thank God they

3    showed up to let it be known you're not stealing this

4    election."

5           In November of 2022, almost two years after the

6    attack on the Capitol, one month after being arrested, the

7    defendant wrote an article for an online publication

8    entitled Pastor Bill:  The Defendant Targeted by the FBI.

9    In this article, the defendant falsely claimed that he did

10   not cause civil discord, did not obstruct official business,

11   and contrary to the evidence, claimed he actually prevented

12   the Capitol barricades from being broken.

13          On November 27th, 2022, the defendant posted an

14   almost identical article to the one described to his

15   church's Facebook page except that he solicited donations

16   for his legal fees through his church's website.  The

17   defendant also recorded a fundraising video which was posted

18   to a podcast website.  In that video, the defendant doubled

19   down on claims that he was solely at the Capitol protesting.

20          In November of this year, 2024, the defendant was

21   interviewed by U.S. Probation in advance of sentencing.

22   While he acknowledged his regrets of actions of pushing bike

23   racks into police officers and interfering with Capitol

24   police and their ability to control the crowd, he again

25   repeated that his intentions were solely to protest, which

1    the Court has found at trial to be false.  Further, the

2    government posits that his apology to officers was weak.

3    The statement falls short of remorse and does not

4    acknowledge his own violent actions.

5         The defendant is a pastor of a church in Warsaw,

6    Ohio.  He is associated with a number of religious groups

7    that organize protests throughout the country.  To be as

8    clear as possible, this defendant's historical role as a

9    religious activist has no bearing on the government's

10   allocution in this case.  The defendant has claimed that his

11   age and health should be considered by the Court, but the

12   defendant has offered no reason why the Federal Bureau of

13   Prisons could not accommodate or treat a man with his health

14   conditions.

15        Additionally, letters of support indicate that the

16   defendant is an active man who runs a construction business

17   in addition to his pastorship.  As recently as spring of

18   this year, according to one letter, the defendant organized

19   a group effort to clean up debris following a tornado.

20   These efforts are certainly laudable, but they do not

21   suggest a man who is in failing health.

22        With regards to his criminal history, on at least

23   two prior occasions prior to January 6th, the defendant was

24   arrested for trespassing while protesting.  Like his actions

25   on January 6th, his actions then exceeded First Amendment

1    protected conduct, and he was arrested for breaking the law.

2    The defendant's constitutional rights are, have and should

3    be protected, including his right to advocate for his

4    religious beliefs.  But the Court can and should consider

5    his actions, and whether he truly understands the gravity of

6    the crimes at issue.

7            The fact that he was previously arrested for such

8    similar conduct indicates that past may be prologue.  The

9    Court should rightly consider the defendant's vocation as a

10   pastor in the context of his actions on January 6th.  The

11   defendant took advantage of a position of trust implicit to

12   that calling.  People at the Capitol trusted him and

13   listened to him because he was a pastor, a pastor who stood

14   on a flowerbed pulpit and preached through a bullhorn urging

15   the crowd to listen, as they might in the pews.  Once he had

16   their attention, his message was clear:  Congress must fear

17   us; if the certification doesn't go our way, we're taking

18   our House; and don't let the gates or police officers stand

19   in your way.  According to Mr. Wright, a prayer was to be

20   the defendant's signal to breach barricades.

21           The demands of general deterrence weighs strongly

22   in favor of incarceration, as they will in any January 6th

23   case.  With regards to this defendant, his actions show

24   disrespect for the law and a willingness to use political

25   violence for his own purposes.  He actively encouraged

1   people to storm the Capitol building.  He recruited others

2   who he believed would help push down barricades.  He ignored

3   police commands and threatened officers.  He was a leader

4   who directly contributed to officers' inability to prevent

5   people from entering the restricted area, and ultimately the

6   Capitol building.

7           The defendant made a volatile and dangerous

8   situation on the east front significantly worse, and used

9   his effective bully pulpit to amplify it.  For years, the

10  defendant denied wrongdoing and showed zero remorse, claimed

11  to be unfairly targeted and that he had done nothing wrong.

12  Here, the guidelines are the beginning but not the end of

13  this Court's analysis or the government's ultimate

14  recommendation in this case.  A period of significant

15  incarceration is necessary to ensure this defendant does not

16  pursue similar conduct in pursuit of his political goals or

17  for any other reason.

18          Section 3553 directs the sentencing court to

19  consider the need to avoid unwarranted sentencing

20  disparities among defendants with similar records who have

21  been found guilty of similar conduct.  No two January 6th

22  cases are the same, and the Court should consider instances

23  where judges have given sentences with charges of similar

24  conviction, like United States vs. Fonticoba.  Courts should

25  consider cases where upward departures and variances have

1  been handed down, like Your Honor's decision in U.S. v.

2  Watson or like Judge McFadden's decision in U.S. v.

3  Hale-Cusanelli.

4       The Court should also consider United States vs.

5  John Douglas Wright, because Mr. Wright was on the same

6  barricade line pushing with the defendant.  I'm happy to

7  discuss the government's comparator cases with Your Honor,

8  but I'd like to focus on Mr. Wright who was sentenced in May

9  2023 by Judge Kollar-Kotelly.  There are some salient

10  differences between these cases, including the fact that

11  Mr. Wright was sentenced for 1512 obstruction.  Mr. Wright's

12  case and the defendant's are very similar factually.

13       They also share many of the same personal

14  characteristics.  The defendant and Mr. Wright are both from

15  Ohio, though they did not know each other prior to January

16  6th.  Both scored a criminal history category of one.  Both

17  are of the same approximate age and health.  Mr. Wright and

18  the defendant each prepared for January 6th in their own

19  way.  Both brought people with them, and went directly to

20  the Capitol instead of the Ellipse where the rally was

21  ongoing.  Both protested the certification on the east

22  front, both confronted police officers, and both pushed

23  barricades together.

24       Unlike Mr. Wright, the defendant has taken -- has

25  been found to have taken a leadership role using a bullhorn

1    to encourage the crowd.  Mr. Wright himself listened to the

2    defendant instruct and encourage rioters to obstruct.  Then

3    the defendant recruited Mr. Wright, Mr. Norris and four

4    other men to breach barricades.  Mr. Wright pushed

5    barricades against these officers on one occasion, which

6    Judge Kotelly found constituted a violent act.  This

7    defendant pushed not once, but twice, and he orchestrated

8    that breach.

9         Notably, unlike this defendant, Mr. Wright pled

10   guilty at the earliest opportunity to obstruction.  He

11   acknowledged that his actions were unlawful at his plea

12   hearing, when interviewed many times by investigators, and

13   to Judge Kotelly at sentencing.  Since he's been sentenced,

14   Mr. Wright has done whatever he can to build trust with the

15   government, and has testified today before the Court, which

16   is not an easy thing to do.  Considering these facts, and

17   Mr. Wright's testimony to the Court today, this Court should

18   find that this defendant's role was at least as aggravated

19   as that of Mr. Wright's.  This Court should sentence to

20   reflect the seriousness of his offenses.

21        Restitution in the amount of $2,000 is appropriate

22   in this case, which the government has detailed in its

23   papers.  The defendant has not shown an inability to pay a

24   fine.  Under the guidelines, the range would be, I believe,

25   $7,500 to $75,000, as calculated by U.S. Probation.  As the

1    government has represented in its filings about his

2    fundraising efforts, defense counsel responded that those

3    funds have gone towards legal fees.  And the government

4    would defer to the Court as to whether a fine is warranted

5    in this matter.

6         The defendant was an avid and willing participant

7    in an unprecedented crime, and a departure and/or a variance

8    is warranted in this case, Your Honor.  Your Honor has heard

9    the facts of this case at trial, again today as we've

10   discussed various enhancements and adjustments.

11   Mr. Dunfee's offense targeted the peaceful transfer of power

12   and a central government function, one of the foundational

13   principles of our democracy.  He stipulated that he was

14   aware that certification was ongoing at the time, and the

15   Court found at trial that he acted with the corrupt intent

16   to obstruct and interfere with the certification.

17        But nothing in the defendant's guidelines range,

18   as calculated by either probation, the government or the

19   Court today, reflects those facts.  The defendant would face

20   the same offense level if his crimes had not endangered the

21   democratic process or interfered with the peaceful

22   transition of power.  Frankly, Your Honor, the criminal code

23   and the guidelines enhancements, as written, have been found

24   wanting by the high courts as they cannot fully address a

25   crime of this nature and magnitude.  In the Supreme Court's

1    recent decision in Fischer, Justice Barrett's dissent

2    reflects that the criminal code lacks the appropriate tools

3    to fully address a crime like January 6th.  Justice Barrett

4    writes:  "Who could blame Congress for its failure of

5    imagination?"  Who could have foreseen an attempt to stop an

6    election from being certified.

7         In the D.C. Circuit's recent opinion in Brock,

8    which found that certain sentencing enhancements do not

9    apply to the certification, the Circuit Court found this

10   fact despite acknowledging that interference with the

11   process:  "No doubt endangered our democratic process, and

12   temporarily derailed Congress' constitutional work."

13   Clearly, the sentencing commission had not anticipated

14   anything like January 6th when drafting guidelines and

15   applicable enhancements.  Nonetheless, we do the best with

16   the tools that are available to us.  And in the post Fischer

17   landscape, judges have relied on guideline sections 5K2.0,

18   5K2.7 and/or 5K2.21 to articulate why a January 6th

19   defendant's conduct is inadequately captured by their

20   guidelines range, finding departures under these sections

21   warranted.

22        Recently, in Sparks -- United States vs. Sparks,

23   Judge Kelly sentenced the defendant who, like Mr. Dunfee,

24   was convicted of violating both 1512 and 231.  And as in

25   Mr. Dunfee's case, prior to sentencing, in light of the

1    Supreme Court's Fischer decision, the 1512 obstruction count

2    was dismissed prior to sentencing.  In that case, Judge

3    Kelly found it important that despite the dismissal of this

4    obstruction charge, that the defendant's conduct still

5    included an intent to obstruct and interfere with that

6    proceeding, that important constitutional proceeding.

7          The defendant found -- the Court found that

8    defendant's behavior to be dark and posing a threat to

9    whether the constitutional process would proceed or whether

10   mob rule would interfere with that process.  Judge Kelly

11   found that a typical person convicted of 231 engaged in

12   nothing like the attack on the Capitol and the

13   certification.  In that case, Mr. Sparks' advisory

14   guidelines range was 15 to 21 months.  But because of his

15   intense interference and obstruction with the Electoral

16   College vote, Judge Kelly granted a departure under 5K2.7,

17   interference with a government function, and 5K2.21,

18   considering the impact of dismissed charges, and sentenced

19   Mr. Sparks to 53 months in prison.

20         Similarly, in United States vs. Robertson, Judge

21   Cooper recently resentenced a defendant after a dismissed

22   1512 conviction post Fischer.  Without that conviction --

23   the 1512 obstruction conviction, rather, the Court

24   determined that a new guidelines range would be 37 to 46

25   months.  But Judge Cooper there also found an upward

1    departure was appropriate under 5K2.7, because that

2    defendant's conduct resulted in a significant disruption of

3    government function; namely, the certification.  And that

4    was true regardless of whether the section 1512 obstruction

5    applied.

6           Judge Cooper also found an upward departure

7    warranted under section 5K2.0, because Mr. Robertson's

8    conduct was:  "More harmful or egregious than the typical

9    case represented by otherwise applicable guidelines range

10   involved."  As these recent cases and other pre-Fischer

11   cases where variances were granted, the defendant's

12   guidelines range was the beginning and not the end of the

13   Court's analysis.

14          During closing arguments in this trial, Your

15   Honor, the Court engaged in a colloquy with defense counsel

16   regarding the interplay between civil disorder and

17   obstruction.  Your Honor asked:  "What about his physical

18   actions?  Clearly, he's forcibly acting against the police."

19   To which defense counsel responded:  "That's civil

20   disorder."  The Court said:  "No, it is civil disorder with

21   the design of stopping Congress from certifying the

22   Electoral College vote."

23          Here, as in Sparks, the advisory guidelines range

24   is driven by a 231 conviction where the guidelines range

25   does not account for the defendant's intent to obstruct, not

1      just law enforcement's doing their duty under 231, but a

2      governmental function, certification of the election.  The

3      Court was already attuned to the aggravated nature of this

4      offense at trial, and the defendant's sentence should

5      reflect that same reasoning.

6             Again, the government is proposing three different

7      bases under section 5K for a departure:  5K2.7 being

8      interference with an important governmental function; 5K2.21

9      to reflect the seriousness of the offense based on conduct

10     where underlying charges were dismissed.  The government

11     intends to dismiss three charges at the end of this

12     proceeding, including counts -- it's the disorderly conduct

13     under 1752, engaging in physical violence under 1752, and

14     physical violence on Capitol grounds under 5104.  The Court

15     should rightly consider the nature of those offenses as

16     well.  And finally, under 5K2.0., circumstances that are not

17     adequately taken into consideration under the guidelines.

18            Prior to the Supreme Court's decision in Fischer,

19     this Court in Watson also granted a variance.  Similarly,

20     Judge McFadden did that in the Hale-Cusanelli case.  These

21     variances were warranted and appropriate.  So a variance is

22     another tool that's available to the Court, just here as it

23     was in Watson.

24            Your Honor, we're asking for a substantial

25     variance, but a variance that takes into account other

1  individuals who have been sentenced, including by this

2  Court.  We're asking for a finding under 3553(a) that your

3  sentence would be the same regardless of the guidelines

4  dispute that Your Honor has resolved today, and written

5  findings in the event that Your Honor does vary upward to

6  support that sentence.  Here, the defendant has a guideline

7  range of up to 24 months, I believe.  Obviously the charges

8  have changed since the Supreme Court decided Fischer.  The

9  guidelines calculation changed even before that when the

10  Circuit Court decided Brock.  But the defendant's conduct

11  has not changed one bit, and the gravity of what he's done

12  has not lessened at all.

13        Based on the defendant's relevant conduct on

14  January 6th, including his statements, his actions, his

15  leadership role, his position of trust as a pastor and

16  corrupt purpose to interfere with the peaceful transfer of

17  power, the government recommends this Court impose a

18  sentence of 48 months incarceration followed by 24 months of

19  supervised release, a $125 special assessment and $2,000 in

20  restitution.  Thank you, Your Honor.

21            THE COURT:  Defense.

22         MR. KIDD:  Should Mr. Dunfee join me at the podium

23  at this time?

24            THE COURT:  No, by yourself right now.

25         MR. KIDD:  Okay, thank you.  Your Honor, as we

1    look at the 3553 factors, we want to start with the history

2    and characteristics of Mr. Dunfee.  Your Honor, who is

3    Mr. Dunfee?  We've seen videos, videos which Mr. Dunfee is

4    not proud of.  But at heart, who is Mr. Dunfee?  I think the

5    letters provide some insight as to who he is.  He is a man

6    who delivers meals to homeless communities on Christmas Eve.

7    He is a man who leads efforts to clean up a tornado ravished

8    area in Ohio.  He's a man who takes his construction

9    expertise across the country when disasters come and the

10   need arises to help without compensation.  He arranges free

11   haircuts for school children.  He provides free backpacks

12   full of school supplies to local public school students.  He

13   provides job opportunities to the homeless.  He makes it

14   possible for a man to pursue his long term dream to be a law

15   enforcement officer.  This is who Bill has shown himself to

16   be.

17          Your Honor, in regard to other history and

18   characteristics, it is true that Mr. Dunfee has had two

19   other charges.  One was 2006 in Florida, and the other one

20   that was mentioned -- and we provided documentation, I

21   believe it was 2013 in Coshocton where we provided

22   documentation that that was dismissed.  Until January 6th,

23   2021, Mr. Dunfee was a law abiding citizen.  We recognize

24   that that picture has changed, but it doesn't take away what

25   he was.

1    Your Honor, in regard to his health, it's been --

2  I don't want to say belittled, but minimized.  But

3  Mr. Dunfee is almost 60 years old.  We did provide medical

4  records which specifically outline what his issues are from

5  a gastroenterologist where he says in his history:  "Of

6  note, patient has a significant cardiac history,

7  unexplainable syncope and collapse note last year."  The

8  date of this record was April 9th of '24.  He underwent

9  heart catheterization in April of '23 without any abnormal

10  findings, no stents.  He had a dual pacemaker/defibrillator

11  put in on June 8th due to unexplainable V-tach.

12    Your Honor, his health is a factor.  He is not the

13  young man that he was.  He's not the young man he was even

14  on January 6th, 2021.  This happened after that, this

15  happened subsequent to that.  Your Honor, he knows his

16  limitations, and he has been doing what he can to try to

17  address those.  We do think that that is a potential reason

18  for a variance.

19    Your Honor, in moving otherwise through the 3553

20  factors, the nature and circumstances of the offense, we

21  understand all those videos we stipulated to, it is as

22  represented in this court today,.  But what we continue to

23  want to point out is that Mr. Dunfee had no weapon, he

24  caused no injury, no property damage.  Regardless of what

25  potentially his intent might have been, he did not enter the

1    Capitol building.  And again, formally to ratify all of

2    that, he was not charged with assaulting an officer.  We

3    recognize that the nature and circumstances of the offense

4    are serious, and so does Mr. Dunfee.  We say that not to

5    minimize, only to state where some differences actually are.

6    In regard to just punishment, a 3553 factor, for a

7    man with no felony conviction, a felony conviction is a very

8    substantial matter.  He will not vote again.  He will not

9    pick up a firearm again.  These collateral consequences

10   indeed are real.  In regard to deterrence, we do think that

11   there has been a marked change in demeanor of Mr. Dunfee

12   since he recognized, through counsel, what the law is, what

13   are -- what's permissible under the First Amendment, and

14   where that begins and where that ends.  We think deterrence

15   has absolutely been impressed upon Mr. Dunfee.

16   As the Court saw in our request, we are asking for

17   a sentence of home confinement.  We understand that's also a

18   variance, and we would join with the government in

19   recognizing that this Court, you, have the right to vary

20   from the guidelines.  The guidelines, of course, have to be

21   the starting point.  Any sentence outside the guidelines has

22   to be justifiable.  We are asking for that variance to go

23   lower than the 18, even to the point of home confinement.

24   Now, we do recognize, of course at this point in

25   time, that this is a zone D offense, and so the guidelines

1    themselves would indicate that confinement is necessary.  At

2    the time of the sentencing -- of drafting the sentencing

3    memorandum, that was an open question as to what zone this

4    would actually be in.  Having said that, we all know that,

5    in regards to the zones, the issue -- the courts still have

6    discretion over sentencing, whether custodial, probationary

7    or whatever.

8           So I think what is key here is sentencing

9    disparities.  Your Honor, I wanted to point out a few of

10   those.  And I did -- I miscalculated in my sentencing

11   memorandum -- in our sentencing memorandum, there have been

12   nine defendants who have received sentences longer than 12

13   months and one day when their only count -- the only felony

14   count of conviction is the 231.  So there have been nine.

15          In regard to the first -- and it's been mentioned,

16   is Sargent.  And, of course, we happen to know the

17   government's own press release.  Sargent was given a

18   60-month sentence.  His conduct is described as grabbing and

19   pushing a police officer to prevent him from detaining

20   another rioter; twice shoved two officers away from the

21   Capitol as they tried to retreat to safety; twice threw a

22   heavy object at a set of doors leading into the Capitol with

23   the intent to break the doors' glass panels while officers

24   stood behind those doors and encouraged other rioters to

25   damage the same set of doors.  That's Sargent, and that's

1    the longest sentence for a 231 alone, 60 months.

2        Moving on to Sargent -- or from Sargent to Sparks,

3    which has already been addressed.  In regard to that, he was

4    given a sentence of 53 months.  Again, CNN reports that:

5    "'Sparks helped light the fire that day,' prosecutors

6    continued, 'using his preparation and planning -- including

7    his protective body armor -- to steel himself against the

8    officers attempting to hold back the mob.'"  He was part of

9    the mob that rushed to the Senate wing door of the Capitol

10   on January 6th, and was the first to climb into the building

11   through a window broken by another rioter.  He also called

12   for civil war in online posts and purchased a rifle the day

13   before.  Again, none of that type of conduct occurred with

14   Mr. Dunfee.

15       After those two, you have to go down to the

16   next -- the next longest would have been a 30-month

17   sentence; then one had a 24; four had 18; and one was

18   sentenced to 15 months.  That is -- those are the ones that

19   are similarly situated to Mr. Dunfee, one felony count, and

20   that being civil disorder.

21       Your Honor has brought up in regard to the

22   government Robertson as being a comp.  Robertson still has a

23   1512 count.  The 1512(c)(2) was vacated, he still has the

24   1512(c)(1) -- which is actually going in and destroying

25   records.  Mr. Dunfee did not do that.  Again, we do not

1    think that is a proper comp in regard to Mr. Dunfee.

2             In regard to some of the other ones mentioned,

3    Mr. Wright in particular, this Court took particular

4    interest, as do I, as to why he hasn't tried to get back in

5    front of a court since Fischer has been decided.  His 1512

6    is his only felony count of conviction.  It would seem that

7    that would be a situation where, if he were to come back in

8    front of the Court, that 49 months would be significantly

9    less than what it was.

10            Another comp that they gave was Hale-Cusanelli,

11   who got a 48-month sentence.  The government asked for 78.

12   He's already out of prison.  He was convicted of a 1512

13   only.  So again, some that would have -- if they would have

14   challenged the 1512, likely would not have had a 48-month

15   sentence.  And of course with Mr. Hale-Cusanelli, he's

16   already out of the BOP, so he has no interest in going back.

17            Your Honor, another comp that we think is relevant

18   is Nolan Cooke.  I'm sure that the Court saw the list of

19   cases that have been presented.  We're at the mercy of the

20   website that the DOJ puts up, and we do appreciate that

21   information.  Nolan Cooke was sentenced to 12 months and a

22   day.  The government had asked for 11 months.  Of course, in

23   the federal system, 12 months and a day is a shorter

24   sentence than 11 months.  He had one count of conviction, a

25   231.  In the government's press release, it says that:  "He

1    helped lead the charge breaking through the police line.  He

2    made statements:  'There's a storm coming.  We're coming

3    through, nothing is holding us back.'  And he banged on the

4    window of the Capitol door" -- and this was on the east

5    side, "with a flagpole."  Nolan Cooke was sentenced to 366

6    days of incarceration.

7           Your Honor, we know we're asking for a variance

8    when we're asking for home confinement, and we recognize

9    that that is a big ask being in zone D.  What we don't

10   think, with the guidelines as they are 18 to 24 months, a

11   sentence very similar to Mr. Cooke, 12 months and a day,

12   would be a very appropriate sentence.  It would be the type

13   of sentence that would be sufficient, but not greater than

14   necessary, to comply with 18 U.S.C. 3553.  That's our ask.

15          As to the fine, we recognize what the guidelines

16   are.  Again, just in regard to the fines, we'd reiterate

17   some factors.  Mr. Dunfee, perhaps after serving a custodial

18   sentence of some length, is going to be older.  His health

19   isn't going to be any better.  His need to take care of his

20   family, his wife -- who's here, and her financial needs and

21   her potential health needs is still going to be there.  We

22   would ask the Court not to impose a fine.

23          Your Honor, unless the Court has any other

24   questions in regard to what we are asking in regard for the

25   sentence, Mr. Dunfee's prepared to come forward and make a

1    statement today.

2         **THE COURT:**  Okay.  Let me give the court reporter

3    a 10-minute break.

4         (Recess taken at 2:54 p.m.)

5         (Back on the record at 3:04 p.m.

6         **THE COURT:**  Counsel, would your client like to

7    speak?

8         **MR. KIDD:**  He would, Your Honor.  Should we

9    approach together?

10        **THE COURT:**  Yes.

11        **THE DEFENDANT:**  Let me begin, Your Honor, by

12   saying I thank you very much for the opportunity to address

13   you regarding my conduct on January 6th.  Sincerely, I want

14   you to know I did not come to January 6th to break any laws.

15   It was never my intention at all to break any law

16   whatsoever.  In fact, my intentions were all spiritual

17   based.  I love the Lord with all my heart.

18        As a minister, I came with a simple message:

19   Repent and be reconciled unto God.  That's the message I've

20   always preached, and that's the message that I continue.

21   The last thing I ever want to do is to take away from God's

22   word and his message.  Unfortunately, Your Honor, I did.

23   We're here talking about things that we shouldn't be talking

24   about.

25        My conduct at the bike rack was wrong.  I

1    disrespected the law and those who were called to enforce

2    it.  And I apologize sincerely to any and every person who

3    felt they were in danger or intimidated or that was affected

4    adversely by me.  This will never happen again.  As I move

5    forward from this incident in my life, I will use the

6    lessons I have learned to teach my six precious grandsons,

7    and to teach others, more perfectly the ways of Christ.

8              Most specifically, as I look back and as I

9    reflect, I will be teaching that that which is of the spirit

10   is of the spirit, and that which is of the flesh is of the

11   flesh.  I was wrong.  I should not have pushed into those

12   bicycle racks.  I should not have led anyone else to believe

13   that it was permissible or acceptable whatsoever.

14             Your Honor, I ask that you and this Court please

15   accept my apologies for my behavior that has caused me and

16   brought me before you today.  And Your Honor, I would also

17   ask in this sentencing process, that you would please

18   consider the six precious little grandsons that I have at

19   home whose faith is very tender, whose faith is very tender.

20             I realize you're in a difficult position and

21   situation.  I do apologize for putting you in it, but I do

22   ask.  Thank you for allowing me to address you, Your Honor.

23             **THE COURT:**  Well, sir, one of the most difficult

24   things that we as judges are called upon to do is to cast

25   judgment on individuals who have been adjudicated guilty in

1    cases before us.  It's an awesome responsibility that I take

2    very seriously and prepare extensively for sentencings to

3    try and make sure I take into account everything that's

4    appropriate to consider in deciding what sentence should be

5    imposed.  Obviously I did that in this case.

6           I start first with the nature of the crime that

7    was committed on January 6th of 2021.  I never envisioned, I

8    never thought, I never dreamed that America would be what

9    America became on that day; I never thought that would ever

10   occur.  I mean, back in 2000 when Vice President Gore was

11   defeated by who became President Bush, you know, that was a

12   really close election.  And it came down to really the state

13   of Florida and the Supreme Court stepping in and, in a

14   sense, awarding the presidency to President Bush.  And there

15   could have been, but fortunately there was not, an uprising

16   on the part of the Democrats who may have felt that they had

17   the election stolen from them.  Fortunately, Vice President

18   Gore was man enough and cared enough about our democracy

19   that he did not claim that somehow the election had been

20   stolen from him.  He took it for the betterment of our

21   country so that we would have a peaceful transition of

22   power, which we have.

23          Unfortunately, that didn't happen in 2020.

24   Leading up to the election unfortunately, as is the case

25   now, the former president started to put into the minds of

1   the American public who supported him that if he lost, the

2   election had to have been stolen -- which is what he is

3   saying now.  I don't know what's going to happen in

4   November, but I fear what may happen regardless of who wins.

5   Because who knows, maybe those on the left, if the left

6   doesn't win or the Democratic party doesn't win, may say,

7   well, look at what the Republicans did when they didn't get

8   what they want, so why shouldn't we act out the same way.

9           And if Mr. Trump loses, he's saying the same

10  things that riled up the American public, at least a

11  segment, to do what they did on that day.  And that was

12  despite the fact that an individual -- I forget his name,

13  Chris Krebs, I think, who was sort of in charge of the

14  electoral process from the Executive Branch's perspective,

15  said it was one of the most honest and fair elections ever

16  held.  There have been, what, over 60 lawsuits filed.  None

17  of them concluded, contrary to what you concluded, that the

18  election had been stolen.  There's just no evidence to

19  support it.  The only thing that supports it are the false

20  claims of someone who lost the election by over 9,000,000

21  votes.

22          Despite that -- you're an intelligent man -- do

23  you just listen to what somebody tells you, and you believe

24  what somebody tells you, and you act on that in the way that

25  you acted that day?  I would have thought that as an

1    intelligent man, a man who says he believes in God and

2    follows God, that you would have looked it up, you would

3    have did your own research, and you would have said what is

4    there that really supports what is being said about the

5    election being stolen.  And I would have thought you would

6    have said it wasn't.  But unfortunately, you acted as so

7    many did, on emotion.  You didn't get what you wanted.  And

8    because you didn't get what you wanted, you came here to

9    protest.  That was fine, that's the American way.  Protest

10   is something that's always been a part of the American

11   heritage.  If it wasn't for protests, I would not be in the

12   position I am.  So I respect the right of the American

13   public to speak out about injustices.  But there was no

14   injustice here.  There was just a desire to achieve what you

15   wanted to achieve, and because you didn't get what you

16   wanted, you did what you did that day.

17            I have the utmost respect for the clergy.  I grew

18   up in a house where -- it was my grandmother's house.  It

19   was a large tenement.  We lived in the basement apartment

20   because we were very poor.  But there was a large hall over

21   the apartment that we lived in, and my grandmother, who had

22   become very religious, let a Pentecostal minister move his

23   church into that space.  And they had church every day, so I

24   had to go to church every day whether I wanted to or not.

25   So I came up in the church, and therefore I've developed a

1    respect for people who go into the ministry, because it's an

2    important aspect of life.

3              And that's what really concerns me, because I know

4    how strongly a lot of people feel about their religion, and

5    justifiably so.  And if a religious leader tells them

6    something, it has a greater effect on them than somebody who

7    doesn't hold that sacred status in our lives.  And

8    therefore, a lot of times people will act on religious

9    beliefs, because they've been told that somehow acting that

10   way is consistent with God's will.  I don't think God had

11   anything to do with wanting what happened on January 6th of

12   2021 to happen.  I don't believe that's the God that

13   controls our lives, I don't believe that.  And I would have

14   hoped that you would have not believed that.

15             There's no question in my mind, for the reasons I

16   indicated, that when you got on that megaphone and you said

17   what you said, and it became known that you were a minister,

18   that resonated with people, I have to believe.  And maybe

19   what happened if you hadn't done that would not have

20   occurred.  You know, what occurred -- again, what really

21   bothers me about what occurred that day, the people who did

22   what they did, it was like a bully.  They had more people

23   than the police, and because they had more people than the

24   police, they did what they did.  If the law enforcement or

25   the military had been there in greater numbers, it would

1    have never happened, because they wouldn't have been able to

2    bully their way into the Capitol, as they did.  And those

3    police officers paid a price.

4         And I'm sure you probably believe that you are in

5    favor of the blue.  You were not that day.  I hear a lot of

6    people say:  Well, nobody was hurt.  Well, there were, I

7    think, two or three police officers who were so traumatized

8    by what took place that day that they took their lives.

9    There was another police officer who died as a result of

10   medical conditions he suffered as a result of what took

11   place that day.  There have been a number of officers who

12   retired, who can't work anymore, one because of physical --

13   I know he's testified in this Court several times, who can't

14   work anymore because of the physical problems he sustained

15   as a result of what happened that day.

16        And even though I can't say that you did anything

17   that directly caused those officers to suffer that trauma,

18   you were a part of the mob that contributed to that.  And

19   that's something I hope that you appreciate that you

20   contributed to, and I hope that bears on your soul, to know

21   that you played a role in creating the environment that

22   caused those officers to take their own lives, to lose their

23   jobs because they couldn't work anymore, to die of a

24   physical ailment as a result of what took place that day.  I

25   hope that bears on your soul, sir, because it should.

1    Because who knows, if you hadn't done that, maybe all that

2    took place would not have occurred.

3           And the other thing that bothers me is the fact

4    that apparently you heard of what was going on on the other

5    side of the Capitol, and you called up for recruits to go

6    over there.  What man of God does that, sir?  I don't get

7    it.  And I read all the letters that were submitted, and it

8    seems like you have a tremendous following of people who

9    believe in you, and believe in you because of the status

10   that you hold as a minister.  And some of the things that

11   you've done to try and help people in distress are laudable,

12   and that's commended.  But what would cause you on this day

13   to forsake all of that, and to do what you did on that day

14   for the benefit of one man because he didn't get what he

15   wanted?  And I fear, like I say, what's going to happen in

16   November?  I don't know.  I pray, I pray that we don't

17   suffer again as we did that day.  And maybe it will be worse

18   that time.  I pray that's not the case.

19          And I know what happened that day has really hurt

20   the image of America in the world community.  I teach a lot

21   overseas in Africa, and I was over there in July.  And it

22   was hard, because I go over and try and teach the judges and

23   the prosecutors over there about our system of government,

24   and how they should try and emulate what we have here as far

25   as our justice system is concerned.  It's hard to do that

1    now, because when I was over there, you know, people would

2    say:  How are you preaching to us about what we should do

3    considering what you all did on January 6th?  There's no

4    answer to it.  It's diminished our status, as that shining

5    light on the hill that we are striving to be.  It really

6    does.

7         And because of all those factors, sir -- and, you

8    know, the other thing that bothers me is some of the things

9    that you said after this took place, basically saying that

10   you really didn't do anything wrong.  You did.  And then

11   denigrating the FBI, as if they are somehow on a witch-hunt

12   against you regardless of the fact that you did yourself

13   what you did.  And that's troubling, because I see those

14   same attacks being brought to bear on the FBI, the Justice

15   Department and other aspects of our government that are

16   extremely detrimental.  If we have the American public start

17   to not believe in the institutions of government that we

18   have, we are headed towards destruction as a country.  The

19   divide that we have in America is very troubling, very

20   troubling.  I don't know what you do about it.  I don't know

21   what you do about it.

22        But I do know that one of the factors I have to

23   take into account is whether punishment is appropriate.  And

24   punishment, in my view, based upon what you did, is

25   appropriate.  I think one of the most important aspects of

1    the sentencing process in this case, and other cases of this

2    nature, is sending a message to the American public that you

3    can do what took place on January 6th if you want to, but if

4    you do, there's going to be a price to pay.  Otherwise, if

5    there's no price to pay, then why not do it.  And that's a

6    message that cannot be sent to the American public, because

7    we cannot -- we cannot let another January 6th occur in this

8    country.  I can't say we won't -- we will be able to stop

9    it, but, boy, if that happens, we are on a downward spiral

10   towards something that will not be the America that we have

11   known, and that would be a sad reality for this country.

12   But I fear that we're headed that way because we're so

13   divided.  There's nothing we can agree on.  And we keep

14   fighting each other rather than realizing the common

15   objectives that we should have as a country.  But we don't.

16   And the rhetoric that's being spewed now is just creating a

17   lot of hatred, a lot of division and it's tearing this

18   country apart, and you contributed to that.

19          You know, I also have to take into account the

20   sentences that I could impose.  Your lawyer's asked for home

21   detention.  I just can't conclude, considering the

22   seriousness of the conduct that you engaged in -- because

23   it's clear to me that you did encourage what occurred that

24   day using that bullhorn to spew a message that I think

25   inevitably inspired people who were in the sound of your

1    voice to do what happened that day.  And that's something

2    that just cannot, cannot be tolerated.  And it must be

3    understood that if you're going to engage in the type of

4    conduct you engaged in that day, there's a price to pay.

5    And maybe, hopefully, that will deter others from doing what

6    happened that day.  I don't -- you know, considering your

7    background, I don't think there's much I can do by way of

8    what I impose that's going to cause you not to engage in

9    further crime.

10            And I have to look at, like I say, what you did

11    that day in assessing what the appropriate sentence is.  And

12    I take into account -- and have to, how other people with a

13    similar background have been sentenced so that I'm not

14    giving a significantly different sentence than what they

15    received, if there's not good reason to do so.  And

16    Mr. Wright, I don't know why -- there may be good reason,

17    his lawyer hasn't requested resentencing.  Because I would

18    have to assume he would not have received the 48-month

19    sentence on resentencing since the penalty for the offense

20    that he was sentenced on -- which is now an offense that the

21    Supreme Court said he could not be convicted of.  I

22    assume -- since that was a 20-year maximum sentence and the

23    civil disorder is a five-year sentence, I assume he would

24    not have received that 48-month sentence.  That's pure

25    speculation on my part, but knowing Judge Kotelly, I would

1    assume that since she came down as low as she did from the

2    20-year sentence that applied in that case to the 48-month

3    sentence that she imposed, that if the sentence she could

4    have imposed would have been limited to five years, I assume

5    she would not have given a 48-month sentence.

6         But there are other sentences that have been

7    given, and I've considered what your lawyer submitted to me

8    in reference to what other individuals have received.  I've

9    considered all that, and no case is the same.  I don't know

10    of any case involving a pastor using his pastoral skills and

11    using his status as a minister to inspire others to do what

12    you inspired people to do that day.  It's a unique

13    situation, and it's a troubling situation for the reasons

14    I've indicated.

15         I've considered all of the factors that the law

16    says I have to consider, including the guidelines, which as

17    calculated, based upon the rulings I made, is 18 months on

18    the bottom as far as prison is concerned to 24 months on the

19    top.  The period of supervised release is one to three years

20    on the felony charge, and one year on the misdemeanor count

21    that you were found guilty of.  And there's a fine range

22    between $7,500 and $75,000.  The law does require that you

23    pay $125 as a special assessment, $100 on the felony and $25

24    on the misdemeanor charge.  And I will impose that as a part

25    of your sentence.

1    As far as the term of incarceration is concerned,

2  as I said, I just cannot go to the level requested by your

3  lawyer of home detention.  I just don't think that sends the

4  appropriate message that this type of conduct is just not

5  acceptable, because it goes to the heart of our democracy.

6  Our democracy depends upon the peaceful transition of power.

7  If we don't have people who are in power who are prepared to

8  peacefully transfer power to someone who defeats them in an

9  election, our democracy is dead.  And I think our country is

10  worth saving.  I've had the opportunity to travel all over

11  this world, and I can't think of a better country or a place

12  I'd rather live other than America.  And I want to see

13  America and our democracy survive.  A part of that survival

14  does require that when people do wrong, that sanctions have

15  to be imposed.

16    So having considered the guidelines and the

17  various factors in the United States Code that I'm required

18  to impose, I will sentence you to a period of 30 months in

19  prison on the felony charge, and one year in prison on the

20  misdemeanor charge.  Those sentences will run concurrent

21  with each other, so a total of 30 months in prison.  As far

22  as supervised release is concerned, I'll require that you be

23  on supervised release for a period of three years on the

24  felony charge, and one year on the misdemeanor charge.

25  Those sentences are to run concurrent with each other.

1   As far as a fine is concerned, I looked at the

2   amount of money that you have available to you, and

3   according to my calculations, you have about $255,000 in

4   savings of some nature.  I therefore will impose a fine of

5   $10,000, and will require that you pay $2,000 towards the

6   restitution, because there was almost over $3,000,000 in

7   damage done to our United States Capitol that day.  I will

8   recommend that you be permitted to serve your sentence at a

9   location as close to your home as possible so you can

10  maintain contact with your family during your period of

11  detention.

12  As conditions of your supervised release, I will

13  require that you comply with all of the standard conditions

14  of release, and you should review those with the probation

15  department and your lawyer to make sure that you comply with

16  them.  But specifically I will require that you not be

17  rearrested on probable cause for any state, local or federal

18  offense; that you not -- and there's no indication of any

19  type of drug use, but it's a standard condition that you not

20  possess or use any type of illegal drugs.  Also, the law

21  does require that you be tested at least once, once you're

22  released from prison, to see if you do have drugs in your

23  system -- which I assume will not be the case.  But there's

24  a requirement that that be done.  And if it's felt that

25  further testing is necessary thereafter, that you comply

1    with that requirement by the probation department.  The law

2    does require that you provide a sample of your DNA so if

3    you're involved in further crime, that can be used to

4    identify you.

5          The conditions of restitution and a fine will also

6    be conditions of your supervised release, and you'll have to

7    comply with a payment schedule of at least $250 per month on

8    the fine, and $100 per month on the restitution amount.  I

9    will require that you provide any financial information to

10   the probation department while you're on supervised release,

11   and that you provide that information upon request until

12   such time as your financial obligations to the Court have

13   been satisfied.

14         Also, I'll order that you not come to the District

15   of Columbia and go to the United States Capitol.  And the

16   area that you cannot go to is between Constitution Avenue,

17   NW and NE to First Street, NE and SE, and also Independence

18   Avenue, SE and SW, and First Street, SW and NW.  Those are

19   the properties that surround the United States Capitol.

20         The fine is to be paid, and the restitution, to

21   the Clerk of the Court who will then disburse those funds to

22   the appropriate entity who is entitled to those funds.  I

23   also will authorize the probation department to release the

24   report, presentence report, to the appropriate individuals

25   and entities who need it in order to carry out the orders of

1    the Court.

2           Also, you have 14 days to appeal your conviction

3    and your sentence to the Court of Appeals.  If you cannot

4    afford to pay for a lawyer to represent you or if you cannot

5    afford to pay for the papers to be filed with that court, to

6    let the Court know that you want to appeal, and those will

7    be paid free of charge by the government.

8           Government counsel, you indicated some charges you

9    want to move to dismiss?

10          **MR. WIDMAN:**  Yes, Your Honor.  The government

11   would move to dismiss the remaining counts in the

12   indictment.

13          **THE COURT:**  That's not the one that I sentenced

14   him on, any of the ones I sentenced him on?

15          **MR. WIDMAN:**  No, Your Honor.

16          **THE COURT:**  You're moving to dismiss those?

17          **MR. WIDMAN:**  No, Your Honor.  The 1752 -- the

18   Court's indulgence, I've got to pull up the counts.  I

19   believe it's counts four, five and six, Your Honor.

20          **THE COURT:**  Very well, the motion will be granted.

21   Anything else from probation?

22          **MS. LUSTIG:**  No, Your Honor.  Thank you.

23          **THE COURT:**  On the issue of the defendant's status

24   pending sentencing, there are two factors I have to take

25   into account in deciding whether release is appropriate.

1    One of those is, is there a viable issue for appellate

2    review that could result in reversal.  I would conclude that

3    that has not been satisfied, because I don't believe there's

4    any issue that is subject to reversal.  There may be some

5    issue regarding the sentence, but I am confident that the

6    rulings that I made were appropriate rulings based upon the

7    information provided to me.

8         And the other is whether he poses a risk of

9    flight, which I conclude he would not.  And the other is

10   whether he poses a risk of danger to the community.  And

11   unfortunately, considering what he did and why he did it,

12   and considering the fact that unfortunately the same

13   rhetoric that inspired people to do what they did on January

14   6th is happening now and we're on the cusp of another

15   presidential election, I would have to conclude that I have

16   no reason to believe he wouldn't do what he did again.  And

17   accordingly, I would have to conclude that he does in fact

18   pose a danger to the community and would detain him without

19   bond pending sentencing.  Thank you.

20        **DEPUTY CLERK:**  Your Honor, I have a quick

21   question.  Will you be waiving interest for the fine?

22        **THE COURT:**  I will waive interest, yes.

23        **MR. KIDD:**  Your Honor, can we be heard on the

24   self-surrender?

25        **THE COURT:**  No -- well, you can, but --

1          **MR. KIDD:**  Your Honor, I appreciate the statement

2    there.  Mr. Dunfee is not asking for any significant period

3    of time, he would be happy to self-surrender to FCI Elkton

4    or wherever within days, whatever the case might be.  He

5    knows and he's fully aware that you do not want him out

6    anywhere close to election day 2024.  Your Honor, the issue

7    of self-surrender really comes down to he has not had any

8    issues on pretrial.  He has not made any statements.  He

9    does have health issues, which we think will be exacerbated

10   by being detained in D.C. for however long before the BOP

11   makes a placement.  That's why we do believe that there's

12   not clear and convincing evidence that he's a danger to the

13   public or a risk of flight, and so we'd ask you to

14   reconsider that decision.

15         **THE COURT:**  I would order that he be examined at

16   the jail, and subsequently at wherever he's going to serve

17   his sentence, to determine what medical intervention he

18   needs, and to provide -- that they provide that to him.  But

19   he will be detained without bond today.

20         (Proceedings adjourned at 3:35 p.m.)

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3                    I, **Jeff M. Hook, Official Court Reporter,**

4      certify that the foregoing is a true and correct transcript

5      of the record of proceedings in the above-entitled matter.

6

7

8

9         October 31, 2024                    _____

10              **DATE**                              **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR.
HARTMAN: **[7]**
18/8 20/20
24/4 25/11
27/6 28/24
29/21
BY MR. WIDMAN:
**[13]**   6/9 6/15
7/14 7/17 8/6
8/19 11/5 12/1
13/2 14/20
30/6 31/19
31/23
DEPUTY CLERK:
**[4]**   3/2 6/2
6/7 138/20
MR. HARTMAN:
**[5]**   20/16
20/18 28/20
29/19 30/2
MR. KIDD: **[64]**
 3/14 5/10
39/14 39/23
40/5 40/16
41/4 41/15
41/20 42/15
44/8 44/15
44/24 45/16
45/21 46/2
46/7 46/16
47/3 47/8
47/14 48/11
48/16 48/20
49/15 49/17
58/20 59/12
59/18 60/2
60/9 60/11
61/1 62/5
62/19 67/3
75/6 78/9 79/4
79/7 80/13
80/18 80/20
80/24 81/25
82/6 82/9
82/11 82/17
83/13 83/15
83/22 84/7
84/9 84/15
84/24 85/15
86/2 86/5
114/22 114/25
122/8 138/23
139/1
MR. WIDMAN:
**[80]**   3/7 3/13
5/7 5/22 6/1

7/11 7/24 8/4
8/17 11/1
12/25 18/5
28/17 29/16
31/16 32/1
32/17 32/23
35/24 53/24
55/9 55/22
57/1 57/20
57/25 58/4
58/6 58/9
58/12 58/18
62/25 63/14
63/23 64/22
65/12 65/23
66/5 66/13
66/18 69/15
69/19 69/25
73/20 73/24
74/2 74/5 74/8
74/16 74/23
76/8 76/11
76/22 77/2
77/14 78/2
82/20 82/23
82/25 83/3
83/6 83/10
83/23 84/15
84/18 91/19
92/5 92/20
92/25 93/20
95/3 96/20
97/1 97/13
98/6 100/6
101/11 102/6
137/10 137/15
137/17
MS. BOLAS:
**[19]**   32/24
33/17 33/20
33/23 35/5
35/9 35/22
36/1 38/3 38/7
38/10 38/17
38/23 38/25
39/6 39/12
50/2 51/9 88/5
MS. LUSTIG:
**[4]**   73/22
91/22 91/25
137/22
THE COURT:
**[186]**
THE DEFENDANT:
**[1]**   122/11
THE WITNESS:
**[18]**   6/6 6/14
11/24 13/22

13/25 14/3
14/5 14/9
14/12 14/15
14/17 25/8
27/3 27/5
28/23 32/8
32/10 32/13

---

**$**

$10,000 **[1]**
135/5
$100 **[2]**
133/23 136/8
$125 **[2]**
114/19 133/23
$2,000 **[3]**
108/21 114/19
135/5
$2.9 **[1]**   92/12
$2.9 million
**[1]**   92/12
$25 **[1]**   133/23
$250 **[1]**   136/7
$255,000 **[1]**
135/3
$3,000,000 **[1]**
135/6
$7,500 **[3]**
92/2 108/25
133/22
$75,000 **[3]**
92/2 108/25
133/22

---

**'**

'21 **[2]**   82/19
84/5
'23 **[5]**   75/23
81/9 84/5
84/24 116/9
'24 **[1]**   116/8
'26 **[1]**   29/24
'83 **[1]**   45/4
'Sparks **[1]**
119/5
'There's **[1]**
121/2
'using **[1]**
119/6

---

**0**

0036 **[1]**   1/4

---

**1**

1.1 **[1]**   58/9
10 **[5]**   23/22
88/7 90/25
91/3 101/1

10-minute **[3]**
53/15 53/18
122/3
10:21 **[1]**   1/6
11 **[2]**   120/22
120/24
1100 **[1]**   7/19
1101 **[7]**   8/8
20/12 20/13
20/16
1102 **[1]**   8/21
1180 **[1]**   49/2
11:41 a.m **[1]**
53/19
11:47 **[1]**   94/5
11:51 a.m **[1]**
53/20
11:55 a.m **[1]**
94/19
11th **[1]**   4/13
12 **[4]**   118/12
120/21 120/23
121/11
1252 **[1]**   78/14
12:30 p.m **[1]**
78/3
1301 **[1]**   1/13
133 **[1]**   49/6
1348 **[1]**   40/19
1352 **[1]**   40/19
1353 **[1]**   40/19
138 **[1]**   89/8
14 **[2]**   64/12
137/2
15 **[5]**   27/18
62/11 92/1
111/14 119/18
1512 **[18]**   28/3
29/7 58/23
64/13 65/15
66/14 107/11
110/24 111/1
111/22 111/23
112/4 119/23
119/23 119/24
120/5 120/12
120/14
16 **[5]**   20/21
74/9 74/11
75/1 79/12
162 **[1]**   49/2
17 **[2]**   74/11
79/13
1752 **[5]**   54/8
55/12 113/13
113/13 137/17
17th **[1]**   5/2
18 **[7]**   2/5

92/1 117/23
119/17 121/10
121/14 133/17
18th **[1]**   4/2
19 **[1]**   1/5
1:10 p.m **[1]**
95/11
1:21 p.m **[1]**
95/14
1:23-cr-0036
**[1]**   1/4
1:26 p.m **[1]**
95/20
1:30 **[1]**   77/25
1:30 p.m **[1]**
96/13
1:31 p.m **[1]**
78/4
1:35 **[1]**   96/21
1:45 **[2]**   26/20
97/19
1:45 a.m **[1]**
93/24
1:45 push **[1]**
36/13
1B1.1 **[1]**   58/3
1B1.3 **[1]**   57/3

---

**2**

20-year **[2]**
132/22 133/2
2000 **[1]**
124/10
20001 **[1]**   1/25
2006 **[1]**
115/19
2013 **[1]**
115/21
2018 **[6]**   82/21
82/23 82/24
82/25 83/7
83/23
2019 **[1]**   87/2
2020 **[6]**   7/6
30/19 92/9
92/25 93/5
124/23
2021 **[22]**   6/20
18/10 63/23
82/9 82/13
83/9 83/10
83/11 83/13
83/14 83/16
83/20 83/22
83/24 84/3
84/9 84/25
102/20 115/23
116/14 124/7

**2**

**2021... [1]**
127/12
**2022 [2]**    103/5
103/13
**2023 [14]**    8/12
49/6  58/20
59/1  82/10
82/12  82/25
83/4  83/8
83/12  83/23
84/3  84/21
107/9
**2024 [5]**    1/5
4/13  5/2
103/20  139/6
**2026 [1]**    29/25
**203 [1]**    38/15
**203C [1]**    38/15
**203E [1]**    38/23
**204 [2]**    35/14
35/23
**20530 [2]**    1/14
1/16
**21 [1]**    111/14
**22 [1]**    4/16
**23-36 [1]**    3/2
**23-cr-138 [1]**
89/8
**231 [13]**    1/18
54/8  55/12
61/11  76/15
89/10  110/24
111/11  112/24
113/1  118/14
119/1  120/25
**24 [6]**    92/1
114/7  114/18
119/17  121/10
133/18
**259 [1]**    50/6
**26th [1]**    58/23
**27th [1]**
103/13
**282 [1]**    81/18
**29th [1]**    58/20
**2:00 [2]**    26/20
102/15
**2:00 p.m [1]**
100/2
**2:54 p.m [1]**
122/4

**3**

**30 [4]**    2/6
24/7  134/18
134/21
**30-month [1]**

119/16
**301 [1]**    34/1
**301A [3]**    39/4
94/24  95/3
**303 [1]**    99/7
**307A [1]**    38/8
**333 [1]**    1/24
**3553 [7]**    92/21
106/18  114/2
115/1  116/19
117/6  121/14
**36 [3]**    3/2
8/14  8/23
**366 [1]**    121/5
**37 [1]**    111/24
**373 [1]**    49/5
**3:04 p.m [1]**
122/5
**3:35 p.m [1]**
139/20
**3B1.1 [5]**    33/2
35/19  39/9
49/24  53/12
**3E [2]**    58/5
58/8
**3E1.1 [15]**
57/21  58/4
61/23  62/13
74/5  74/16
75/16  76/4
78/16  78/25
79/7  81/6  83/4
83/6  84/3

**4**

**40 [6]**    37/4
47/20  47/25
48/12  48/20
96/7
**403 [1]**    10/21
**411 [5]**    13/14
14/22  26/9
31/4  36/13
**412 [1]**    15/17
**413 [1]**    30/8
**415 [1]**    15/25
**45032 [1]**    1/19
**45230 [1]**    1/21
**46 [1]**    111/24
**48 [2]**    92/22
114/18
**48-month [6]**
120/11  120/14
132/18  132/24
133/2  133/5
**49 [5]**    4/23
7/25  8/14  8/22
120/8

**4C1.1 [10]**
70/7  86/6
86/10  87/23
88/6  88/7
88/10  89/6
89/7  90/24

**5**

**507 [1]**    20/17
**5104 [1]**
113/14
**524 [1]**    50/5
**53 [2]**    111/19
119/4
**5K [1]**    113/7
**5K2.0 [3]**
110/17  112/7
113/16
**5K2.21 [3]**
110/18  111/17
113/8
**5K2.7 [4]**
110/18  111/16
112/1  113/7
**5th [3]**    19/14
20/25  21/25

**6**

**60 [3]**    116/3
119/1  125/16
**60-month [1]**
118/18
**601 [1]**    1/16
**64 [1]**    40/18
**6th [50]**    6/20
8/10  8/12  10/1
10/3  11/7
12/20  13/11
17/4  17/7
18/10  20/6
32/25  34/18
34/21  34/23
35/11  37/7
63/24  63/25
70/17  92/7
92/15  93/6
93/10  98/3
101/24  102/20
104/23  104/25
105/10  105/22
106/21  107/16
107/18  110/3
110/14  110/18
114/14  115/22
116/14  119/10
122/13  122/14
124/7  127/11
130/3  131/3

131/7  138/14

**7**

**71 [1]**    5/17
**7394 [1]**    1/21
**74 [1]**    5/17
**761 [1]**    40/22
**78 [1]**    120/11
**7th [1]**    59/1

**8**

**86 [1]**    78/14
**8th [3]**    20/25
34/22  116/11

**9**

**9,000,000 [1]**
125/20
**926 [1]**    40/22
**9:25 on [1]**
93/10
**9th [1]**    116/8

**A**

**a.m [6]**    1/6
53/19  53/20
93/10  93/24
94/19
**abiding [1]**
115/23
**ability [2]**
70/20  103/24
**able [8]**    24/19
24/20  36/4
42/16  95/23
101/22  128/1
131/8
**abnormal [1]**
116/9
**above [3]**    39/3
100/22  140/5
**above-entitled**
**[1]**    140/5
**absent [1]**
71/13
**absolutely [3]**
38/3  67/6
117/15
**abuse [1]**    80/6
**abused [1]**
78/15
**accept [4]**
60/5  61/18
68/17  123/15
**acceptable [2]**
123/13  134/5
**acceptance [16]**
53/23  54/1

56/18  58/16
61/13  67/7
67/9  67/12
67/17  68/1
68/3  70/1
70/25  72/12
81/13  81/15
**accepted [1]**
86/19
**accepting [5]**
43/10  60/23
63/22  68/15
68/21
**access [1]**
89/4
**accommodate [1]**
104/13
**accompanied [1]**
87/5
**accomplices [2]**
43/20  50/11
**accomplish [2]**
89/21  91/11
**accomplished**
**[3]**    101/25
102/11  102/11
**according [7]**
43/15  44/19
98/13  98/17
104/18  105/19
135/3
**accordingly [3]**
63/2  72/8
138/17
**account [11]**
21/1  72/10
72/24  94/16
112/25  113/25
124/3  130/23
131/19  132/12
137/25
**accountable [2]**
45/20  55/6
**accounting [3]**
4/7  4/12  4/14
**accurate [1]**
75/6
**achieve [2]**
126/14  126/15
**achieved [1]**
89/2
**acknowledge [8]**
15/7  36/14
56/21  57/15
59/9  68/25
69/12  104/4
**acknowledged**
**[2]**    103/22

**A**

**acknowledged...**
**[1]**  108/11
**acknowledgement**
**[1]**  67/1
**acknowledges**
**[2]**  34/24
86/20
**acknowledging**
**[4]**  49/18
57/14 72/1
110/10
**across [3]**
98/15 100/19
115/9
**act [10]**  40/2
40/14 41/17
43/25 54/6
54/17 108/6
125/8 125/24
127/8
**acted [5]**  53/5
58/15 109/15
125/25 126/6
**acting [6]**
33/7 34/14
43/25 88/19
112/18 127/9
**action [4]**  1/3
56/6 60/18
96/10
**actions [19]**
43/10 47/17
55/2 63/7 70/8
70/19 70/22
100/12 102/19
103/22 104/4
104/24 104/25
105/5 105/10
105/23 108/11
112/18 114/14
**active [1]**
104/16
**actively [1]**
105/25
**activist [1]**
104/9
**activities [1]**
6/19
**activity [5]**
5/19 45/5 45/6
48/23 63/11
**acts [1]**  52/16
**actual [3]**
44/24 86/23
89/2
**actually [12]**

14/25 18/20
33/24 44/9
48/21 54/11
86/17 98/22
103/11 117/5
118/4 119/24
**adapted [1]**
87/1
**addition [1]**
104/17
**additional [7]**
50/20 62/4
73/7 73/11
77/20 80/12
85/20
**Additionally**
**[1]**  104/15
**address [10]**
32/20 32/22
50/3 53/16
66/19 109/24
110/3 116/17
122/12 123/22
**addressed [5]**
79/11 95/15
96/21 102/7
119/3
**addresses [1]**
91/3
**addressing [3]**
73/8 78/11
78/22
**adequately [1]**
113/17
**adjourned [1]**
139/20
**adjudicated [1]**
123/25
**adjustment [5]**
39/17 56/25
75/12 78/16
81/22
**adjustments [1]**
109/10
**admit [4]**
56/14 56/23
68/16 71/11
**admitted [1]**
21/14
**admitting [2]**
7/5 69/10
**adopted [1]**
87/1
**advance [1]**
103/21
**advanced [1]**
100/19
**advancing [1]**

100/18
**advantage [1]**
105/11
**adversely [1]**
123/4
**advised [1]**
98/18
**advisory [2]**
111/13 112/23
**advocacy [1]**
62/1
**advocate [1]**
105/3
**advocating [2]**
33/1 65/20
**affected [1]**
123/3
**affirm [1]**  6/3
**affirmative [2]**
21/8 21/11
**affirmatively**
**[1]**  56/14
**afford [2]**
137/4 137/5
**Africa [1]**
129/21
**afterward [1]**
67/15
**afterwards [1]**
101/1
**again [67]**  4/4
4/19 4/20 4/24
4/24 9/22 19/3
26/23 36/3
37/5 38/2 39/6
40/22 42/3
43/12 43/15
43/20 44/4
44/24 46/20
47/8 47/14
47/17 48/13
49/1 49/6
49/11 50/18
51/6 52/3
54/21 54/24
59/18 61/24
62/5 67/22
70/6 73/3 79/1
80/24 81/25
83/20 85/1
86/22 87/8
87/22 87/24
88/21 94/25
97/10 99/19
100/7 103/24
109/9 113/6
117/1 117/8
117/9 119/4

119/13 119/25
120/13 121/16
123/4 127/20
129/17 138/16
**against [17]**
15/14 16/19
54/15 76/23
77/10 77/13
88/19 91/9
97/21 98/16
98/19 100/3
100/4 108/5
112/18 119/7
130/12
**age [2]**  104/11
107/17
**Agency [1]**  5/1
**agent [1]**  56/5
**aggravated [2]**
108/18 113/3
**aggravating [9]**
39/15 40/24
49/8 49/22
49/24 86/8
87/9 87/25
88/8
**ago [2]**  62/11
76/6
**agree [19]**
36/15 48/16
49/20 51/10
51/12 55/6
55/10 56/21
57/18 59/5
68/20 69/11
70/6 72/3 72/3
84/24 88/5
91/5 131/13
**agreed [6]**
20/2 55/14
77/18 77/19
80/9 86/17
**agreeing [3]**
59/16 60/25
77/22
**agreement [6]**
7/9 7/19 9/3
17/22 20/3
21/15
**agreements [1]**
66/2
**agrees [2]**
53/24 75/18
**ahead [2]**
32/21 38/8
**ailment [1]**
128/24
**aim [1]**  101/6

**al [1]**  89/8
**allegations [1]**
56/22
**alleged [1]**
57/17
**alleges [1]**
33/13
**alleging [2]**
36/2 65/20
**allocate [4]**
62/9 76/1
79/20 81/5
**allocution [2]**
92/3 104/10
**allowing [1]**
123/22
**almost [4]**
103/5 103/14
116/3 135/6
**alone [3]**
52/21 59/11
119/1
**along [4]**  5/4
12/7 45/25
52/11
**although [1]**
50/23
**always [3]**
68/1 122/20
126/10
**Amendment [10]**
45/6 45/9 46/4
46/15 46/17
47/16 70/4
70/18 104/25
117/13
**AMERICA [9]**
1/3 3/3 124/8
124/9 129/20
130/19 131/10
134/12 134/13
**American [8]**
125/1 125/10
126/9 126/10
126/12 130/16
131/2 131/6
**among [3]**  6/23
49/3 106/20
**amongst [1]**
22/22
**amount [6]**
3/19 52/1
63/10 108/21
135/2 136/8
**amounted [2]**
4/16 69/13
**amplify [1]**
106/9

**A**

**analysis [2]**
106/13 112/13
**anarchy [1]**
72/22
**answered [1]**
93/4
**anticipated [1]**
110/13
**anticipating**
**[1]**  20/6
**anymore [3]**
128/12 128/14
128/23
**apart [1]**
131/18
**apartment [2]**
126/19 126/21
**apologies [2]**
70/21 123/15
**apologize [2]**
123/2 123/21
**apology [2]**
70/23 104/2
**apparently [2]**
48/22 129/4
**appeal [3]**
75/18 137/2
137/6
**Appeals [1]**
137/3
**appear [3]**
34/5 83/15
84/21
**appearance [1]**
3/5
**APPEARANCES [1]**
1/11
**appellate [2]**
58/25 138/1
**applicable [4]**
46/22 90/25
110/15 112/9
**application [2]**
62/1 95/12
**applied [4]**
64/13 73/17
112/5 133/2
**applies [4]**
41/5 53/17
68/7 85/6
**apply [12]**
39/10 39/17
52/15 52/19
53/11 53/12
55/8 70/7
85/14 89/7

**applying [2]**
91/4 91/6
**appreciate [5]**
42/8 59/12
120/20 128/19
139/1
**approach [7]**
3/5 7/11 8/4
8/17 82/17
83/22 122/9
**approached [6]**
11/11 11/13
22/20 94/1
94/11 101/5
**appropriate**
**[22]**  53/13
64/14 67/11
70/2 72/5
72/11 72/12
92/22 108/21
110/2 112/1
113/21 121/12
124/4 130/23
130/25 132/11
134/4 136/22
136/24 137/25
138/6
**approximate [1]**
107/17
**approximately**
**[6]**  93/24
94/5 95/11
96/20 97/19
100/2
**April [3]**  59/1
116/8 116/9
**April 7th [1]**
59/1
**April 9th [1]**
116/8
**area [13]**
22/15 23/6
35/16 52/2
98/23 99/2
99/7 100/16
100/20 102/14
106/5 115/8
136/16
**areas [1]**
24/12
**argue [10]**
39/9 43/12
57/2 59/22
63/14 63/15
70/3 70/14
77/15 80/16
**argued [1]**

**arguing [1]**
70/7
**argument [22]**
32/18 60/4
60/6 61/21
68/2 68/7 69/1
71/17 76/2
77/15 78/23
79/21 80/24
81/7 85/4 86/7
86/11 86/11
86/21 87/8
87/10 87/23
**arguments [6]**
54/4 54/10
70/5 70/12
76/12 112/14
**arises [1]**
115/10
**armor [1]**
119/7
**arms [1]**
100/22
**around [6]**
34/8 48/2
95/23 95/23
95/24 100/1
**arranges [1]**
115/10
**arrest [3]**
37/2 57/9 85/8
**arrested [7]**
17/6 63/17
64/2 103/6
104/24 105/1
105/7
**arrived [1]**
10/5
**Arthur [1]**
89/8
**article [4]**
64/3 103/7
103/9 103/14
**articulate [1]**
110/18
**articulating**
**[1]**  41/10
**aspect [1]**
127/2
**aspects [2]**
130/15 130/25
**assaulting [1]**
117/2
**assertion [2]**
42/16 42/18
**assessing [1]**
132/11

**assessment [3]**
59/5 114/19
133/23
**assistance [4]**
12/17 15/23
31/13 94/12
**assisted [5]**
75/2 75/10
75/20 79/15
81/21
**Associate [25]**
33/12 33/13
33/24 34/2
34/6 34/14
34/16 34/20
34/22 34/25
35/11 35/13
35/15 36/3
36/8 36/23
50/19 55/18
93/25 94/3
94/5 94/11
94/11 97/6
97/13
**associated [1]**
104/6
**associates [1]**
93/25
**assume [6]**
132/18 132/22
132/23 133/1
133/4 135/23
**Assuming [1]**
42/2
**attachment [4]**
4/15 4/16
36/25 97/7
**attachments [4]**
4/19 4/23
4/23 5/4
**attack [4]**
92/7 92/8
103/6 111/12
**attacked [1]**
99/10
**attacks [1]**
130/14
**attempt [2]**
15/7 110/5
**attempted [1]**
99/8
**attempting [1]**
119/8
**attend [1]**
10/13
**attention [1]**
105/16
**attorney [8]**

28/12 28/13
28/18 28/19
42/19 58/22
67/5 79/24
**attorney-client**
**[2]**  28/12
28/18
**attuned [1]**
113/3
**audience [2]**
64/7 96/13
**audio [1]**  34/5
**AUSA [2]**  3/8
32/19
**authorities [8]**
75/2 75/11
75/21 75/22
79/15 79/17
81/2 81/21
**authority [6]**
50/9 57/13
66/23 69/7
71/5 71/13
**authorize [1]**
136/23
**available [4]**
3/25 110/16
113/22 135/2
**Avenue [4]**
1/13 1/24
136/16 136/18
**avid [1]**  109/6
**avoid [6]**  62/7
62/10 75/24
79/18 81/3
106/19
**avoids [2]**
75/11 81/21
**award [1]**
73/12
**awarding [1]**
124/14
**aware [2]**
109/14 139/5
**away [8]**  24/18
27/17 34/11
90/16 94/21
115/24 118/20
122/21
**awesome [1]**
124/1

**B**

**baby [1]**  49/9
**back [41]**
14/10 16/16
16/20 16/20
24/11 24/17

**B**

**back... [35]**
24/20 27/7
27/19 33/10
34/3 34/8
35/15 43/2
49/19 53/20
54/23 54/23
56/3 68/5 70/1
76/18 77/25
78/4 81/9
87/18 90/17
95/23 95/23
95/24 98/25
99/3 101/12
102/22 119/8
120/4 120/7
120/16 122/5
123/8 124/10
**back.' [1]**
121/3
**background [2]**
132/7 132/13
**backpacks [1]**
115/11
**backward [1]**
43/10
**backwards [2]**
27/17 100/22
**bad [1]**  80/21
**ballot [1]**
93/3
**banged [1]**
121/3
**bank [6]**  45/24
46/1 46/5
46/12 46/13
46/14
**Bankruptcy [1]**
1/24
**Barrett [1]**
110/3
**Barrett's [1]**
110/1
**barricade [23]**
12/7 15/13
23/16 23/25
24/6 24/13
24/20 25/13
25/19 25/24
25/25 26/4
26/6 26/24
27/12 31/8
33/11 36/18
56/2 90/23
96/1 99/9
107/6

**barricades [40]**
12/17 13/6
15/23 24/19
27/10 27/11
32/25 33/5
33/14 33/18
35/1 35/15
36/11 36/16
37/23 54/10
55/17 64/10
66/9 88/14
90/3 94/13
94/17 94/23
97/5 97/20
98/12 98/17
98/19 99/1
99/5 99/6
99/19 100/3
103/12 105/20
106/2 107/23
108/4 108/5
**barrier [9]**
15/5 15/7
16/11 24/9
25/5 25/7 31/3
91/9 100/24
**barriers [12]**
11/10 11/19
11/25 13/19
13/21 13/23
14/10 14/18
24/10 24/14
24/17 87/19
**based [24]**
9/25 45/5
52/20 53/23
55/2 62/13
63/5 70/10
73/14 73/19
75/15 76/4
78/25 85/19
90/25 91/14
91/16 91/21
113/9 114/13
122/17 130/24
133/17 138/6
**basement [1]**
126/19
**bases [1]**
113/7
**Bashay [1]**  3/9
**basically [2]**
78/15 130/9
**basis [3]**
59/11 60/21
77/9
**baton [1]**
90/15

**battalion [1]**
40/7
**bear [1]**
130/14
**bearing [1]**
104/9
**bears [2]**
128/20 128/25
**became [3]**
124/9 124/11
127/17
**become [2]**
98/3 126/22
**becomes [1]**
71/16
**beforehand [2]**
43/5 100/21
**began [4]**
11/19 11/24
25/8 96/16
**begin [6]**
23/16 23/16
43/13 88/12
98/19 122/11
**beginning [4]**
3/6 58/1
106/12 112/12
**begins [1]**
117/14
**behalf [6]**  3/3
3/15 5/10
28/16 37/15
99/16
**behavior [5]**
45/20 47/7
71/7 111/8
123/15
**behind [6]**
26/1 26/5
43/12 99/3
99/4 118/24
**beige [1]**
55/19
**belie [1]**
42/21
**belief [1]**
45/6
**beliefs [2]**
105/4 127/9
**believes [3]**
36/23 42/2
126/1
**belittled [1]**
116/2
**below [1]**
36/20
**bench [1]**
65/13

**benefit [2]**
9/3 129/14
**besides [3]**
46/17 65/20
72/11
**best [3]**  75/9
81/20 110/15
**better [2]**
121/19 134/11
**betterment [1]**
124/20
**beyond [1]**
55/1
**bicycle [2]**
70/19 123/12
**big [1]**  121/9
**bike [2]**
103/22 122/25
**Bikundi [2]**
40/22 49/5
**Bill [4]**  35/17
58/20 103/8
115/15
**Bill's [1]**
45/2
**binding [3]**
78/12 85/2
85/3
**bit [3]**  9/22
34/14 114/11
**Black's [1]**
87/2
**blame [1]**
110/4
**blue [7]**  19/16
20/7 21/6 21/9
30/19 41/24
128/5
**body [2]**  87/19
119/7
**BOLAS [3]**  1/15
3/9 32/19
**bond [2]**
138/19 139/19
**BOP [2]**  120/16
139/10
**borne [2]**
71/23 72/6
**both [15]**
15/13 36/12
46/8 54/8
59/19 79/3
84/2 107/14
107/16 107/16
107/19 107/21
107/22 107/22
110/24
**bothers [3]**

127/21 129/3
130/8
**bottom [2]**
81/18 133/18
**Box [1]**  1/18
**boy [1]**  131/9
**Boys [7]**  33/25
34/7 94/2 94/7
94/10 94/13
94/18
**Branch's [1]**
125/14
**breach [46]**
11/19 11/25
13/6 13/8
13/23 14/18
15/8 21/23
23/16 25/4
25/7 25/9
25/13 25/20
32/4 32/25
33/5 33/11
33/14 33/18
35/1 36/10
37/23 44/23
45/1 51/4
51/25 52/8
54/10 54/11
54/12 55/17
56/1 66/8
94/17 95/9
97/5 98/12
98/17 98/21
99/19 100/15
102/15 105/20
108/4 108/8
**breached [17]**
19/21 21/17
21/18 21/24
22/1 27/10
27/11 27/13
42/1 44/18
44/21 51/2
51/2 51/5 51/5
64/10 98/8
**breaches [6]**
26/20 26/24
27/2 55/25
56/7 94/22
**breaching [11]**
12/17 13/19
13/20 15/23
21/21 26/8
44/12 47/5
51/24 94/12
99/6
**break [9]**
53/15 77/24

**B**

**break... [7]**
77/25 98/22
101/16 118/23
122/3 122/14
122/15
**breaking [2]**
105/1 121/1
**breath [1]**
16/23
**brief [5]**    28/1
38/6 83/25
86/3 92/13
**briefly [7]**
30/7 42/4 50/2
76/9 86/7
90/13 90/15
**bring [5]**    23/6
33/10 35/22
38/15 47/20
**bringing [1]**
38/4
**brings [1]**
34/4
**broach [1]**
26/22
**broadcast [1]**
95/12
**Brock [2]**
110/7 114/10
**Brodie [1]**
50/5
**broken [2]**
103/12 119/11
**brought [8]**
47/20 47/21
94/6 96/5
107/19 119/21
123/16 130/14
**build [1]**
108/14
**building [26]**
17/2 17/3
17/10 27/18
27/23 34/3
39/8 88/14
88/18 89/1
94/4 95/10
95/19 97/22
100/9 100/23
101/24 102/8
102/14 102/17
102/21 102/25
106/1 106/6
117/1 119/10
**buildings [1]**
27/16

**bulldozed [1]**
102/12
**bullhorn [8]**
16/7 51/17
51/18 51/21
94/19 105/14
107/25 131/24
**bully [3]**
106/9 127/22
128/2
**Bureau [3]**
7/25 9/13
104/12
**bus [7]**    9/20
9/24 18/11
18/12 18/14
18/16 18/18
**buses [1]**
30/15
**Bush [2]**
124/11 124/14
**business [2]**
103/10 104/16

**C**

**calculated [5]**
73/14 74/10
108/25 109/18
133/17
**calculation [3]**
74/9 77/3
114/9
**calculations
[1]**    135/3
**call [4]**    5/23
42/17 56/4
64/25
**called [8]**
56/8 56/10
66/9 95/20
119/11 123/1
123/24 129/5
**calling [2]**
54/12 105/12
**calls [1]**    95/4
**came [18]**    3/23
17/19 23/9
24/14 27/19
41/22 41/24
48/7 48/24
51/15 61/11
61/15 81/9
122/18 124/12
126/8 126/25
133/1
**can [50]**    4/10
4/21 4/25 6/2
9/21 9/22

10/24 11/13
11/16 15/20
16/4 18/9
19/10 20/14
23/20 30/18
30/22 34/2
38/14 45/12
51/16 53/15
56/15 62/6
62/7 64/1 66/5
66/25 69/18
76/23 77/12
80/11 81/11
82/18 84/9
88/22 90/2
94/3 98/6
103/1 105/4
108/14 116/16
131/3 131/13
132/7 135/9
136/3 138/23
138/25
**Capitol [61]**
3/10 6/20 8/10
10/1 10/2 10/7
10/9 10/11
17/3 17/10
17/18 22/13
27/20 27/23
33/6 38/19
39/8 70/20
88/14 89/5
91/8 92/8
93/12 95/9
95/15 95/19
95/22 96/15
96/21 97/2
97/7 97/22
97/25 98/23
99/6 99/11
100/8 101/23
102/7 102/14
102/21 103/6
103/12 103/19
103/23 105/12
106/1 106/6
107/20 111/12
113/14 117/1
118/21 118/22
119/9 121/4
128/2 129/5
135/7 136/15
136/19
**captured [1]**
110/19
**cardiac [1]**
116/6
**care [1]**

121/19
**cared [1]**
124/18
**carry [2]**
41/12 136/25
**case [58]**    7/23
8/1 9/9 27/1
28/3 28/6 29/6
40/16 45/3
45/5 45/11
48/8 48/10
48/19 49/1
49/6 50/3 50/4
54/5 60/7
66/23 67/22
69/7 69/20
70/10 71/5
71/12 71/13
72/9 77/16
78/12 78/13
78/21 86/23
90/20 92/23
100/11 104/10
105/23 106/14
107/12 108/22
109/8 109/9
110/25 111/2
111/13 112/9
113/20 124/5
124/24 129/18
131/1 133/2
133/9 133/10
135/23 139/4
**cases [14]**
50/14 64/14
68/18 86/24
89/7 106/22
106/25 107/7
107/10 112/10
112/11 120/19
124/1 131/1
**cast [1]**
123/24
**category [1]**
107/16
**catheterization
[1]**    116/9
**cause [8]**    40/2
52/1 56/8
93/24 103/10
129/12 132/8
135/17
**caused [5]**
73/10 116/24
123/15 128/17
128/22
**celebrating [1]**
102/15

**center [1]**
98/4
**centered [1]**
48/2
**central [1]**
109/12
**cert [2]**    61/14
81/10
**certain [3]**
52/4 55/13
110/8
**certainly [3]**
36/16 37/10
104/20
**certification
[15]**    7/6 92/9
93/23 101/8
102/1 102/4
102/13 105/17
107/21 109/14
109/16 110/9
111/13 112/3
113/2
**certified [1]**
110/6
**certify [1]**
140/4
**certifying [1]**
112/21
**cetera [1]**
75/4
**chain [1]**
100/25
**challenge [2]**
60/13 61/3
**challenged [1]**
120/14
**challenging [3]**
65/7 67/20
86/19
**change [2]**
66/2 117/11
**changed [6]**
82/12 83/16
114/8 114/9
114/11 115/24
**changes [1]**
66/1
**chant [3]**    39/1
93/17 96/15
**chants [1]**
37/17
**character [1]**
4/15
**characteristics
[3]**    107/14
115/2 115/18
**characterizatio
n [3]**    54/16

**C**

**characterizatio n... [2]** 54/22 60/17
**characterizatio ns [1]** 76/12
**charge [26]** 17/21 58/25 59/7 59/8 65/8 65/10 65/20 66/4 66/13 72/4 76/21 77/4 77/5 77/10 77/11 77/23 111/4 121/1 125/13 133/20 133/24 134/19 134/20 134/24 134/24 137/7
**charged [7]** 6/18 6/22 9/25 17/14 69/23 76/16 117/2
**charges [10]** 17/20 57/10 66/11 106/23 111/18 113/10 113/11 114/7 115/19 137/8
**charter [4]** 9/20 9/24 18/11 30/15
**chartered [1]** 18/18
**check [1]** 74/8
**cheered [1]** 98/7
**cherish [1]** 45/9
**children [1]** 115/11
**chime [1]** 52/5
**chose [1]** 23/3
**Chris [1]** 125/13
**Christ [1]** 123/7
**Christian [1]** 64/3
**Christmas [1]** 115/6
**church [11]** 34/17 47/21 48/3 48/23 48/24 96/6 104/5 126/23

126/23 126/24 126/25
**church's [2]** 103/15 103/16
**Cincinnati [1]** 1/21
**circle [4]** 15/1 15/20 16/4 30/22
**circled [1]** 16/6
**circling [1]** 15/10
**Circuit [8]** 40/18 40/22 45/4 78/11 78/21 86/23 110/9 114/10
**Circuit's [1]** 110/7
**circumstances [13]** 41/16 52/9 52/14 56/25 63/4 63/13 69/8 70/1 71/14 71/25 113/16 116/20 117/3
**cite [1]** 40/21
**citizen [1]** 115/23
**civil [17]** 54/20 55/12 55/21 55/23 58/21 58/24 59/21 81/8 97/18 102/2 103/10 112/16 112/19 112/20 119/12 119/20 132/23
**claim [2]** 45/14 124/19
**claimed [6]** 50/11 57/12 103/9 103/11 104/10 106/10
**claims [2]** 103/19 125/20
**clarify [1]** 13/18
**clause [2]** 61/1 83/6
**Clay [2]** 12/14 96/4
**Clayton [1]** 30/12
**clean [2]**

104/19 115/7
**clear [9]** 13/3 13/4 46/10 59/2 97/5 104/8 105/16 131/23 139/12
**clearly [19]** 44/2 44/20 51/15 52/7 52/14 52/20 53/1 54/1 54/17 55/1 63/4 69/10 72/18 86/18 88/19 89/3 93/7 110/13 112/18
**clergy [1]** 126/17
**Clerk [1]** 136/21
**client [9]** 28/12 28/18 59/6 78/7 80/7 86/16 86/18 86/20 122/6
**client's [2]** 60/23 66/20
**climb [1]** 119/10
**clip [2]** 35/6 38/10
**clipped [1]** 65/3
**close [7]** 26/15 71/3 72/8 88/18 124/12 135/9 139/6
**closer [1]** 9/22
**closing [1]** 112/14
**clue [1]** 23/13
**CNN [1]** 119/4
**co [2]** 3/15 43/2
**co-counsel [2]** 3/15 43/2
**coat [1]** 55/19
**code [5]** 38/23 39/4 109/22 110/2 134/17
**cognizant [1]** 89/13
**coincidence [1]** 36/18
**collapse [1]**

116/7
**collateral [1]** 117/9
**College [4]** 88/24 92/10 111/16 112/22
**colloquy [2]** 81/12 112/15
**COLUMBIA [3]** 1/1 16/14 136/15
**coming [9]** 10/17 18/10 19/11 34/18 67/12 90/9 96/23 121/2 121/2
**command [2]** 37/5 96/8
**commander [1]** 96/1
**commands [1]** 106/3
**commended [1]** 129/12
**comment [12]** 56/12 56/13 57/20 57/21 57/25 58/1 58/13 81/18 81/19 83/3 83/6 84/3
**commentary [1]** 57/24
**comments [1]** 42/21
**commission [7]** 50/10 57/17 72/4 84/12 84/13 85/8 110/13
**commit [4]** 7/5 52/12 72/14 72/16
**commits [1]** 67/23
**committed [4]** 52/13 56/23 71/8 124/7
**committee [2]** 3/24 3/25
**committing [2]** 39/18 46/25
**common [1]** 131/14
**communicate [1]** 51/19
**communicated [1]** 52/17

**communicating [1]** 53/2
**communications [1]** 28/13
**communities [1]** 115/6
**community [3]** 129/20 138/10 138/18
**comp [4]** 119/22 120/1 120/10 120/17
**company [5]** 9/20 9/24 18/14 18/16 18/18
**comparator [1]** 107/7
**compensation [1]** 115/10
**competent [1]** 24/2
**complete [2]** 5/11 59/21
**complies [4]** 15/2 15/21 16/5 30/23
**comply [7]** 40/10 99/25 121/14 135/13 135/15 135/25 136/7
**conceivable [1]** 63/2
**conceivably [2]** 48/15 48/17
**concerned [5]** 129/25 133/18 134/1 134/22 135/1
**concerning [1]** 55/15
**concerns [1]** 127/3
**conclude [17]** 52/22 53/3 53/10 53/12 71/21 72/5 72/25 73/9 85/7 85/18 88/22 91/12 131/21 138/2 138/9 138/15 138/17
**concluded [4]** 77/1 89/12 125/17 125/17
**concludes [1]**

**C**

concludes...
**[1]**  63/10

concurrent **[2]**
134/20 134/25

condition **[2]**
81/1 135/19

conditional **[1]**
87/14

conditions **[6]**
104/14 128/10
135/12 135/13
136/5 136/6

conduct **[58]**
8/10 17/7 44/9
45/3 45/15
45/20 46/7
54/8 55/6
56/12 56/15
56/16 57/2
57/3 57/16
57/18 58/6
58/14 59/16
60/24 60/24
62/22 63/18
66/21 66/21
66/23 66/24
68/14 68/17
68/22 69/1
69/4 69/12
71/17 71/23
77/12 83/18
85/5 92/14
105/1 105/8
106/16 106/21
110/19 111/4
112/2 112/8
113/9 113/12
114/10 114/13
122/13 122/25
131/22 132/4
134/4

confident **[1]**
138/5

confinement **[4]**
117/17 117/23
118/1 121/8

conflict **[1]**
82/1

confronted **[1]**
107/22

confused **[1]**
25/3

congregants **[1]**
93/6

congregation
**[8]**  34/18

36/24 37/3
48/18 63/24
93/1 96/5
102/19

Congress **[6]**
95/16 97/23
102/2 105/16
110/4 112/21

Congress' **[1]**
110/12

conjunction **[1]**
41/12

connected **[1]**
38/7

connection **[1]**
46/5

consequences
**[1]**  117/9

consider **[10]**
105/4 105/9
106/19 106/22
106/25 107/4
113/15 123/18
124/4 133/16

consideration
**[2]**  75/19
113/17

considered **[5]**
104/11 133/7
133/9 133/15
134/16

considering **[9]**
59/7 76/25
108/16 111/18
130/3 131/21
132/6 138/11
138/12

consisted **[1]**
59/20

consistent **[14]**
40/3 40/10
40/14 41/18
44/12 52/16
53/2 53/5 63/7
67/1 70/24
80/22 82/15
127/10

consisting **[1]**
92/16

constituted **[1]**
108/6

constitutes **[1]**
86/21

Constitution
**[2]**  1/24
136/16

constitutional
**[4]**  105/2

110/12 111/6
111/9

constitutionall
y **[1]**  45/7

construction
**[2]**  104/16
115/8

construed **[2]**
87/16 87/17

contact **[10]**
11/7 42/24
86/16 86/19
86/20 86/22
87/12 87/21
87/22 135/10

contested **[2]**
59/23 60/4

contests **[2]**
56/16 58/14

context **[2]**
95/7 105/10

continuance **[2]**
61/12 80/2

continue **[8]**
61/15 77/25
78/22 80/4
81/11 87/24
116/22 122/20

continued **[7]**
66/7 70/3
81/14 99/19
101/7 101/13
119/6

continues **[1]**
57/11

contradicts **[1]**
69/7

contrary **[3]**
61/2 103/11
125/17

contributed **[4]**
106/4 128/18
128/20 131/18

control **[40]**
35/19 36/6
36/9 36/22
39/23 39/25
40/1 40/20
40/23 41/7
41/17 41/19
43/9 46/11
46/19 47/18
47/21 47/25
48/1 48/22
48/22 49/8
49/11 49/13
49/20 49/22
50/4 50/6

50/15 50/16
50/17 50/22
51/6 51/11
60/6 70/21
95/25 96/12
97/4 103/24

controlled **[2]**
37/10 64/20

controlling **[3]**
26/4 26/5
43/7

controls **[1]**
127/13

conversation
**[2]**  11/20
34/7

conversations
**[2]**  28/18
66/7

convey **[1]**
72/13

conveyed **[1]**
53/6

convicted **[5]**
28/3 110/24
111/11 120/12
132/21

conviction **[12]**
8/22 106/24
111/22 111/22
111/23 112/24
117/7 117/7
118/14 120/6
120/24 137/2

convince **[1]**
59/4

convincing **[1]**
139/12

Cooke **[4]**
120/18 120/21
121/5 121/11

Cooper **[3]**
111/21 111/25
112/6

coordinated **[1]**
98/16

COPD **[1]**  16/25

copy **[2]**  20/10
20/10

corpus **[1]**
29/15

correctly **[1]**
20/24

corrupt **[3]**
100/13 109/15
114/16

Coshocton **[1]**
115/21

counsel **[26]**
3/4 3/15 5/21
43/2 53/23
55/10 62/20
62/21 64/12
66/5 66/20
67/8 68/9
68/19 69/25
71/9 76/13
76/14 83/7
88/6 109/2
112/15 112/19
117/12 122/6
137/8

counsel's **[2]**
50/14 69/8

count **[12]**
55/7 55/20
68/24 80/7
111/1 118/13
118/14 119/19
119/23 120/6
120/24 133/20

counter **[1]**
57/2

counterfactual
**[1]**  76/18

countless **[1]**
97/24

country **[10]**
104/7 115/9
124/21 130/18
131/8 131/11
131/15 131/18
134/9 134/11

counts **[5]**
77/20 113/12
137/11 137/18
137/19

couple **[1]**
26/14

coupled **[1]**
52/24

course **[12]**
4/21 47/18
47/23 48/23
64/22 83/16
99/22 117/20
117/24 118/16
120/15 120/22

court **[126]**
1/1 1/23 1/23
3/23 6/24 19/9
28/7 29/6 42/2
44/1 45/11
49/9 49/23
53/14 54/3
54/16 54/21

**C**

**court... [109]**
55/2 55/8
55/11 55/13
55/15 57/20
58/14 59/2
59/8 60/22
61/14 62/8
63/10 64/12
64/21 65/13
65/16 65/18
67/11 68/2
69/15 69/18
69/19 70/12
70/15 72/7
74/24 75/25
77/1 77/11
78/13 78/13
78/17 78/19
79/10 79/19
81/3 81/4
81/11 86/8
86/9 86/24
87/24 92/6
92/13 92/15
94/15 94/24
94/25 95/3
96/11 97/13
97/15 98/6
98/12 98/24
100/3 100/12
101/9 101/11
102/6 104/1
104/11 105/4
105/9 106/18
106/22 107/4
108/15 108/17
108/17 108/19
109/4 109/15
109/19 110/9
111/7 111/23
112/15 112/20
113/3 113/14
113/19 113/22
114/2 114/8
114/10 114/17
116/22 117/16
117/19 120/3
120/5 120/8
120/18 121/22
121/23 122/2
123/14 124/13
128/13 132/21
136/12 136/21
137/1 137/3
137/5 137/6
140/3

**Court's [10]**
35/24 38/4
70/13 74/10
106/13 109/25
111/1 112/13
113/18 137/18
**courthouse [2]**
3/23 8/13
**courtroom [3]**
8/13 10/24
80/1
**courts [4]**
1/24 106/24
109/24 118/5
**cover [1]**
77/12
**cr [2]** 1/4
89/8
**creating [2]**
128/21 131/16
**credibility [1]**
72/20
**credible [7]**
42/3 42/5
43/13 88/10
89/24 90/12
90/19
**credit [3]**
43/21 56/17
57/6
**crew [2]** 98/8
102/12
**crime [21]** 7/5
17/14 46/25
50/12 52/12
52/12 56/23
56/24 57/15
57/17 69/23
71/9 72/14
72/16 85/9
109/7 109/25
110/3 124/6
132/9 136/3
**crimes [4]**
6/24 69/5
105/6 109/20
**criminal [14]**
1/3 3/2 5/19
6/19 44/5
45/14 47/7
48/23 52/1
71/7 104/22
107/16 109/22
110/2
**CRM [1]** 1/13
**Cross [3]** 2/5
18/6 18/7
**Cross-Examinati
on [3]** 2/5

18/6 18/7
**crowd [55]**
23/3 33/10
34/10 34/12
34/25 35/15
36/4 36/22
36/24 37/9
37/21 38/11
38/12 38/18
39/3 39/7 43/3
44/12 45/12
50/22 50/22
52/5 52/5 52/7
52/16 52/23
54/25 55/17
63/6 70/21
88/25 89/14
90/12 93/12
93/13 93/16
94/20 95/4
95/7 95/13
95/18 96/2
96/9 96/14
96/16 97/4
98/7 99/9
99/14 99/15
100/21 101/14
103/24 105/15
108/1
**crowd's [2]**
63/6 99/14
**crowded [1]**
45/12
**Crystal [1]**
3/4
**culpability
[10]** 59/10
67/2 67/24
68/11 68/13
68/15 69/10
68/25 69/10
71/11
**culpable [2]**
46/4 69/5
**current [1]**
84/21
**currently [2]**
7/24 9/13
**CURT [3]** 1/20
1/20 3/15
**Cusanelli [4]**
107/3 113/20
120/10 120/15
**cusp [1]**
138/14
**custodial [2]**
118/6 121/17

**D**

**D.C [17]** 10/6
18/10 18/19
18/23 19/2
19/6 19/11
30/16 40/18
40/22 45/4
78/11 78/21
86/23 93/6
110/7 139/10
**damage [3]**
116/24 118/25
135/7
**danger [4]**
123/3 138/10
138/18 139/12
**dangerous [1]**
106/7
**dark [1]** 111/8
**date [4]** 61/12
96/12 116/8
140/10
**dated [1]** 5/1
**David [1]** 3/10
**day [39]** 3/25
5/19 10/5
10/13 26/25
42/20 44/2
63/20 93/14
97/25 118/13
119/12 120/22
120/23 121/11
124/9 125/11
125/25 126/16
126/23 126/24
127/21 128/5
128/8 128/11
128/15 128/24
129/12 129/13
129/17 129/19
131/24 132/1
132/4 132/6
132/11 133/12
135/7 139/6
**day,' [1]**
119/5
**days [5]** 34/21
97/6 121/6
137/2 139/4
**DC [5]** 1/5
1/14 1/15 1/16
1/25
**dead [1]** 134/9
**deal [2]** 5/15
68/18
**debris [1]**
104/19

**December [3]**
80/1 81/10
92/25
**December 2020
[1]** 92/25
**decide [3]**
38/13 49/9
50/16
**decided [9]**
42/25 52/3
56/4 64/13
64/14 64/21
114/8 114/10
120/5
**decides [1]**
71/10
**deciding [5]**
51/13 72/10
72/24 124/4
137/25
**decision [19]**
7/23 8/1 28/7
28/15 29/1
29/4 40/17
50/9 56/2
58/25 67/10
72/6 78/19
107/1 107/2
110/1 111/1
113/18 139/14
**declined [1]**
94/13
**decrease [4]**
74/17 74/24
79/10 91/17
**deems [1]**
56/17
**defeated [1]**
124/11
**defeats [1]**
134/8
**defendant [179]**

**defendant's
[40]** 4/14 5/2
18/2 33/3 33/5
34/17 34/23
35/16 36/17
36/24 37/3
50/21 60/13
61/3 70/11
70/15 92/14
93/25 94/6
94/17 96/10
100/12 102/12
104/8 105/2
105/9 105/20
107/12 108/18

**D**

**defendant's...**
**[11]**  109/17
110/19 111/4
111/8 112/2
112/11 112/25
113/4 114/10
114/13 137/23
**defendants [3]**
89/9 106/20
118/12
**defense [22]**
5/9 39/13
50/14 54/4
55/10 58/19
64/11 66/5
66/19 69/8
69/11 75/5
76/13 76/14
78/5 83/7 88/6
89/23 109/2
112/15 112/19
114/21
**defer [1]**
109/4
**defibrillator**
**[1]**  116/10
**defined [1]**
87/4
**definition [2]**
87/2 87/2
**degree [3]**
45/6 50/12
68/22
**delayed [1]**
3/21
**delaying [1]**
101/25
**delivers [1]**
115/6
**demands [1]**
105/21
**demeanor [1]**
117/11
**democracy [6]**
109/13 124/18
134/5 134/6
134/9 134/13
**democratic [4]**
93/7 109/21
110/11 125/6
**Democrats [1]**
124/16
**demonstrably**
**[1]**  70/13
**demonstrated**
**[1]**  54/1

**denial [6]**
60/15 61/4
61/6 63/15
63/16 71/8
**denied [6]**
57/11 68/1
68/10 86/16
86/18 106/10
**denies [3]**
56/16 57/22
58/13
**denigrating [1]**
130/11
**deny [9]**  49/23
57/5 57/11
62/24 68/5
68/15 71/20
85/22 87/25
**denying [6]**
57/10 59/11
67/24 67/25
69/4 86/10
**department [7]**
5/15 53/7
130/15 135/15
136/1 136/10
136/23
**department's**
**[1]**  4/5
**departure [6]**
92/21 109/7
111/16 112/1
112/6 113/7
**departures [2]**
106/25 110/20
**dependent [1]**
74/9
**depends [3]**
44/6 62/25
134/6
**depicted [2]**
47/11 52/24
**deprives [1]**
57/19
**derailed [1]**
110/12
**describe [2]**
11/13 30/18
**described [3]**
58/7 103/14
118/18
**describes [1]**
8/9
**describing [1]**
34/23
**design [1]**
112/21
**desire [3]**

44/21 73/8
126/14
**desired [1]**
89/1
**despite [6]**
72/23 85/19
110/10 111/3
125/12 125/22
**destroying [1]**
119/24
**destruction [1]**
130/18
**detail [1]**
42/11
**detailed [1]**
108/22
**details [1]**
42/17
**detain [1]**
138/18
**detained [2]**
139/10 139/19
**detaining [1]**
118/19
**detention [3]**
131/21 134/3
135/11
**deter [2]**
101/19 132/5
**determination**
**[2]**  73/15
91/16
**determinative**
**[1]**  49/1
**determine [3]**
75/10 81/20
139/17
**determined [3]**
74/25 79/11
111/24
**determines [1]**
58/15
**determining [1]**
50/6
**deterred [1]**
99/5
**deterrence [3]**
105/21 117/10
117/14
**detrimental [1]**
130/16
**developed [1]**
126/25
**die [1]**  128/23
**died [1]**  128/9
**difference [3]**
45/22 49/12
84/1

**differences [3]**
93/3 107/10
117/5
**different [5]**
46/17 54/3
82/7 113/6
132/14
**differentiated**
**[1]**  46/8
**difficult [2]**
123/20 123/23
**diminished [1]**
130/4
**direct [4]**  2/4
6/8 31/5 41/17
**directed [2]**
33/14 33/17
**directing [2]**
26/3 39/3
**directly [10]**
10/10 28/18
31/7 84/12
90/10 95/14
96/21 106/4
107/19 128/17
**directs [1]**
106/18
**disagree [4]**
40/23 45/1
60/16 60/16
**disagreement**
**[2]**  44/25
85/16
**disagrees [1]**
61/19
**disasters [1]**
115/9
**disburse [1]**
136/21
**discord [1]**
103/10
**discretion [6]**
57/5 65/4
70/14 78/16
80/6 118/6
**discuss [2]**
92/20 107/7
**discussed [2]**
33/9 109/10
**discussion [3]**
35/3 78/1
96/18
**discussions [1]**
65/12
**dismiss [5]**
77/19 113/11
137/9 137/11
137/16

**dismissal [1]**
111/3
**dismissed [7]**
17/20 17/21
111/2 111/18
111/21 113/10
115/22
**disorder [15]**
54/21 55/12
55/21 55/23
58/21 58/24
59/21 81/9
97/18 102/2
112/16 112/20
112/20 119/20
132/23
**disorderly [1]**
113/12
**disparities [2]**
106/20 118/9
**displayed [1]**
10/18
**disposal [1]**
48/13
**dispute [4]**
54/9 76/12
96/8 114/4
**disputed [2]**
54/16 96/9
**disputes [2]**
5/14 69/23
**disrespect [1]**
105/24
**disrespected**
**[1]**  123/1
**disruption [1]**
112/2
**dissent [1]**
110/1
**distinctions**
**[1]**  49/3
**distinctive [1]**
94/12
**distress [1]**
129/11
**district [12]**
1/1 1/1 1/10
1/24 6/24
16/14 65/18
78/13 78/14
86/24 90/22
136/14
**divide [1]**
130/19
**divided [1]**
131/13
**division [1]**
131/17

**D**

DNA [1]    136/2
documentation
  [2]  115/20
  115/22
DOJ [2]    1/13
  120/20
DOJ-CRM [1]
  1/13
Donald [3]
  90/8 90/8
  96/14
donations [1]
  103/15
done [18]    28/6
  28/10 45/14
  51/24 58/22
  61/11 64/7
  67/6 76/6
  101/7 106/11
  108/14 114/11
  127/19 129/1
  129/11 135/7
  135/24
door [6]    54/24
  54/24 101/2
  101/14 119/9
  121/4
doors [6]
  101/5 101/13
  101/16 118/22
  118/24 118/25
doors' [1]
  118/23
doubled [1]
  103/18
doubt [1]
  110/11
DOUGLAS [7]
  2/3 5/23 6/8
  6/16 18/7 30/5
  107/5
down [20]
  16/15 16/20
  16/21 19/10
  26/12 27/7
  37/12 45/23
  61/25 74/19
  81/18 95/16
  102/9 103/19
  106/2 107/1
  119/15 124/12
  133/1 139/7
downplaying [1]
  63/18
downward [1]
  131/9

dozens [2]
  65/2 65/2
drafting [2]
  110/14 118/2
dream [1]
  115/14
dreamed [1]
  124/8
drive [2]    1/21
  18/18
driven [1]
  112/24
drove [2]
  18/11 18/12
drug [1]
  135/19
drugs [2]
  135/20 135/22
dual [1]
  116/10
due [3]    33/3
  88/9 116/11
DUNFEE [72]
  1/6 3/3 3/16
  5/11 11/3 11/7
  12/19 12/24
  13/4 15/11
  15/13 15/22
  20/5 21/12
  21/18 22/4
  23/15 25/1
  25/18 25/20
  26/3 26/11
  31/13 33/10
  34/4 34/4
  41/23 41/25
  42/7 42/12
  42/20 42/23
  42/25 43/6
  43/8 43/15
  43/17 44/1
  44/1 48/2
  55/16 56/13
  58/21 60/6
  61/18 63/24
  67/6 67/11
  67/18 87/14
  87/18 88/2
  92/7 110/23
  114/22 115/2
  115/3 115/3
  115/4 115/18
  115/23 116/3
  116/23 117/4
  117/11 117/15
  119/14 119/19
  119/25 120/1
  121/17 139/2

Dunfee's [5]
  83/17 85/5
  109/11 110/25
  121/25
during [17]
  4/10 4/21 4/25
  37/25 53/9
  66/6 78/10
  84/20 88/16
  92/7 92/14
  94/9 98/21
  99/13 100/15
  112/14 135/10
duty [1]    113/1

**E**

earlier [2]
  24/11 91/3
earliest [1]
  108/10
early [1]
  93/10
east [25]    10/7
  10/8 10/11
  22/13 26/25
  33/1 54/12
  54/13 55/25
  56/7 93/11
  94/2 94/23
  95/13 95/21
  96/2 97/21
  98/1 98/3
  100/4 100/19
  102/24 106/8
  107/21 121/4
easy [1]
  108/16
edition [5]
  83/13 83/14
  83/16 83/21
  84/10
editions [1]
  84/6
effect [12]
  19/15 32/3
  50/21 54/7
  56/8 64/6
  83/17 85/1
  85/4 85/12
  85/13 127/6
effective [1]
  106/9
effectuating
  [1]    25/19
efficiently [4]
  62/9 76/1
  79/20 81/5
effort [3]

98/4 98/16
  104/19
efforts [4]
  98/25 104/20
  109/2 115/7
egregious [1]
  112/8
eight [1]    5/4
either [11]
  5/18 22/12
  26/1 48/23
  51/14 61/4
  65/7 67/21
  72/3 84/5
  109/18
elected [3]
  93/2 93/15
  93/17
election [21]
  7/6 64/2 92/11
  93/5 93/14
  102/1 102/22
  103/4 110/6
  113/2 124/12
  124/17 124/19
  124/24 125/2
  125/18 125/20
  126/5 134/9
  138/15 139/6
elections [1]
  125/15
electoral [5]
  88/24 92/9
  111/15 112/22
  125/14
element [3]
  35/19 41/8
  49/13
elements [7]
  4/17 55/11
  57/14 59/20
  59/21 65/15
  65/15
eligible [2]
  88/7 88/9
Elkton [2]
  9/17 139/3
Ellipse [1]
  107/20
else [7]    5/5
  9/4 23/19
  39/11 91/18
  123/12 137/21
emissaries [4]
  33/8 55/16
  55/18 94/17
emissary [1]
  34/15

emotion [1]
  126/7
emulate [1]
  129/24
encourage [7]
  45/13 45/18
  45/19 54/6
  108/1 108/2
  131/23
encouraged [5]
  54/10 63/12
  96/2 105/25
  118/24
encouragement
  [3]    54/14
  56/11 66/8
encouraging [6]
  44/13 45/17
  47/7 54/17
  65/25 70/4
end [9]    11/20
  22/12 43/20
  57/7 57/21
  58/12 106/12
  112/12 113/11
endangered [2]
  109/20 110/11
ended [1]    18/9
ends [3]    12/12
  52/12 117/14
enforce [1]
  123/1
enforcement
  [14]    15/14
  54/15 54/20
  54/23 55/23
  64/8 70/22
  97/18 100/7
  101/4 101/18
  101/21 115/15
  127/24
enforcement's
  [1]    113/1
engage [10]
  33/10 34/6
  45/19 66/24
  87/12 89/2
  89/9 98/16
  132/3 132/8
engaged [6]
  64/11 87/12
  111/11 112/15
  131/22 132/4
engages [1]
  71/7
engaging [4]
  39/7 45/15
  89/10 113/13

**E**

**enhanced [1]**
65/3
**enhancement**
**[21]**  5/24
32/18 33/3
35/20 39/9
39/15 39/24
41/6 49/10
49/24 53/13
53/17 56/13
60/2 60/16
60/19 61/19
63/3 70/7
74/10 86/18
**enhancements**
**[4]**  109/10
109/23 110/8
110/15
**enjoy [1]**
96/11
**enough [4]**
26/15 100/2
124/18 124/18
**ensure [1]**
106/15
**enter [7]**  17/3
17/10 75/23
79/17 81/2
100/14 116/25
**entered [4]**
7/20 99/2
100/16 101/23
**entering [3]**
65/11 99/7
106/5
**entire [2]**
48/12 96/5
**entities [1]**
136/25
**entitled [14]**
54/2 56/25
59/17 62/3
71/4 71/15
72/25 85/10
85/20 91/13
91/14 103/8
136/22 140/5
**entity [1]**
136/22
**environment [1]**
128/21
**envisioned [1]**
124/7
**equally [1]**
41/5
**especially [2]**

**essentially [1]**
72/1
**establish [2]**
60/14 61/4
**established [1]**
37/8
**et [2]**  75/3
89/8
**Ethan [1]**  94/9
**eve [2]**  77/17
115/6
**even [25]**  19/9
20/5 21/25
40/12 42/22
43/8 46/22
48/11 57/14
60/21 69/9
71/21 72/8
73/16 79/24
83/19 83/20
87/20 97/2
97/5 99/6
114/9 116/13
117/23 128/16
**event [9]**
63/21 66/21
66/24 67/1
68/10 68/14
68/21 69/9
114/5
**events [3]**
55/4 70/16
85/9
**eventually [1]**
17/3
**everybody [1]**
43/19
**everyone [1]**
99/22
**evidence [18]**
33/21 33/23
34/14 44/1
50/20 51/15
54/5 63/4
70/10 71/23
90/18 99/15
100/11 100/13
101/23 103/11
125/18 139/12
**evolve [1]**
44/9
**exacerbated [1]**
139/9
**exactly [7]**
13/19 14/7
49/15 49/17
81/7 87/18

**89/22**
**examination [7]**
2/4 2/5 2/6
6/8 18/6 18/7
30/5
**examined [1]**
139/15
**example [4]**
38/25 40/6
41/22 75/17
**exceeded [1]**
104/25
**except [1]**
103/15
**exchange [1]**
9/4
**excuse [5]**
8/14 8/25
31/11 38/15
82/4
**excused [1]**
32/15
**Executive [1]**
125/14
**exercise [3]**
40/20 50/9
70/18
**exercised [1]**
87/7
**exercising [1]**
36/21
**exhibit [27]**
7/16 7/19 8/8
8/21 10/16
10/21 13/14
14/22 15/17
15/25 20/11
20/16 26/9
30/8 31/2 31/4
31/5 34/1 34/1
35/14 35/23
36/13 94/24
94/25 95/3
98/7 99/7
**Exhibit 1100**
**[1]**  7/19
**Exhibit 1101**
**[2]**  8/8 20/16
**Exhibit 1102**
**[1]**  8/21
**Exhibit 204 [2]**
35/14 35/23
**Exhibit 301 [1]**
34/1
**Exhibit 301A**
**[2]**  94/24
95/3
**Exhibit 303 [1]**
99/7

**Exhibit 403 [1]**
10/21
**Exhibit 411 [5]**
13/14 14/22
26/9 31/4
36/13
**Exhibit 412 [1]**
15/17
**Exhibit 413 [1]**
30/8
**Exhibit 415 [1]**
15/25
**exhibits [6]**
35/12 37/11
43/19 65/2
92/16 97/20
**existed [3]**
64/24 66/6
77/6
**existing [1]**
57/2
**expected [1]**
70/17
**expend [1]**
73/7
**expenditure [1]**
73/10
**expertise [1]**
115/9
**explain [1]**
18/9
**expressed [2]**
102/19 102/23
**expressing [2]**
69/2 70/3
**expressions [1]**
57/8
**extensive [3]**
5/20 65/1 65/4
**extensively [1]**
124/2
**extent [3]**
41/8 52/16
73/6
**extremely [1]**
130/16
**eyes [1]**  80/21

**F**

**F.3d [4]**  40/22
49/2 49/6 50/6
**F.4th [1]**
40/19
**F.Supp.3d [1]**
78/14
**face [1]**
109/19
**Facebook [2]**

**21/1 103/15**
**fact [42]**  7/1
7/5 34/15
34/22 37/13
39/22 40/23
42/4 42/8
42/21 45/15
48/9 53/3
53/11 56/23
57/12 60/13
61/2 62/21
63/10 63/12
64/9 64/18
65/16 68/12
71/11 71/17
77/11 78/23
88/17 89/13
97/5 97/20
105/7 107/10
110/10 122/16
125/12 129/3
130/12 138/12
138/17
**factor [8]**
50/6 50/17
51/11 51/12
67/13 72/24
116/12 117/6
**factors [12]**
46/17 50/8
51/13 92/21
115/1 116/20
121/17 130/7
130/22 133/15
134/17 137/24
**facts [14]**
16/16 55/10
55/11 59/19
59/20 65/15
66/17 72/3
76/25 92/23
96/8 108/16
109/9 109/19
**factual [2]**
42/16 42/18
**factually [1]**
107/12
**failed [1]**
93/8
**failing [1]**
104/21
**failure [2]**
80/12 110/4
**fair [2]**  26/19
125/15
**faith [8]**  60/6
60/21 62/21
63/11 69/3

**F**

**faith... [3]**
77/9 123/19
123/19
**fall [1]**   49/19
**fallback [2]**
49/11 49/18
**falling [1]**
90/16
**falls [1]**
104/3
**false [10]**
17/15 17/20
17/21 60/15
61/4 61/6
63/15 70/13
104/1 125/19
**falsely [4]**
56/15 57/22
58/13 103/9
**familiar [1]**
61/8
**family [2]**
121/20 135/10
**far [10]**   8/2
24/25 52/18
64/9 67/17
129/24 133/18
134/1 134/21
135/1
**favor [3]**
65/17 105/22
128/5
**FBI [7]**   17/9
17/15 17/17
64/5 103/8
130/11 130/14
**FCI [1]**   139/3
**fear [7]**   93/1
93/18 93/20
105/16 125/4
129/15 131/12
**February [1]**
63/17
**federal [6]**
7/25 9/9 9/13
104/12 120/23
135/17
**feel [1]**   127/4
**fees [3]**   64/7
103/16 109/3
**fellow [1]**
40/14
**felony [11]**
66/13 76/16
117/7 117/7
118/13 119/19

120/6 133/20
133/23 134/19
134/24
**felt [5]**   70/22
71/1 123/3
124/16 135/24
**fence [1]**
99/23
**fencing [5]**
15/14 16/18
91/9 91/10
98/15
**few [5]**   26/11
28/2 38/12
92/18 118/9
**fight [8]**
19/16 20/7
21/6 21/9
41/23 90/2
96/3 96/16
**fighting [5]**
20/6 54/14
95/25 97/3
131/14
**figure [1]**
22/21
**figured [1]**
91/20
**file [4]**   28/14
29/14 29/18
80/12
**filed [3]**   5/3
125/16 137/5
**filing [1]**
4/22
**filings [3]**
4/7 8/1 109/1
**fills [1]**
24/19
**films [1]**
47/11
**final [2]**   4/4
80/25
**finally [6]**
56/19 57/7
90/5 90/13
92/20 113/16
**financial [3]**
121/20 136/9
136/12
**find [10]**
33/10 58/2
58/8 72/12
74/13 78/12
82/5 90/21
90/24 108/18
**finding [4]**
55/17 87/9

110/20 114/2
**findings [2]**
114/5 116/10
**finds [1]**
70/12
**fine [13]**   92/2
108/24 109/4
121/15 121/22
126/9 133/21
135/1 135/4
136/5 136/8
136/20 138/21
**fines [1]**
121/16
**finish [1]**
19/8
**fire [2]**   45/11
119/5
**firearm [1]**
117/9
**fired [1]**   51/3
**Firm [1]**   1/20
**first [31]**
5/15 5/16 21/4
22/19 26/9
26/21 26/22
33/6 33/8 36/6
39/16 42/9
45/6 45/9 46/3
46/14 46/17
47/16 58/13
70/3 70/18
98/2 98/21
100/14 104/25
117/13 118/15
119/10 124/6
136/17 136/18
**Firstly [1]**
54/3
**Fischer [17]**
7/23 28/8
28/15 29/1
29/4 58/25
77/6 81/12
81/15 110/1
110/16 111/1
111/22 112/10
113/18 114/8
120/5
**five [25]**   5/20
20/14 20/16
20/18 22/4
22/6 22/18
23/21 24/7
31/15 31/16
31/17 31/18
31/20 31/21
42/6 42/13

52/23 53/4
53/4 98/14
98/18 132/23
133/4 137/19
**five-year [1]**
132/23
**fived [1]**
102/16
**flagpole [1]**
121/5
**flesh [2]**
123/10 123/11
**flight [2]**
138/9 139/13
**flock [1]**
72/16
**Florida [2]**
115/19 124/13
**flowerbed [9]**
22/16 34/9
35/16 39/2
93/11 94/6
94/19 97/16
105/14
**focus [2]**
78/22 107/8
**follow [1]**
37/17
**followed [4]**
8/14 8/22
47/17 114/18
**follower [1]**
34/20
**followers [2]**
37/7 96/6
**following [4]**
21/1 92/14
104/19 129/8
**follows [1]**
126/2
**Fonticoba [1]**
106/24
**force [7]**
57/11 87/4
87/5 87/6 87/7
88/15 88/17
**forced [2]**
43/11 92/8
**forceful [1]**
70/8
**forcibly [2]**
88/19 112/18
**foregoing [1]**
140/4
**foreseen [1]**
110/5
**foreshadowing**
**[1]**   94/22

**forget [1]**
125/12
**formal [2]**
75/13 81/23
**formally [1]**
117/1
**formed [1]**
100/25
**former [3]**
95/8 95/11
124/25
**forsake [1]**
129/13
**forth [1]**   56/3
**fortunately [2]**
124/15 124/17
**forward [5]**
67/13 77/22
101/13 121/25
123/5
**found [33]**
29/12 54/21
54/24 55/2
72/2 74/24
78/10 78/22
86/8 87/3
87/11 88/15
89/6 90/23
92/6 96/11
100/12 101/9
104/1 106/21
107/25 108/6
109/15 109/23
110/8 110/9
111/3 111/7
111/7 111/11
111/25 112/6
133/21
**foundational**
**[1]**   109/12
**four [12]**   23/6
33/2 39/16
40/25 43/20
53/13 73/17
74/11 91/16
108/3 119/17
137/19
**four-level [1]**
91/16
**four-point [4]**
33/2 40/25
53/13 73/17
**fourth [1]**
42/10
**frankly [4]**
44/16 49/11
89/23 109/22
**free [4]**   45/9

**F**

**free... [3]**
115/10 115/11
137/7
**frenzy [1]**
98/2
**friend [4]**
12/13 22/23
23/4 31/8
**friends [1]**
30/13
**frivolous [4]**
60/15 61/4
63/13 63/15
**frivolously [3]**
56/16 57/22
58/14
**frivolousness
[1]** 61/6
**front [33]**
16/15 20/22
22/16 26/25
33/1 36/5
42/23 54/11
54/12 54/13
54/14 54/15
56/1 56/7
93/12 94/3
94/23 95/13
95/21 95/22
96/1 96/2
97/21 98/1
98/3 100/4
101/3 101/5
102/25 106/8
107/22 120/5
120/8
**fruits [1]**
50/12
**full [6]** 6/10
59/19 77/15
81/15 82/14
115/12
**fully [9]**
60/23 63/21
65/13 66/22
67/15 86/19
109/24 110/3
139/5
**function [5]**
109/12 111/17
112/3 113/2
113/8
**fundraising [2]**
103/17 109/2
**funds [3]**
109/3 136/21

136/22
**further [12]**
5/10 12/19
31/11 32/1
54/19 60/12
61/24 100/18
104/1 132/9
135/25 136/3
**fury [1]** 87/5

**G**

**gaining [1]**
89/4
**gallery [1]**
3/9
**games [1]**
93/16
**gas [1]** 102/16
**gastroenterolog
ist [1]** 116/5
**gates [7]**
34/11 37/20
94/21 95/9
97/17 98/8
105/18
**gather [2]**
33/14 33/17
**gathered [3]**
93/13 94/2
97/23
**gave [7]** 11/18
26/8 62/9
79/23 81/8
81/8 120/10
**gear [2]** 99/17
100/16
**general [2]**
33/7 105/21
**generally [1]**
47/18
**gentleman [5]**
11/11 11/13
11/15 22/23
24/18
**gets [3]** 34/4
40/8 72/16
**given [11]**
34/16 73/16
77/5 85/24
92/23 93/1
106/23 118/17
119/4 133/5
133/7
**gives [2]**
29/12 37/14
**giving [1]**
132/14
**glass [1]**

118/23
**goal [3]** 98/11
99/5 101/25
**goals [1]**
106/16
**God [7]** 103/2
122/19 126/1
126/2 127/10
127/12 129/6
**God's [2]**
122/21 127/10
**goes [14]**
28/18 33/9
34/3 34/8
46/13 48/13
64/4 64/9
69/22 75/14
79/13 82/2
86/5 134/5
**good [17]** 3/7
3/12 3/13 3/14
3/17 6/10
16/25 30/2
39/14 60/6
60/21 62/21
63/11 69/3
77/9 132/15
132/16
**Gore [2]**
124/10 124/18
**government
[100]** 1/12
3/6 4/9 4/20
4/24 5/21 7/9
7/20 9/3 26/10
32/16 32/17
33/1 33/13
36/2 36/22
43/6 43/18
44/20 47/12
49/10 50/1
50/20 51/11
53/23 53/24
55/9 56/22
57/16 61/5
61/22 62/6
62/7 62/8
62/12 62/18
62/20 62/23
65/21 66/20
68/8 70/14
73/7 73/25
75/2 75/9
75/13 75/15
75/20 75/24
75/25 76/3
76/11 77/4
77/15 77/19

78/6 78/15
78/18 78/24
79/14 79/18
79/19 80/2
80/15 80/25
81/4 81/6
81/20 81/23
82/2 85/21
86/15 87/15
88/4 91/5 92/4
101/22 104/2
108/15 108/22
109/1 109/3
109/12 109/18
111/17 112/3
113/6 113/10
114/17 117/18
119/22 120/11
120/22 129/23
130/15 130/17
137/7 137/8
137/10
**government's
[28]** 3/22
4/12 4/18 4/22
5/3 5/16 8/8
8/21 14/21
15/17 30/8
49/18 53/10
59/15 59/22
60/20 74/14
74/22 80/11
85/19 89/11
94/1 97/8
104/9 106/13
107/7 118/17
120/25
**governmental
[2]** 113/2
113/8
**grabbed [3]**
15/7 90/14
90/15
**grabbing [1]**
118/18
**Graham [1]**
49/2
**grand [2]**
16/14 16/15
**grandmother [1]**
126/21
**grandmother's
[1]** 126/18
**grandsons [2]**
123/6 123/18
**grant [2]** 73/1
80/12
**granted [8]**

61/14 75/12
81/10 81/23
111/16 112/11
113/19 137/20
**gravity [2]**
105/5 114/11
**great [1]**
41/22
**greater [7]**
41/8 74/10
75/1 79/12
121/13 127/6
127/25
**grew [1]**
126/17
**ground [1]**
96/1
**grounds [4]**
89/4 93/12
100/14 113/14
**group [24]**
12/2 12/13
18/19 22/4
22/18 22/22
23/24 31/24
34/2 34/4 37/6
41/9 45/23
45/25 46/10
46/11 46/12
48/8 52/25
53/4 94/9
98/19 101/5
104/19
**groups [1]**
104/6
**guess [3]**
47/22 84/6
85/6
**guide [1]** 39/8
**guideline [6]**
52/14 53/11
91/21 92/1
110/17 114/6
**guidelines [44]**
50/8 53/16
57/21 62/2
67/14 73/13
73/19 74/9
75/8 77/3
82/18 83/3
83/8 84/10
84/16 84/19
84/21 84/25
85/3 86/1
91/18 106/12
108/24 109/17
109/23 110/14
110/20 111/14

**G**

guidelines...
[16]   111/24
112/9 112/12
112/23 112/24
113/17 114/3
114/9 117/20
117/20 117/21
117/25 121/10
121/15 133/16
134/16
guilt [1]   72/1
guilty [22]
7/1 7/4 7/8
29/12 56/24
59/6 65/7 65/9
65/11 66/11
71/12 72/2
75/23 76/24
77/23 79/17
80/8 81/3
106/21 108/10
123/25 133/21

**H**

habeas [1]
29/14
haircuts [1]
115/11
Hale [4]   107/3
113/20 120/10
120/15
Hale-Cusanelli
[3]   107/3
113/20 120/10
hall [1]
126/20
Hallelujah [1]
102/10
hand [1]   6/3
handed [1]
107/1
handful [1]
98/22
handled [1]
76/18
hands [2]   93/9
100/17
happen [11]
57/3 57/4 71/8
99/12 118/16
123/4 124/23
125/3 125/4
127/12 129/15
happened [18]
7/22 11/17
17/1 25/15
25/16 27/4

63/20 65/17
87/18 116/14
116/15 127/11
127/19 128/1
128/15 129/19
132/1 132/6
happening [1]
138/14
happens [3]
69/21 81/11
131/9
happy [4]   35/5
38/21 107/6
139/3
hard [2]
129/22 129/25
harm [1]   87/7
harmful [1]
112/8
HARTMAN [4]
1/20 1/20 2/5
3/15
Harveysburg [1]
1/19
hat [4]   30/18
31/5 31/9
94/12
hatred [1]
131/17
head [2]   40/7
100/22
headed [2]
130/18 131/12
heads [1]
36/17
health [10]
16/25 104/11
104/13 104/21
107/17 116/1
116/12 121/18
121/21 139/9
hear [19]   5/21
12/24 14/11
14/12 14/14
19/2 24/24
24/25 25/21
32/5 32/11
34/2 36/4
43/20 53/23
69/18 97/10
98/6 128/5
heard [16]
26/16 32/18
43/21 52/7
54/3 55/15
94/3 94/15
95/3 97/8
97/13 98/13

102/6 109/8
129/4 138/23
hearing [5]
4/10 4/21 5/1
53/9 108/12
heart [4]
115/4 116/9
122/17 134/5
heave [1]
89/11
heave-ho [1]
89/11
heavy [1]
118/22
held [6]   45/20
46/4 55/8
77/11 99/13
125/16
help [6]   54/14
64/7 98/12
106/2 115/10
129/11
helped [3]
64/9 119/5
121/1
helpful [2]
35/6 37/25
heritage [1]
126/11
heroic [1]
98/25
hey [2]   46/11
61/10
hierarchical
[6]   33/4
34/19 35/18
37/5 37/8 49/3
hierarchy [4]
43/24 46/7
46/9 48/2
high [2]
102/16 109/24
high-fived [1]
102/16
higher [2]
41/6 77/2
highest [1]
76/16
hill [2]   96/6
130/5
himself [5]
43/8 99/13
108/1 115/15
119/7
historical [1]
104/8
historically
[1]   26/19

history [6]
104/22 107/16
115/1 115/17
116/5 116/6
ho [1]   89/11
hold [7]   76/23
77/12 98/9
98/25 119/8
127/7 129/10
holding [6]
15/5 16/7
16/11 31/8
90/16 121/3
home [7]
117/17 117/23
121/8 123/19
131/20 134/3
135/9
homeless [2]
115/6 115/13
honest [1]
125/15
Honor [152]
Honor's [2]
69/20 107/1
HONORABLE [1]
1/9
HOOK [3]   1/23
140/3 140/10
hooked [1]
10/16
hope [3]
128/19 128/20
128/25
hoped [1]
127/14
hopefully [1]
132/5
hopes [1]   9/8
hour [2]   78/10
102/15
hours [1]
97/16
house [12]
34/11 38/18
89/1 90/9
94/21 95/17
95/17 96/23
96/24 105/18
126/18 126/18
How'd [1]   93/4
huge [1]   43/24
huh [2]   21/3
26/13
human [1]   71/6
hundred [1]
92/11
hunt [1]

130/11
hurt [2]   128/6
129/19
hyperbole [1]
90/1

**I**

idea [2]   14/5
42/8
identical [1]
103/14
identified [10]
11/2 26/11
36/7 36/12
49/21 62/13
75/16 76/4
78/25 94/11
identify [1]
136/4
ignored [1]
106/2
illegal [3]
45/15 45/19
135/20
image [4]
10/17 10/18
16/10 129/20
images [2]
47/11 92/16
imagination [1]
110/5
immediate [1]
51/20
immediately [6]
34/3 34/10
39/21 43/1
94/18 100/15
impact [1]
111/18
impacted [1]
24/3
impediment [1]
65/10
impeding [1]
101/25
implement [1]
56/6
implicit [1]
105/11
imploring [1]
38/11
important [13]
50/4 50/15
50/17 51/6
51/11 51/22
52/4 54/12
111/3 111/6
113/8 127/2

**I**

important...
**[1]** 130/25
**Importantly [1]**
33/15
**impose [7]**
114/17 121/22
131/20 132/8
133/24 134/18
135/4
**imposed [4]**
124/5 133/3
133/4 134/15
**impossible [1]**
102/4
**impressed [1]**
117/15
**imprisonment**
**[1]** 92/1
**improvised [1]**
100/25
**inability [2]**
106/4 108/23
**inadequately**
**[1]** 110/19
**incarcerated**
**[1]** 7/24
**incarceration**
**[8]** 8/14 9/18
92/22 105/22
106/15 114/18
121/6 134/1
**incident [1]**
123/5
**incited [1]**
102/24
**include [1]**
50/8
**included [1]**
111/5
**including [11]**
4/19 35/13
50/8 101/19
105/3 107/10
113/12 114/1
114/14 119/6
133/16
**inconsistent**
**[4]** 54/7
58/15 62/22
68/15
**increase [4]**
33/2 73/14
73/18 91/17
**indeed [4]**
47/15 76/3
79/23 117/10

**Independence**
**[1]** 136/17
**indicate [10]**
22/3 48/6 48/9
51/15 63/21
66/21 68/12
69/10 104/15
118/1
**indicated [6]**
85/23 91/5
91/16 127/16
133/14 137/8
**indicates [2]**
21/5 105/8
**indicating [7]**
44/21 46/25
52/7 68/11
73/14 80/23
82/16
**indication [4]**
41/17 51/18
68/13 135/18
**indictment [2]**
4/4 137/12
**indirect [1]**
87/21
**individual [13]**
12/2 15/10
15/11 16/6
16/7 28/21
30/9 34/12
35/9 36/1
50/18 95/4
125/12
**individuals**
**[13]** 33/14
33/17 36/10
37/1 37/16
37/17 52/2
52/11 52/19
114/1 123/25
133/8 136/24
**indulgence [3]**
35/24 38/4
137/18
**inevitably [1]**
131/25
**inferred [1]**
51/16
**infirmed [1]**
45/7
**information [6]**
53/8 101/15
120/21 136/9
136/11 138/7
**inhibit [1]**
89/14
**initial [1]**

66/7
**initially [3]**
17/9 27/22
40/12
**injured [1]**
92/11
**injury [1]**
116/24
**injustice [1]**
126/14
**injustices [1]**
126/13
**inmate [1]**
9/13
**inside [5]**
17/17 97/23
99/11 101/19
102/7
**insight [1]**
115/5
**insistence [1]**
77/23
**insisting [1]**
58/23
**inspire [1]**
133/11
**inspired [3]**
131/25 133/12
138/13
**instances [2]**
90/9 106/22
**instead [1]**
107/20
**institutions**
**[1]** 130/17
**instruct [1]**
108/2
**instructions**
**[1]** 12/19
**intelligent [2]**
125/22 126/1
**intend [8]**
29/18 34/13
37/22 51/18
53/11 54/19
89/19 95/6
**intended [2]**
52/15 55/1
**intends [1]**
113/11
**intense [1]**
111/15
**intent [11]**
19/12 55/22
87/7 88/23
99/18 100/13
109/15 111/5
112/25 116/25

118/23
**intention [4]**
75/22 79/17
81/2 122/15
**intentions [3]**
70/17 103/25
122/16
**interaction [2]**
18/3 99/16
**interest [4]**
120/4 120/16
138/21 138/22
**interests [4]**
62/13 75/16
76/4 78/25
**interfere [10]**
54/20 55/22
55/24 64/8
97/17 98/11
109/16 111/5
111/10 114/16
**interfered [3]**
100/6 101/21
109/21
**interference**
**[7]** 101/3
101/8 102/23
110/10 111/15
111/17 113/8
**interfering [3]**
70/20 93/22
103/23
**interplay [1]**
112/16
**interruption**
**[4]** 28/1 38/6
83/25 92/9
**intervention**
**[1]** 139/17
**interviewed [2]**
103/21 108/12
**intimidated [1]**
123/3
**intimidation**
**[1]** 93/21
**into [37]** 7/20
10/16 11/7
22/17 26/5
28/12 33/5
33/9 34/18
37/7 42/18
44/9 46/18
51/13 52/2
70/19 72/10
72/24 93/8
96/10 98/1
98/22 103/23
113/17 113/25

118/22 119/10
123/11 124/3
124/25 126/23
127/1 128/2
130/23 131/19
132/12 137/25
**introduced [1]**
35/12
**investigation**
**[4]** 4/5 75/3
75/21 79/15
**investigators**
**[1]** 108/12
**involved [4]**
27/8 67/8
112/10 136/3
**involvement [1]**
73/18
**involving [2]**
5/19 133/10
**issue [29]**
4/10 4/14
32/20 32/21
39/23 43/14
46/23 49/20
53/17 53/21
59/2 59/14
59/23 59/25
61/13 62/14
72/11 73/21
78/9 78/22
80/2 89/25
105/6 118/5
137/23 138/1
138/4 138/5
139/6
**issued [2]**
4/13 19/14
**issues [5]**
46/21 85/25
116/4 139/8
139/9

**J**

**jacket [1]**
11/16
**jail [1]**
139/16
**January [56]**
6/20 8/10 10/1
10/2 11/7
12/20 13/11
16/12 16/16
17/4 17/7
18/10 19/14
20/6 20/25
20/25 21/25
32/24 34/18

**J**

**January... [37]**
34/21 34/22
34/23 35/11
37/7 63/10
63/25 70/16
92/7 92/15
93/6 93/10
98/3 101/24
102/20 104/23
104/25 105/10
105/22 106/21
107/15 107/18
110/3 110/14
110/18 114/14
115/22 116/14
119/10 122/13
122/14 124/7
127/11 130/3
131/3 131/7
138/13
**January 5th [3]**
19/14 20/25
21/25
**January 6th [2]**
6/20 101/24
**January 8th [2]**
20/25 34/22
**JEFF [3]** 1/23
140/3 140/10
**Jennaie [1]**
3/9
**job [2]** 99/10
115/13
**jobs [2]** 102/9
128/23
**JOHN [8]** 2/3
5/23 6/8 6/12
6/16 18/7 30/5
107/5
**Johnson [1]**
40/18
**join [8]** 80/3
80/4 80/5
81/10 93/6
96/3 114/22
117/18
**joined [1]** 3/8
**judge [16]**
1/10 8/12
90/22 107/2
107/9 108/6
108/13 110/23
111/2 111/10
111/16 111/20
111/25 112/6
113/20 132/25

**judges [5]**
64/12 106/23
110/17 123/24
129/22
**judgment [2]**
8/21 123/25
**July [2]** 58/23
129/21
**July 26th [1]**
58/23
**jumped [1]**
12/23
**June [7]** 29/24
29/25 58/20
75/23 76/19
81/9 116/11
**June 29th [1]**
58/20
**June 8th [1]**
116/11
**jury [3]** 16/14
16/15 29/12
**justice [6]**
72/21 72/21
110/1 110/3
129/25 130/14
**justifiable [1]**
117/22
**justifiably [1]**
127/5

**K**

**KATHRYN [2]**
1/15 3/8
**keep [4]** 34/11
38/21 94/21
131/13
**keeps [1]**
79/24
**Kelly [4]**
110/23 111/3
111/10 111/16
**key [1]** 118/8
**khaki [1]**
11/16
**kicking [1]**
87/20
**KIDD [3]** 1/17
1/18 3/14
**kind [3]** 26/22
27/11 43/9
**knock [1]**
97/17
**knowing [1]**
132/25
**known [4]**
102/21 103/3
127/17 131/11

**knows [4]**
116/15 125/5
129/1 139/5
**Kollar [2]**
8/13 107/9
**Kollar-Kotelly**
**[2]** 8/13
107/9
**Kotelly [5]**
8/13 107/9
108/6 108/13
132/25
**Krebs [1]**
125/13

**L**

**lack [1]** 57/9
**lacks [1]**
110/2
**landscape [3]**
64/23 77/6
110/17
**language [8]**
58/11 74/14
74/20 80/10
80/14 80/22
84/4 84/20
**large [4]**
51/19 53/1
126/19 126/20
**larger [2]**
46/21 50/11
**last [10]**
22/17 23/12
58/1 61/1
75/14 76/2
79/8 80/20
116/7 122/21
**later [3]**
63/17 64/2
69/25
**laudable [2]**
104/20 129/11
**law [37]** 1/20
6/19 15/14
40/16 45/18
49/1 50/3 50/4
54/15 54/20
54/23 55/22
60/7 64/8
69/14 70/22
78/21 86/23
87/2 97/18
100/6 101/4
101/18 101/21
105/1 105/24
113/1 115/14
115/23 117/12

122/15 123/1
127/24 133/15
133/22 135/20
136/1
**laws [1]**
122/14
**lawsuits [1]**
125/16
**lawyer [5]**
132/17 133/7
134/3 135/15
137/4
**lawyer's [1]**
131/20
**layer [3]** 36/6
36/9 36/21
**lead [3]** 46/18
85/9 121/1
**leader [14]**
5/18 34/20
34/24 37/6
41/3 41/6 50/7
51/14 52/15
60/3 92/7
97/14 106/3
127/5
**leaders [1]**
94/13
**leadership [20]**
5/24 32/18
33/2 33/3
39/24 40/4
40/11 40/12
40/15 41/13
46/18 49/24
52/10 56/11
63/5 63/8
63/10 96/12
107/25 114/15
**leading [5]**
52/20 55/5
96/14 118/22
124/24
**leads [1]**
115/7
**leaning [1]**
16/11
**learned [1]**
123/6
**least [15]** 9/8
36/17 38/13
42/13 43/18
52/15 52/22
66/16 72/17
102/14 104/22
108/18 125/10
135/21 136/7
**leave [1]**

29/19
**leaving [1]**
102/17
**lecturn [1]**
3/5
**led [2]** 32/25
123/12
**left [3]** 43/16
125/5 125/5
**legal [6]** 62/1
64/7 64/23
77/6 103/16
109/3
**legitimate [2]**
59/9 69/3
**legitimately**
**[1]** 47/6
**Lemon [1]** 45/4
**length [1]**
121/18
**less [5]** 48/20
64/15 77/17
100/25 120/9
**lessened [1]**
114/12
**lessons [1]**
123/6
**letter [1]**
104/18
**letters [7]**
4/15 4/16 61/9
72/17 104/15
115/5 129/7
**level [15]**
41/6 70/9 74/9
74/11 74/25
75/1 79/11
79/12 91/16
91/17 91/23
91/24 91/25
109/20 134/2
**lieutenant [3]**
3/10 40/7
98/23
**life [2]** 123/5
127/2
**light [6]** 28/7
28/15 29/1
110/25 119/5
130/5
**likely [1]**
120/14
**limitations [1]**
116/16
**limited [1]**
133/4
**line [21]** 12/7
15/14 27/12

**L**

**line... [18]**
31/8 32/4
36/18 42/23
44/13 44/15
44/17 44/21
47/6 51/24
51/25 98/9
99/3 99/9
100/9 100/25
107/6 121/1

**lines [6]**
19/20 21/17
21/22 22/1
42/1 74/19

**list [1]**
120/18

**listen [8]**
37/12 37/13
37/13 38/11
38/12 38/13
105/15 125/23

**listened [2]**
105/13 108/1

**listening [3]**
96/10 99/23
99/24

**literally [1]**
39/3

**litigate [1]**
65/24

**little [4]**
9/21 25/3
34/14 123/18

**live [1]**
134/12

**lived [2]**
126/19 126/21

**lives [4]**
127/7 127/13
128/8 128/22

**LLC [1]**  1/18

**local [2]**
115/12 135/17

**locate [1]**
101/22

**located [2]**
93/11 94/16

**location [5]**
43/18 56/3
94/6 102/3
135/9

**locked [3]**
54/24 54/25
101/14

**logic [1]**
85/15

**logically [1]**
47/24

**long [2]**
115/14 139/10

**longer [5]**
56/6 85/12
88/6 93/16
118/12

**longest [2]**
119/1 119/16

**look [8]**  4/8
62/5 75/8
82/16 115/1
123/8 125/7
132/10

**looked [2]**
126/2 135/1

**looking [14]**
20/21 37/22
39/7 48/3
52/23 82/7
82/8 82/9
82/12 82/13
82/20 82/23
83/11 97/14

**looks [1]**
38/19

**Lord [1]**
122/17

**lose [1]**
128/22

**loses [1]**
125/9

**losses [1]**
92/12

**lost [2]**  125/1
125/20

**lot [10]**  32/11
37/16 48/20
86/23 127/4
127/8 128/5
129/20 131/17
131/17

**lots [1]**  32/10

**loud [1]**  14/5

**loudest [1]**
44/2

**love [1]**
122/17

**low [1]**  133/1

**lower [1]**
117/23

**lunch [2]**
77/24 78/10

**Lustig [1]**  3/4

**M**

**magnitude [1]**

109/25

**maintain [1]**
135/10

**major [1]**
67/13

**majority [1]**
47/15

**makes [6]**  52/4
64/5 67/24
69/22 115/13
139/11

**making [13]**
17/14 21/15
25/20 44/10
44/16 44/22
46/24 50/9
52/6 54/4
67/19 80/6
86/16

**male [3]**  33/9
36/7 55/18

**man [20]**  10/22
13/1 13/4
24/14 104/13
104/16 104/21
115/5 115/7
115/8 115/14
116/13 116/13
117/7 124/18
125/22 126/1
126/1 129/6
129/14

**managed [1]**
98/25

**manager [2]**
40/20 41/2

**manner [4]**
58/15 64/14
75/11 81/21

**manual [2]**
84/22 85/4

**many [14]**  12/4
48/25 63/25
74/19 93/23
96/7 96/9
96/16 103/2
103/2 103/2
107/13 108/12
126/7

**march [2]**  8/12
96/14

**March 6th [1]**
8/12

**marched [1]**
101/2

**marked [8]**
7/18 8/7 8/20
13/14 14/21

15/16 38/8
117/11

**marshal [1]**
99/1

**mask [1]**
102/16

**material [1]**
3/19

**materials [1]**
94/1

**matter [8]**  3/2
3/17 49/3
53/25 67/12
109/5 117/8
140/5

**matters [1]**
93/8

**maximum [1]**
132/22

**may [38]**  3/4
6/7 7/11 8/4
8/17 19/17
21/7 27/25
28/15 35/7
36/4 41/2
41/17 44/2
46/9 50/24
51/3 51/19
60/8 60/21
63/23 74/8
75/12 77/9
81/22 82/17
83/22 84/15
84/18 96/8
102/20 105/8
107/8 124/16
125/4 125/6
132/16 138/4

**May 2021 [1]**
102/20

**maybe [14]**
23/11 49/18
52/15 52/21
68/1 71/6
80/21 82/7
83/19 125/5
127/18 129/1
129/17 132/5

**McFadden [1]**
113/20

**McFadden's [1]**
107/2

**meals [1]**
115/6

**mean [16]**  14/3
26/14 39/20
40/2 44/9
44/11 45/22

47/6 48/5
48/15 55/4
63/1 63/2
63/12 77/8
124/10

**means [3]**
73/13 93/7
95/12

**meant [1]**  97/2

**media [4]**
19/15 19/19
22/2 43/5

**medical [3]**
116/3 128/10
139/17

**meet [3]**  41/9
55/11 94/7

**meeting [8]**
3/25 20/5
22/14 41/11
41/11 41/23
65/15 94/18

**megaphone [6]**
31/8 36/2 44/2
88/25 93/13
127/16

**megaphones [1]**
44/4

**member [3]**
37/20 38/18
94/10

**members [9]**
36/23 38/12
52/5 94/2 94/4
94/7 94/9
95/16 97/23

**memo [3]**  33/12
37/1 97/8

**memorandum [9]**
3/22 4/6 4/11
4/15 4/18 5/3
118/3 118/11
118/11

**men [7]**  12/17
31/12 31/16
34/2 98/14
98/18 108/4

**mentally [1]**
97/3

**mentioned [6]**
49/7 59/13
86/25 115/20
118/15 120/2

**mercy [1]**
120/19

**mere [1]**  70/4

**merely [2]**
39/17 41/20

**M**

**message [9]**
105/16 122/18
122/19 122/20
122/22 131/2
131/6 131/24
134/4

**messages [1]**
21/1

**met [8]** 21/12
21/18 22/3
41/24 65/15
86/12 86/13
100/15

**metal [3]**
15/14 16/18
98/15

**Mexico [1]**
78/14

**microphone [1]**
9/21

**middle [7]**
10/25 12/11
22/11 43/16
74/6 75/8 79/8

**midst [4]**
54/20 55/23
97/18 100/7

**might [7]** 19/9
28/13 76/17
99/21 105/15
116/25 139/4

**military [2]**
3/24 127/25

**million [1]**
92/12

**mind [1]**
127/15

**minds [1]**
124/25

**mine [2]** 22/23
84/11

**minimize [1]**
117/5

**minimized [1]**
116/2

**minimizing [1]**
63/18

**minister [6]**
72/15 122/18
126/22 127/17
129/10 133/11

**ministry [1]**
127/1

**minus [1]**
91/17

**minute [5]**

19/18 24/7
53/15 53/18
122/3

**minutes [7]**
23/21 23/22
24/7 24/7
27/18 100/21
101/1

**mirrors [1]**
94/15

**miscalculated
[1]** 118/10

**misconduct [3]**
75/3 75/22
79/16

**misdemeanor [4]**
133/20 133/24
134/20 134/24

**missing [2]**
82/4 83/20

**mission [2]**
102/10 102/11

**mob [10]** 98/1
98/2 98/25
100/9 101/1
101/3 102/24
111/10 119/9
128/18

**mob.' [1]**
119/8

**modification
[1]** 65/21

**moment [6]**
18/6 27/25
35/2 51/3
69/16 96/17

**moment to [1]**
69/16

**moments [1]**
98/9

**money [1]**
135/2

**monitor [2]**
10/16 14/25

**month [13]**
61/11 80/1
103/6 118/18
119/16 120/11
120/14 132/18
132/24 133/2
133/5 136/7
136/8

**months [34]**
7/25 8/14 8/14
8/22 8/23
62/11 62/11
63/24 67/15
76/6 92/2

92/22 102/18
111/14 111/19
111/25 114/7
114/18 114/18
118/13 119/1
119/4 120/8
120/8 120/21
120/22 120/23
120/24 121/10
121/11 133/17
133/18 134/18
134/21

**more [18]** 5/20
28/2 30/3
34/14 44/11
47/12 48/1
53/3 53/4
70/25 92/11
92/18 97/5
100/13 112/8
123/7 127/22
127/23

**moreover [1]**
55/24

**morning [16]**
3/7 3/12 3/13
3/14 3/17 3/22
4/2 6/10 39/14
92/17 94/15
94/25 96/11
97/9 98/13
98/24

**most [13]** 44/3
49/1 49/6
50/16 51/22
59/2 66/13
76/15 87/1
123/8 123/23
125/15 130/25

**motion [23]**
4/12 62/13
73/25 75/1
75/13 75/15
75/19 76/4
78/7 78/17
78/18 78/25
79/14 79/22
79/22 80/4
80/5 80/6
80/12 81/23
82/3 85/22
137/20

**motions [1]**
28/14

**motivated [1]**
9/8

**motorcade [2]**
56/6 100/20

**move [13]** 9/21
32/21 56/2
77/22 78/18
80/25 81/6
87/19 95/23
123/4 126/22
137/9 137/11

**moved [1]** 56/7

**movement [1]**
89/14

**moves [1]**
80/25

**moving [5]**
67/13 78/16
116/19 119/2
137/16

**Mr. [170]**

**Mr. Associate
[1]** 97/6

**Mr. Clay [1]**
12/14

**Mr. Cooke [1]**
121/11

**Mr. Dunfee [65]**
5/11 11/7
12/19 12/24
13/4 15/11
15/13 15/22
20/5 21/12
21/18 22/4
23/15 25/1
25/18 25/20
26/3 26/11
31/13 33/10
34/4 34/4
41/23 41/25
42/7 42/12
42/20 42/23
42/25 43/6
43/8 43/15
43/17 44/1
44/1 48/2
55/16 56/13
60/6 61/18
63/24 67/6
67/11 67/18
87/14 87/18
88/2 110/23
115/2 115/3
115/3 115/4
115/18 115/23
116/3 116/23
117/4 117/11
117/15 119/14
119/19 119/25
120/1 121/17
139/2

**Mr. Dunfee's
[5]** 83/17

85/5 109/11
110/25 121/25

**Mr. Ethan [1]**
94/9

**Mr.
Hale-Cusanelli
[1]** 120/15

**Mr. John [1]**
5/23

**Mr. Norris [12]**
30/13 30/15
31/7 31/12
31/20 36/12
36/15 36/25
47/19 47/22
51/1 108/3

**Mr. Norris' [1]**
30/18

**Mr. Police [1]**
90/6

**Mr. Reyher [1]**
89/9

**Mr. Robertson's
[1]** 112/7

**Mr. Sparks [1]**
111/19

**Mr. Sparks' [1]**
111/13

**Mr. Trump [1]**
125/9

**Mr. Widman [2]**
79/13 80/3

**Mr. William [1]**
11/2

**Mr. Wright [63]**
6/18 6/22
7/15 7/19 8/7
8/20 9/2 9/2
9/11 9/21
10/15 10/18
10/22 11/2
11/6 13/13
13/15 14/23
15/4 15/16
15/17 15/25
16/12 18/9
28/2 30/7 33/9
36/5 36/7
36/11 36/14
41/21 41/22
42/5 42/22
47/8 47/10
50/19 50/23
51/1 51/3 51/5
55/16 56/10
90/22 94/16
98/13 98/14
98/17 105/19

**M**

**Mr. Wright...
[13]**   107/5
107/8  107/11
107/14  107/17
107/24  108/1
108/3  108/4
108/9  108/14
120/3  132/16
**Mr. Wright's
[9]**   8/1  28/19
42/2  43/21
47/13  52/21
107/11  108/17
108/19
**much [4]**   11/21
67/4  122/12
132/7
**multiple [2]**
79/24  86/15
**must [3]**   40/20
105/16  132/2
**myself [3]**
31/21  41/12
64/18

**N**

**name [4]**   6/11
6/16  90/10
125/12
**named [2]**
33/12  48/16
**namely [1]**
112/3
**nature [12]**
44/6  45/14
50/9  71/6
109/25  113/3
113/15  116/20
117/3  124/6
131/2  135/4
**NE [2]**   136/17
136/17
**near [4]**   35/13
35/14  101/3
101/15
**necessarily [3]**
36/15  60/14
61/3
**necessary [4]**
106/15  118/1
121/14  135/25
**necessitate [1]**
89/20
**necessity [1]**
46/19
**need [13]**   48/1
51/21  62/17

73/13  73/19
74/12  80/3
95/23  101/24
106/19  115/10
121/19  136/25
**needed [6]**   4/2
23/25  52/3
56/4  93/8
93/18
**needs [3]**
121/20  121/21
139/18
**negotiate [2]**
37/14  99/8
**negotiation [1]**
64/11
**negotiations
[4]**   64/15
67/14  68/23
73/5
**new [5]**   1/13
78/14  85/12
85/14  111/24
**News [1]**   64/3
**next [8]**   11/17
31/7  32/21
36/9  82/6
82/14  119/16
119/16
**nexus [3]**   45/2
45/2  56/1
**nine [2]**
118/12  118/14
**nobody [2]**
24/19  128/6
**noise [2]**
32/10  32/11
**noisy [1]**   36/5
**Nolan [3]**
120/18  120/21
121/5
**non [1]**   68/11
**non-culpability
[1]**   68/11
**none [4]**   41/16
90/19  119/13
125/16
**nonetheless [3]**
56/22  72/23
110/15
**Nordean [1]**
94/10
**Norris [17]**
12/14  30/12
30/13  30/15
31/7  31/12
31/20  36/12
36/12  36/15

36/25  37/1
47/19  47/22
51/1  96/4
108/3
**Norris' [1]**
30/18
**not on [1]**
44/15
**notable [1]**
50/22
**notably [2]**
51/1  108/9
**note [27]**
34/21  35/11
37/9  37/10
39/16  41/21
46/20  50/3
57/8  60/13
62/12  75/7
76/2  78/23
78/23  79/7
79/8  80/15
80/18  80/19
90/13  90/17
90/21  116/6
116/7
**notes [1]**   85/2
**nothing's [1]**
28/10
**notice [2]**
4/22  39/1
**notifies [1]**
81/2
**notify [1]**
76/5
**notifying [2]**
75/22  79/16
**November [5]**
103/5  103/13
103/20  125/4
129/16
**November 27th
[1]**   103/13
**Nugent [1]**
94/10
**number [14]**
4/19  20/12
22/8  35/12
37/11  38/20
43/25  46/17
49/16  51/19
52/19  53/1
104/6  128/11
**numbers [1]**
127/25
**numerous [2]**
57/10  97/19

**NW [5]**   1/13
1/16  1/24
136/17  136/18

**O**

**o'clock [2]**
26/20  102/15
**object [2]**
28/17  118/22
**objection [4]**
29/16  53/17
73/12  85/20
**objections [3]**
5/16  65/24
66/6
**objective [3]**
41/10  89/19
89/21
**objectives [1]**
131/15
**obligations [1]**
136/12
**observing [1]**
101/16
**obstruct [5]**
103/10  108/2
109/16  111/5
112/25
**obstructed [1]**
102/13
**obstructing [3]**
7/6  28/4
101/25
**obstruction
[25]**   6/23  7/1
55/7  58/25
59/7  64/13
65/8  65/20
66/3  66/12
66/14  68/24
69/5  69/13
72/4  76/21
77/23  107/11
108/10  111/1
111/4  111/15
111/23  112/4
112/17
**obtaining [1]**
71/9
**obviously [17]**
4/10  36/14
37/15  45/9
46/22  51/17
51/25  53/8
59/9  72/19
85/10  86/7
87/13  89/15
91/7  114/7

124/5
**occasion [1]**
108/5
**occasions [2]**
88/13  104/23
**occur [4]**
39/22  85/11
124/10  131/7
**occurred [12]**
5/19  52/8  55/5
77/16  84/20
91/12  119/13
127/20  127/20
127/21  129/2
131/23
**occurring [2]**
39/21  88/24
**off [2]**   35/3
96/18
**offender [1]**
86/6
**offenders [1]**
49/3
**offense [36]**
8/9  8/9  15/6
19/25  20/11
20/22  29/7
39/18  50/10
50/13  52/1
66/16  66/17
67/23  68/4
69/6  74/25
76/16  76/25
79/11  85/1
85/5  86/17
89/10  91/23
91/25  109/11
109/20  113/4
113/9  116/20
117/3  117/25
132/19  132/20
135/18
**offenses [3]**
72/2  108/20
113/15
**offer [2]**
58/24  67/21
**offered [2]**
58/21  104/12
**officer [9]**
3/10  90/16
99/17  99/20
100/16  100/17
100/19  101/12
115/15  117/2
118/19  128/9
**officer's [1]**
90/15

**O**

**officers [40]**
16/19 70/20
90/3 90/6
90/10 90/18
92/12 93/22
95/15 95/18
95/25 96/22
97/3 97/21
97/21 98/12
98/17 98/23
99/8 99/10
99/24 100/4
100/10 101/1
102/11 102/24
103/23 104/2
105/18 106/3
107/22 108/5
118/20 118/23
119/8 128/3
128/7 128/11
128/17 128/22
**officers' [3]**
90/5 99/22
106/4
**official [6]**
1/23 6/23 7/2
28/4 103/10
140/3
**officials [3]**
93/2 93/15
93/17
**often [1]**
89/11
**Ohio [7]**   9/12
48/7 88/23
102/18 104/6
107/15 115/8
**old [1]**   116/3
**older [4]**
11/15 40/17
45/4 121/18
**ominously [2]**
93/4 99/20
**omit [1]**   67/15
**once [6]**   25/4
64/16 105/15
108/7 135/21
135/21
**one [106]**
12/13 18/6
22/19 26/20
26/20 30/13
30/15 31/12
31/20 31/24
33/8 33/12
33/13 33/24

34/2 34/6
34/14 34/16
34/20 34/22
34/25 35/2
35/10 35/11
35/13 35/15
36/3 36/8
36/23 37/13
40/18 43/23
46/11 47/19
49/6 50/6
50/19 50/24
54/11 55/18
56/12 57/21
57/23 57/25
62/4 72/17
72/18 73/3
73/11 73/12
73/14 73/18
73/24 77/17
78/7 78/11
78/20 80/12
84/6 85/21
86/2 86/14
93/20 93/24
94/1 94/3 94/5
94/11 94/11
94/16 94/22
96/4 96/4
96/17 97/14
97/15 98/21
99/16 100/14
102/15 103/6
103/14 104/18
107/16 108/5
109/12 114/11
115/19 115/19
118/13 119/17
119/17 119/19
120/24 123/23
125/15 128/12
129/14 130/22
130/25 133/19
133/20 134/19
134/24 137/13
138/1
**One's [1]**   97/6
**one-point [7]**
73/3 73/11
73/12 73/14
73/18 73/24
85/21
**ones [4]**   12/11
119/18 120/2
137/14
**ongoing [2]**
107/21 109/14
**online [2]**

103/7 119/12
**only [32]**   3/21
12/2 14/15
17/24 23/15
26/21 43/23
50/5 51/12
52/13 52/20
54/18 59/5
59/14 61/20
62/6 63/19
73/18 75/12
79/4 80/4
81/23 86/2
89/15 89/16
91/11 117/5
118/13 118/13
120/6 120/13
125/19
**open [2]**   27/19
118/3
**operation [2]**
74/25 79/12
**opinion [1]**
110/7
**opportunities
[1]**   115/13
**opportunity [7]**
62/10 67/16
71/10 79/23
108/10 122/12
134/10
**opposed [1]**
80/5
**opposition [1]**
65/9
**option [1]**
77/7
**options [1]**
78/19
**orations [1]**
95/14
**orchestrated
[1]**   108/7
**orchestration
[1]**   94/22
**order [6]**   4/12
78/7 91/10
136/14 136/25
139/15
**ordered [2]**
43/16 78/18
**orders [2]**
99/25 136/25
**organize [1]**
104/7
**organized [3]**
19/1 19/4
104/18

**organizer [6]**
5/18 41/3 41/5
50/7 51/14
52/16
**organizing [1]**
50/13
**originally [2]**
65/21 81/13
**ostensibly [1]**
96/14
**others [31]**
12/4 12/13
31/21 40/21
42/6 45/19
48/21 52/13
54/7 54/14
54/17 55/17
55/24 64/18
65/25 65/25
66/8 70/5
72/13 87/3
93/23 96/2
96/12 98/7
99/14 99/15
101/17 106/1
123/7 132/5
133/11
**otherwise [12]**
5/20 42/21
45/3 51/20
60/10 71/6
71/13 71/14
101/6 112/9
116/19 131/4
**out [38]**   10/24
12/7 16/23
22/21 23/3
33/9 36/10
39/16 40/8
40/17 41/12
45/4 48/3
48/21 59/1
60/3 61/15
61/16 62/16
69/22 70/17
71/23 72/6
78/13 86/23
91/20 93/4
95/4 98/15
99/13 116/23
118/9 120/12
120/16 125/8
126/13 136/25
139/5
**outdate [1]**
29/23
**outline [1]**
116/4

**outnumbered [1]**
100/8
**outrage [1]**
87/6
**outside [2]**
46/22 117/21
**outsiders [1]**
48/3
**over [30]**
11/18 22/2
26/2 33/25
36/22 40/13
40/21 47/9
53/7 73/12
92/12 93/5
95/18 97/2
97/4 97/17
99/24 101/4
102/25 118/6
125/16 125/20
126/20 129/6
129/21 129/22
129/23 130/1
134/10 135/6
**overlook [1]**
80/11
**Overruled [1]**
28/22
**overrun [1]**
102/17
**overseas [1]**
129/21
**overwhelmed [1]**
101/1
**own [16]**   18/16
25/23 43/10
43/22 43/23
63/18 75/3
75/21 79/16
93/8 104/4
105/25 107/18
118/17 126/3
128/22
**owned [1]**   9/20
**owner [1]**   9/24

**P**

**p.m [10]**   78/3
78/4 95/11
95/14 95/20
96/13 100/2
122/4 122/5
139/20
**pacemaker [1]**
116/10
**pacemaker/defib
rillator [1]**
116/10

**P**

**page [8]**   2/2
20/14 20/15
20/16 20/17
79/6 81/18
103/15
**paid [3]**   128/3
136/20 137/7
**panels [1]**
118/23
**papers [4]**
57/12 65/14
108/23 137/5
**paragraph [12]**
5/17 5/17
20/21 58/1
75/8 75/9 76/3
79/8 80/18
80/19 81/19
82/15
**paralegal [1]**
3/9
**Pardon [1]**
30/25
**parishioners
[1]**   72/18
**parked [2]**
10/7 100/21
**part [16]**   9/8
17/21 20/2
34/17 36/24
37/9 48/18
50/25 81/12
119/8 124/16
126/10 128/18
132/25 133/24
134/13
**participant [1]**
109/6
**participants
[1]**   5/20
**participate [1]**
89/14
**participation
[2]**   50/10
50/13
**particular [3]**
69/20 120/3
120/3
**parties [1]**
4/18
**parts [1]**
87/19
**party [1]**
125/6
**past [9]**   54/23
88/17 89/3

89/15 89/17
91/10 95/18
99/9 105/8
**pastor [9]**
15/22 35/17
103/8 104/5
105/10 105/13
105/13 114/15
133/10
**pastoral [1]**
133/10
**pastorship [1]**
104/17
**patient [1]**
116/6
**patriots [3]**
64/1 103/2
103/2
**pay [8]**   108/23
131/4 131/5
132/4 133/23
135/5 137/4
137/5
**payment [1]**
136/7
**peaceful [7]**
19/12 92/10
109/11 109/21
114/16 124/21
134/6
**peacefully [1]**
134/8
**peculiar [1]**
84/7
**penalty [1]**
132/19
**pending [2]**
137/24 138/19
**Pentecostal [1]**
126/22
**people [75]**
19/1 19/4 22/4
22/5 22/6
22/18 22/20
22/22 23/3
23/7 23/11
23/12 24/3
26/1 26/4
26/11 26/14
27/20 27/22
33/10 36/21
37/4 37/11
37/22 40/2
41/9 41/12
41/17 42/13
43/11 43/25
44/4 45/12
45/19 45/23

46/10 47/1
47/20 47/25
48/7 48/24
49/16 51/19
51/19 52/23
53/1 53/4 53/4
54/6 60/3
72/17 96/7
97/14 97/25
105/12 106/1
106/5 107/19
127/1 127/4
127/8 127/18
127/21 127/22
127/23 128/6
129/8 129/11
130/1 131/25
132/12 133/12
134/7 134/14
138/13
**pepper [1]**
101/17
**per [2]**   136/7
136/8
**perch [1]**   34/9
**perfectly [1]**
123/7
**perhaps [1]**
121/17
**period [7]**
99/13 106/14
133/19 134/18
134/23 135/10
139/2
**permissible [2]**
117/13 123/13
**permitted [1]**
135/8
**permitting [8]**
62/8 75/24
75/25 79/18
79/19 81/3
81/4 89/16
**persecuted [1]**
68/7
**person [15]**
11/23 22/17
23/12 31/9
44/3 56/24
57/14 57/17
63/11 67/16
67/20 68/9
71/15 111/11
123/2
**person's [1]**
67/25
**personal [1]**
107/13

**personally [1]**
87/21
**perspective [1]**
125/14
**persuading [1]**
93/23
**petition [1]**
29/15
**pews [1]**
105/15
**photo [1]**
26/17
**photograph [1]**
26/9
**phrases [1]**
94/4
**physical [18]**
57/10 86/16
86/18 86/21
87/4 87/5 87/6
87/7 87/12
87/22 89/2
93/21 112/17
113/13 113/14
128/12 128/14
128/24
**physically [4]**
18/11 88/16
97/2 99/19
**pick [1]**   117/9
**Picking [1]**
31/3
**picture [12]**
13/16 14/23
15/1 15/4
15/18 16/1
16/2 26/10
30/20 30/24
31/1 115/24
**piece [2]**
56/11 57/7
**place [13]**
22/14 44/14
47/6 63/20
68/24 73/5
128/8 128/11
128/24 129/2
130/9 131/3
134/11
**placement [1]**
139/11
**places [1]**
54/3
**plainly [2]**
50/6 50/17
**Plaintiff [1]**
1/4
**plan [3]**   33/5

56/6 95/9
**planning [2]**
50/13 119/6
**plans [5]**
28/14 28/20
28/25 29/9
29/14
**plant [1]**
24/12
**play [5]**   4/25
35/6 38/8 39/4
51/13
**played [17]**
35/8 35/25
37/24 38/9
38/16 38/24
39/5 73/15
93/19 95/2
96/25 97/12
98/5 100/5
101/10 102/5
128/21
**playing [2]**
38/21 93/16
**plaza [1]**
100/20
**plea [20]**   7/8
7/19 15/6
17/21 20/2
21/15 61/17
64/11 64/15
65/11 67/14
67/21 75/23
76/14 76/15
78/17 79/17
81/2 81/8
108/11
**plead [12]**   7/8
58/21 58/24
59/6 62/16
65/7 66/11
66/16 71/11
76/24 77/23
80/7
**pleading [6]**
7/4 55/12
62/15 65/9
66/16 68/5
**please [4]**   6/2
6/10 123/14
123/17
**pled [4]**   7/1
29/12 89/10
108/9
**plight [1]**
67/20
**plus [1]**   86/17
**PO [1]**   1/18

**P**

**podcast [4]**
34/23 64/6
97/6 103/18
**podium [1]**
114/22
**point [70]**
10/24 13/23
26/19 33/2
34/15 37/13
38/14 39/16
40/17 40/25
40/25 40/25
48/6 49/10
49/20 50/3
50/18 50/21
53/13 54/2
57/20 58/22
58/23 60/12
61/21 61/22
62/4 62/6 62/7
64/12 64/23
65/5 67/20
68/10 68/16
69/15 69/19
69/20 70/15
71/4 71/15
71/21 73/1
73/3 73/11
73/12 73/14
73/16 73/17
73/18 73/24
78/7 78/10
78/20 80/12
81/1 85/21
85/24 85/25
86/6 90/14
91/15 97/4
102/3 102/16
116/23 117/21
117/23 117/24
118/9
**points [2]**
61/20 74/11
**police [59]**
3/10 16/19
19/20 20/7
21/17 21/22
22/1 27/11
32/4 37/15
42/1 44/13
44/21 47/5
51/25 52/2
70/20 88/18
88/20 89/3
89/13 89/15
90/6 90/10

91/7 92/11
93/21 95/15
95/25 96/21
97/3 97/21
97/25 98/11
98/16 98/23
99/8 99/16
99/17 99/21
99/23 100/8
100/25 101/12
102/11 102/24
103/23 103/24
105/18 106/3
107/22 112/18
118/19 121/1
127/23 127/24
128/3 128/7
128/9
**political [5]**
47/3 47/4 90/1
105/24 106/16
**poor [1]**
126/20
**pose [1]**
138/18
**poses [2]**
138/8 138/10
**posing [1]**
111/8
**posit [1]** 41/4
**position [26]**
25/25 41/14
46/9 52/10
59/15 60/20
60/22 62/22
63/5 64/19
64/20 68/9
69/3 69/12
71/18 71/22
71/24 72/5
75/10 78/6
81/20 89/18
105/11 114/15
123/20 126/12
**positions [2]**
71/19 73/4
**posits [1]**
104/2
**possess [1]**
135/20
**possible [4]**
20/9 104/8
115/14 135/9
**post [5]** 21/12
66/21 68/14
110/16 111/22
**post-event [2]**
66/21 68/14

**posted [4]**
20/25 21/4
103/13 103/17
**posts [1]**
119/12
**potential [3]**
28/18 116/17
121/21
**potentially [1]**
116/25
**power [8]**
92/10 109/11
109/22 114/17
124/22 134/6
134/7 134/8
**powerful [2]**
100/11 100/13
**pray [3]**
129/16 129/16
129/18
**prayer [35]**
11/19 11/20
11/25 13/9
13/23 13/24
14/2 14/4
14/12 14/18
23/16 24/1
24/6 24/23
24/24 24/25
25/1 25/1 25/5
25/6 25/8
25/12 25/15
25/20 25/21
26/8 26/15
26/16 32/4
43/14 43/19
43/20 43/22
98/20 105/19
**pre [1]** 112/10
**pre-Fischer [1]**
112/10
**preached [2]**
105/14 122/20
**preaching [1]**
130/2
**preceded [1]**
60/18
**preceding [1]**
92/14
**precious [2]**
123/6 123/18
**precise [2]**
61/13 80/2
**precisely [1]**
80/14
**preclude [1]**
91/4
**precludes [2]**

73/10 91/6
**predicate [1]**
59/11
**premised [1]**
25/20
**preparation [9]**
3/18 3/20 4/3
5/6 6/21 65/3
77/16 81/22
119/6
**prepare [3]**
77/5 80/3
124/2
**prepared [12]**
57/15 64/16
64/23 64/24
65/3 71/23
76/24 77/17
97/4 107/18
121/25 134/7
**prepared six
[1]** 64/16
**preparing [5]**
62/7 75/11
75/24 79/18
81/3
**presence [1]**
42/14
**present [6]**
10/1 10/2 51/7
83/7 87/24
98/24
**presented [6]**
44/20 50/20
53/9 53/9
55/11 120/19
**presentence [2]**
4/4 136/24
**presidency [1]**
124/14
**president [10]**
56/3 95/8
95/11 97/23
102/2 124/10
124/11 124/14
124/17 124/25
**president's [1]**
100/20
**presidential
[1]** 138/15
**press [3]**
101/13 118/17
120/25
**pretrial [2]**
5/1 139/8
**pretty [1]**
11/21
**prevent [3]**

64/9 106/4
118/19
**prevented [1]**
103/11
**preventing [1]**
101/8
**previously [5]**
16/13 63/19
85/23 91/15
105/7
**price [4]**
128/3 131/4
131/5 132/4
**pride [1]**
102/19
**primarily [2]**
55/14 76/12
**principles [1]**
109/13
**prior [17]**
9/18 13/11
20/5 37/1 57/9
64/16 64/25
74/25 77/18
79/11 85/11
104/23 104/23
107/15 110/25
111/2 113/18
**prison [7]**
111/19 120/12
133/18 134/19
134/19 134/21
135/22
**Prisons [3]**
7/25 9/14
104/13
**pro [1]** 44/10
**probable [1]**
135/17
**probably [1]**
128/4
**probation [18]**
3/4 4/5 5/15
8/23 53/7
53/15 53/25
63/17 70/16
91/20 103/21
108/25 109/18
135/14 136/1
136/10 136/23
137/21
**probationary
[1]** 118/6
**problems [1]**
128/14
**proceed [4]**
53/18 64/14
64/23 111/9

**P**

proceeded [1]
100/24

proceeding [6]
6/23 7/2 77/10
111/6 111/6
113/12

proceedings [3]
28/4 139/20
140/5

proceeds [2]
46/21 46/21

process [9]
17/25 109/21
110/11 110/11
111/9 111/10
123/17 125/14
131/1

produces [1]
84/11

prohibit [1]
66/25

prologue [1]
105/8

proper [1]
120/1

properties [1]
136/19

property [1]
116/24

proposing [2]
65/22 113/6

prosecution [4]
67/25 75/3
75/21 79/16

prosecutors [2]
119/5 129/23

protect [2]
91/8 99/11

protected [6]
45/3 46/14
47/16 52/3
105/1 105/3

protecting [2]
97/22 97/25

protective [1]
119/7

protest [6]
19/12 54/19
101/6 103/25
126/9 126/9

protested [1]
107/21

protesting [2]
103/19 104/24

protests [2]
104/7 126/11

proud [8]
33/25 34/7
94/2 94/7
94/10 94/13
94/18 115/4

proveable [1]
76/15

proved [1]
88/2

proves [1]
67/4

provide [9]
42/17 92/13
115/5 116/3
136/2 136/9
136/11 139/18
139/18

provided [3]
115/20 115/21
138/7

provides [3]
87/25 115/11
115/13

proximity [1]
51/20

public [9]
67/19 115/12
125/1 125/10
126/13 130/16
131/2 131/6
139/13

publication [1]
103/7

publicly [1]
69/23

publishes [1]
64/3

pull [1]
137/18

pulled [1]
22/19

pulpit [2]
105/14 106/9

pumped [1]
97/16

punching [1]
87/20

punishment [3]
117/6 130/23
130/24

purchased [1]
119/12

pure [1]
132/24

purpose [6]
34/10 37/20
85/16 86/10
94/20 114/16

purposes [1]
105/25

pursuant [4]
4/23 7/8 74/14
74/21

pursue [2]
106/16 115/14

pursuit [1]
106/16

push [8]    25/24
25/25 36/13
97/20 98/16
99/18 99/18
106/2

pushed [12]
36/15 54/23
54/23 54/23
88/13 90/2
100/3 101/12
107/22 108/4
108/7 123/11

pushing [17]
15/14 16/18
25/13 25/19
26/4 26/5 27/8
70/19 86/21
89/12 90/23
91/9 95/18
98/19 103/22
107/6 118/19

put [4]    52/10
100/17 116/11
124/25

puts [1]
120/20

putting [1]
123/21

**Q**

qualified [1]
5/18

qualifies [6]
50/7 51/14
74/17 74/20
74/23 79/9

quick [1]
138/20

quieted [1]
37/11

Quigley [1]
49/5

quite [1]
89/23

quote [1]
88/16

quoted [2]
49/4 70/16

quoting [2]

37/4 90/1

**R**

rack [1]
122/25

racks [3]
70/19 103/23
123/12

railroaded [1]
72/19

raise [1]    6/3

raised [4]
22/15 24/12
93/11 100/21

raises [1]
66/20

raising [1]
60/21

rally [2]
10/13 107/20

range [13]
92/1 92/2
108/24 109/17
110/20 111/14
111/24 112/9
112/12 112/23
112/24 114/7
133/21

rather [3]
111/23 131/14
134/12

ratify [1]
117/1

ravished [1]
115/7

reactive [1]
56/5

read [2]    72/17
129/7

reading [2]
20/24 60/12

ready [7]
23/25 24/6
35/1 51/1 97/3
97/17 97/17

real [2]    59/2
117/10

reality [1]
131/11

realize [2]
93/15 123/20

realizing [1]
131/14

reallocate [1]
62/10

reallocated [1]
76/5

reallocation
[1]    62/14

really [15]
14/6 37/22
47/24 48/1
63/21 89/24
124/12 124/12
126/4 127/3
127/20 129/19
130/5 130/10
139/7

realm [1]    67/9

rearrested [1]
135/17

reason [15]
3/20 49/23
59/6 59/9
62/24 77/3
87/25 90/21
93/1 104/12
106/17 116/17
132/15 132/16
138/16

reasonable [4]
70/13 71/19
71/20 73/4

reasonably [2]
51/16 65/7

reasoning [1]
113/5

reasons [8]
39/9 50/24
79/21 85/23
91/5 91/13
127/15 133/13

recalculate [2]
53/15 73/19

recall [3]
13/21 23/20
43/1

recalled [2]
96/4 96/5

receive [5]
9/4 53/22 67/6
67/16 71/20

received [8]
3/21 87/11
88/2 118/12
132/15 132/18
132/24 133/8

receiving [3]
9/8 66/25 77/2

recent [4]
40/17 110/1
110/7 112/10

recently [4]
49/6 104/17
110/22 111/21

recess [5]
53/14 53/18

**R**

**recess... [3]**
53/19 78/3
122/4
**recessed [1]**
102/2
**recognize [14]**
10/21 13/15
14/22 15/17
16/1 16/7 30/8
51/6 51/7
115/23 117/3
117/24 121/8
121/15
**recognized [2]**
97/15 117/12
**recognizing [3]**
87/8 87/24
117/19
**recollection
[1]** 38/1
**recommend [1]**
135/8
**recommendation
[1]** 106/14
**recommends [1]**
114/17
**reconcile [1]**
81/17
**reconciled [1]**
122/19
**reconsider [1]**
139/14
**record [16]**
3/6 5/11 11/1
11/4 29/22
35/3 53/20
56/9 61/9 78/4
85/17 86/14
96/18 116/8
122/5 140/5
**recorded [1]**
103/17
**recordings [1]**
37/25
**records [3]**
106/20 116/4
119/25
**recovered [1]**
26/22
**recruited [2]**
106/1 108/3
**recruiting [3]**
55/24 60/3
65/25
**recruitment [2]**
50/11 66/8

**recruits [1]**
129/5
**red [1]** 30/19
**Redirect [3]**
2/6 30/4 30/5
**reduced [1]**
9/8
**reduction [35]**
53/22 54/2
57/19 59/11
59/17 62/24
66/25 68/10
68/16 71/4
71/15 71/21
72/12 73/1
73/3 73/11
73/13 73/16
73/17 73/25
85/10 85/21
85/24 86/6
86/10 87/11
88/3 88/7 88/9
89/7 91/4 91/6
91/13 91/14
91/15
**reevaluate [1]**
71/10
**reference [18]**
4/7 4/9 4/13
5/13 13/20
14/1 39/21
59/8 65/10
66/20 68/23
71/22 73/3
73/5 73/8 79/5
88/25 133/8
**referencing [6]**
58/3 58/10
60/1 79/2 83/5
95/17
**referred [4]**
75/7 79/7
89/11 93/25
**referring [7]**
76/14 83/7
90/5 93/2 93/5
93/15 95/16
**reflect [6]**
11/1 11/4
108/20 113/5
113/9 123/9
**reflecting [1]**
8/22
**reflects [2]**
109/19 110/2
**refresh [1]**
38/1
**refuse [2]**

62/6 80/5
**refused [1]**
80/4 80/7
**refusing [1]**
86/5
**regard [34]**
4/8 29/15
39/15 39/24
40/16 40/23
41/5 41/7 42/4
44/24 46/19
47/1 47/17
48/25 49/4
62/1 67/13
71/24 78/20
78/21 81/13
86/6 115/17
116/1 117/6
117/10 118/15
119/3 119/21
120/1 120/2
121/16 121/24
121/24
**regarding [22]**
4/17 16/13
49/13 53/22
59/10 61/25
63/3 66/2 66/3
66/17 69/1
69/3 71/17
73/15 73/17
76/25 86/1
86/24 91/18
112/16 122/13
138/5
**regardless [5]**
112/4 114/3
116/24 125/4
130/12
**regards [7]**
55/25 64/19
69/20 83/22
104/22 105/23
118/5
**REGGIE [1]** 1/9
**regret [1]**
70/19
**regrets [1]**
103/22
**reinforcements
[3]** 54/13
95/21 95/22
**reiterate [1]**
121/16
**reiterated [1]**
81/9
**rejected [1]**
58/22

**rejects [1]**
60/22
**related [1]**
4/17
**relates [2]**
52/19 55/20
**relating [1]**
5/17
**relationship
[4]** 34/19
35/18 37/5
37/8
**relaying [1]**
101/15
**release [14]**
8/15 8/25
114/19 118/17
120/25 133/19
134/22 134/23
135/12 135/14
136/6 136/10
136/23 137/25
**released [1]**
135/22
**relevant [20]**
54/8 56/12
56/14 56/16
57/2 57/2 57/4
57/16 57/18
58/6 58/14
59/16 60/24
62/22 69/1
69/3 71/17
71/22 114/13
120/17
**relied [1]**
110/17
**religion [1]**
127/4
**religious [7]**
47/4 104/6
104/9 105/4
126/22 127/5
127/8
**rely [1]** 86/10
**relying [2]**
62/23 80/11
**remain [2]** 6/2
56/15
**remained [2]**
101/15 102/13
**remaining [1]**
137/11
**remains [1]**
57/1
**remanded [1]**
65/18
**remember [4]**

11/16 14/6
14/7 22/8
**remorse [6]**
57/8 57/9
70/24 102/23
104/3 106/10
**remove [1]**
67/9
**removing [1]**
84/20
**repeat [2]**
52/5 96/16
**repeated [2]**
47/1 103/25
**repeatedly [1]**
101/20
**repeating [2]**
35/16 36/3
**Repent [1]**
122/19
**replicated [1]**
47/9
**replied [1]**
102/9
**reply [1]** 50/1
**report [5]** 4/5
5/1 5/14
136/24 136/24
**reporter [7]**
1/23 1/23
19/10 53/14
69/18 122/2
140/3
**reports [1]**
119/4
**represent [1]**
137/4
**representative
[1]** 99/14
**represented [3]**
109/1 112/9
116/22
**representing
[1]** 67/18
**Republicans [1]**
125/7
**request [7]**
4/6 17/24
74/15 85/22
94/14 117/16
136/11
**requested [2]**
132/17 134/2
**require [10]**
85/23 133/22
134/14 134/22
135/5 135/13
135/16 135/21

**R**

**require...** [2]
136/2 136/9

**required** [5]
35/19 46/20
56/14 61/5
134/17

**requirement** [4]
40/24 86/12
135/24 136/1

**requires** [1]
47/18

**research** [2]
78/9 126/3

**resecure** [2]
99/1 100/8

**resentenced** [1]
111/21

**resentencing**
**[3]** 28/16
132/17 132/19

**resolve** [3]
61/17 67/12
71/12

**resolved** [2]
5/15 114/4

**resonated** [1]
127/18

**resources** [8]
62/9 62/10
62/14 73/7
76/1 76/6
79/20 81/5

**respect** [5]
5/23 8/1
126/12 126/17
127/1

**respond** [3]
62/18 68/8
76/8

**responded** [3]
102/10 109/2
112/19

**responding** [2]
37/16 38/19

**responds** [3]
34/13 37/21
95/5

**response** [5]
3/21 4/11 5/2
39/13 63/6

**responsibility**
**[22]** 43/10
54/1 56/18
58/16 60/5
60/23 61/13
61/18 63/22

66/22 67/7
67/10 67/13
67/17 68/1
68/4 68/21
70/2 70/25
81/13 81/16
124/1

**rest** [4] 17/1
27/8 27/16
27/18

**restitution** [6]
108/21 114/20
135/6 136/5
136/8 136/20

**restore** [1]
27/12

**restricted** [8]
52/2 98/23
99/2 99/7
100/14 100/16
102/14 106/5

**result** [10]
7/23 28/15
45/24 73/18
89/2 128/9
128/10 128/15
128/24 138/2

**resulted** [3]
65/21 92/12
112/2

**resumed** [1]
95/14

**retired** [1]
128/12

**retreat** [1]
118/21

**retreating** [1]
100/10

**return** [1]
99/2

**returned** [6]
43/2 54/25
94/5 94/19
99/4 102/18

**reversal** [2]
138/2 138/4

**review** [8]
3/19 4/1 4/2
4/4 4/20 4/25
135/14 138/2

**reviewed** [1]
5/5

**revise** [1]
84/16

**revision** [1]
84/19

**revisit** [2]
28/25 29/9

**Reyher** [2]
89/8 89/9

**rhetoric** [2]
131/16 138/13

**rhetorically**
**[1]** 93/3

**ride** [1] 30/15

**Ridgepoint** [1]
1/21

**rifle** [1]
119/12

**right** [37] 6/3
10/25 13/10
17/7 21/11
22/16 24/17
24/20 26/11
28/3 29/24
35/10 37/14
41/2 42/4
43/17 45/8
45/9 46/4
47/14 50/11
50/14 55/1
61/13 62/15
64/20 69/24
70/18 71/20
74/3 75/18
94/21 102/21
105/3 114/24
117/19 126/12

**rightly** [2]
105/9 113/15

**rightness** [1]
67/25

**rights** [3]
29/13 70/4
105/2

**rile** [1] 88/25

**riled** [2]
50/24 125/10

**riot** [4] 97/7
99/17 100/7
100/16

**rioter** [8]
37/13 96/4
96/4 102/7
102/8 102/9
118/20 119/11

**rioters** [9]
54/14 95/24
97/1 99/1
100/14 101/16
101/19 108/2
118/24

**risk** [3] 138/8
138/10 139/13

**rob** [4] 45/24
46/1 46/12

46/14

**robbery** [1]
46/6

**Robert** [2]
11/2 92/7

**Robertson** [3]
111/20 119/22
119/22

**Robertson's** [1]
112/7

**robs** [1] 46/13

**role** [26]
34/23 39/15
40/13 40/24
41/10 46/18
49/8 49/11
49/23 49/25
52/11 60/2
63/3 63/8
73/15 73/17
86/9 87/9
87/25 88/8
96/12 104/8
107/25 108/18
114/15 128/21

**role in** [1]
49/11

**rolls** [1] 70/1

**Rotunda** [4]
101/2 101/5
101/13 101/16

**rule** [6] 4/23
47/18 65/16
75/7 85/19
111/10

**ruled** [4] 29/6
59/8 60/10
63/2

**ruling** [1]
91/2

**rulings** [5]
91/15 91/21
133/17 138/6
138/6

**run** [3] 26/2
134/20 134/25

**running** [1]
27/22

**runs** [1]
104/16

**rushed** [2]
100/9 119/9

**S**

**sacred** [1]
127/7

**sad** [1] 131/11

**safety** [6]

90/4 90/5
99/21 99/22
99/25 118/21

**safety's** [2]
90/4 99/20

**sake** [2] 90/4
99/20

**salient** [1]
107/9

**same** [29]
15/22 16/13
23/9 31/9 31/9
36/19 41/7
43/17 63/16
64/6 65/24
66/6 69/4 85/2
86/22 99/9
106/22 107/5
107/13 107/17
109/20 113/5
114/3 118/25
125/8 125/9
130/14 133/9
138/12

**sample** [1]
136/2

**sanctions** [1]
134/14

**Sargent** [5]
118/16 118/17
118/25 119/2
119/2

**sat** [2] 16/20
16/21

**satisfied** [3]
59/20 136/13
138/3

**saving** [1]
134/10

**savings** [1]
135/4

**saw** [7] 26/9
44/1 94/24
100/3 101/11
117/16 120/18

**saying** [46]
13/19 14/8
25/4 32/6 34/2
34/24 35/17
38/12 38/14
38/18 39/22
40/3 40/14
41/13 41/23
41/25 42/6
44/9 44/12
44/20 45/10
45/23 46/3
46/13 46/16

**S**

saying... **[21]**
48/11 51/23
53/1 54/16
56/24 59/25
63/6 63/20
64/7 67/5
68/14 69/8
69/9 70/16
72/18 79/24
98/8 122/12
125/3 125/9
130/9
scarce **[1]**
62/14
scared **[1]**
17/19
scene **[2]**
51/16 51/17
schedule **[1]**
136/7
scheduled **[1]**
29/22
school **[3]**
115/11 115/12
115/12
scored **[1]**
107/16
scream **[1]**
45/11
screen **[3]**
10/16 10/19
35/10
SE **[2]** 136/17
136/18
seated **[1]** 6/7
seats **[2]**
18/20 18/21
second **[9]**
21/14 33/11
42/10 80/18
80/19 81/19
90/3 100/4
100/15
secondly **[1]**
47/24
Secret **[2]**
56/2 56/5
section **[13]**
52/18 52/18
58/7 74/5 74/7
78/8 80/10
81/22 91/6
106/18 112/4
112/7 113/7
sections **[2]**
110/17 110/20

secure **[2]**
56/3 102/3
seeing **[2]**
82/22 83/4
seek **[1]** 48/12
seeking **[3]**
48/21 89/13
91/7
seem **[4]** 43/9
69/2 87/1
120/6
seemed **[1]**
44/13
seems **[17]**
34/17 39/20
40/2 52/9
52/20 59/22
65/6 68/19
68/22 68/24
71/5 71/13
73/4 85/7
89/18 91/10
129/8
segment **[1]**
125/11
selection **[1]**
92/15
self **[3]**
138/24 139/3
139/7
self-surrender
**[3]** 138/24
139/3 139/7
Senate **[1]**
119/9
send **[1]** 84/12
sending **[1]**
131/2
sends **[1]**
134/3
sense **[4]** 19/1
35/18 47/24
124/14
sent **[1]** 131/6
sentence **[49]**
8/22 9/9 28/25
29/9 45/5 61/2
72/11 72/25
75/14 79/8
80/20 82/6
82/14 108/19
113/4 114/3
114/6 114/18
117/17 117/21
118/18 119/1
119/4 119/17
120/11 120/15
120/24 121/11

121/12 121/13
121/18 121/25
124/4 132/11
132/14 132/19
132/22 132/23
132/24 133/2
133/3 133/3
133/5 133/25
134/18 135/8
137/3 138/5
139/17
sentenced **[16]**
8/12 76/17
77/4 107/8
107/11 108/13
110/23 111/18
114/1 119/18
120/21 121/5
132/13 132/20
137/13 137/14
sentences **[8]**
65/17 82/1
106/23 118/12
131/20 133/6
134/20 134/25
sentencing **[48]**
1/9 3/18 3/18
3/20 3/22 4/3
4/6 4/14 4/18
5/3 5/6 8/8
33/12 37/1
49/4 59/23
59/25 61/19
67/14 75/13
77/19 81/24
84/10 84/12
84/13 85/11
85/13 90/23
94/1 97/8
103/21 106/18
106/19 108/13
110/8 110/13
110/25 111/2
112/8 118/2
118/6 118/8
118/10 118/11
123/17 131/1
137/24 138/19
sentencings **[1]**
124/2
separate **[2]**
27/2 88/13
September **[3]**
1/5 4/13 5/2
September 11th
**[1]** 4/13
September 17th
**[1]** 5/2

sergeant **[2]**
40/9 40/9
serious **[2]**
66/13 117/4
seriously **[1]**
124/2
seriousness **[3]**
108/20 113/9
131/22
serve **[2]**
135/8 139/16
Service **[1]**
56/5
Service's **[1]**
56/2
Services **[1]**
5/1
serving **[1]**
121/17
set **[5]** 51/25
91/8 93/22
118/22 118/25
settle **[1]**
93/3
seven **[4]**
20/14 20/16
20/18 62/11
several **[6]**
4/24 5/14 50/8
54/3 76/12
128/13
share **[3]**
46/21 50/12
107/13
shining **[1]**
130/4
shocked **[1]**
17/19
short **[1]**
104/3
shorter **[1]**
120/23
shot **[1]** 40/8
shoved **[1]**
118/20
show **[11]**
10/15 13/13
15/16 15/25
31/4 41/19
63/4 92/15
92/17 102/20
105/23
showed **[4]**
26/10 31/4
103/3 106/10
showing **[8]**
7/18 8/7 8/20
14/21 30/7

35/13 38/2
84/2
shown **[11]**
33/24 36/13
36/25 37/11
43/18 47/12
52/24 97/19
99/7 108/23
115/15
shows **[1]**
99/15
shut **[1]** 102/9
side **[9]** 10/7
10/8 10/11
22/13 95/21
96/3 99/23
121/5 129/5
sidestepped **[1]**
100/18
signal **[5]**
13/8 25/12
26/15 98/19
105/20
signed **[1]** 8/9
significant **[4]**
106/14 112/2
116/6 139/2
significantly
**[3]** 106/8
120/8 132/14
silent **[2]**
56/15 57/1
similar **[9]**
89/7 105/8
106/16 106/20
106/21 106/23
107/12 121/11
132/13
similarly **[3]**
111/20 113/19
119/19
simple **[1]**
122/18
simply **[2]**
70/3 70/9
sincere **[1]**
70/21
sincerely **[3]**
70/18 122/13
123/2
sit **[1]** 16/15
sitting **[1]**
45/23
situated **[1]**
119/19
situation **[15]**
46/22 46/23
47/18 55/8

**S**

situation...
**[11]**  67/5
67/23 71/10
71/16 86/7
89/9 106/8
120/7 123/21
133/13 133/13
**six [32]**  12/5
12/5 22/4 22/7
22/18 22/22
23/24 31/12
31/17 31/22
48/1 48/12
48/14 48/20
49/19 49/21
50/25 62/12
64/16 64/24
75/7 76/2
77/16 79/8
80/18 80/19
81/19 83/6
84/3 123/6
123/18 137/19
**skills [1]**
133/10
**social [4]**
19/15 19/19
22/2 43/5
**sold [2]**  18/20
18/21
**soldiers [2]**
40/10 40/14
**sole [1]**  101/6
**solely [3]**
70/18 103/19
103/25
**solemnly [1]**
6/3
**solicited [1]**
103/15
**somebody [16]**
18/18 22/25
22/25 23/10
42/24 51/17
62/21 63/9
68/3 69/22
72/13 88/22
91/9 125/23
125/24 127/6
**somehow [3]**
124/19 127/9
130/11
**someone [7]**
50/7 51/14
71/7 90/17
102/16 125/20

134/8
**someone's [1]**
66/24
**sorry [6]**  35/4
71/1 71/1
74/19 84/18
96/19
**sort [8]**  33/7
34/20 35/14
36/20 37/6
37/13 90/19
125/13
**sought [1]**
36/10
**soul [2]**
128/20 128/25
**sound [2]**
95/12 131/25
**sounds [2]**
61/8 70/25
**space [1]**
126/23
**Sparks [5]**
110/22 110/22
111/19 112/23
119/2
**Sparks' [1]**
111/13
**speak [7]**
11/11 22/24
23/1 45/8
99/16 122/7
126/13
**speaking [13]**
12/24 32/12
33/25 35/10
35/15 36/1
41/13 42/13
44/17 47/2
48/7 53/5 94/3
**speaks [1]**
69/25
**special [2]**
114/19 133/23
**specific [1]**
86/17
**specifically
[6]**  6/22 22/8
37/2 116/4
123/8 135/16
**speculation [1]**
132/25
**speech [16]**
44/4 44/7 44/8
45/2 45/3 45/9
46/23 47/3
47/4 47/4
47/15 54/6

60/17 70/4
95/8 95/12
**speeches [2]**
44/16 45/1
**spew [1]**
131/24
**spewed [1]**
131/16
**spiral [1]**
131/9
**spirit [2]**
123/9 123/10
**spiritual [1]**
122/16
**split [1]**  49/9
**spoke [1]**
93/12
**spoken [2]**
51/23 52/25
**sponte [1]**
78/19
**spot [2]**  24/19
43/2
**sprayed [1]**
101/18
**spread [2]**
12/6 98/15
**spring [1]**
104/17
**spurred [1]**
96/10
**staff [2]**
77/24 97/24
**stairs [2]**
54/22 100/24
**stand [2]**
102/22 105/18
**standard [3]**
65/16 135/13
135/19
**standing [4]**
6/2 11/10 34/9
39/2
**start [7]**
25/12 26/8
38/4 99/24
115/1 124/6
130/16
**started [7]**
13/22 13/24
14/18 25/24
93/16 96/15
124/25
**starting [2]**
39/1 117/21
**starts [2]**
37/17 58/11
**state [6]**  3/5

6/10 84/25
117/5 124/12
135/17
**stated [5]**
42/19 79/13
93/17 102/20
102/25
**statement [22]**
8/8 15/6 17/20
19/15 19/25
20/11 20/21
21/4 21/8
21/14 32/7
45/24 46/13
64/6 67/21
67/24 68/4
70/15 75/7
104/3 122/1
139/1
**statements [23]**
17/15 17/21
38/20 43/5
44/10 44/22
46/5 46/24
46/25 52/4
52/6 57/10
67/7 67/8
67/15 67/19
69/22 70/11
87/14 97/6
114/14 121/2
139/8
**states [29]**
1/1 1/3 1/10
3/3 3/8 6/19
6/24 7/20 8/10
10/2 28/7
40/18 40/22
49/5 49/5 50/5
84/10 84/13
89/8 91/8 92/8
106/24 107/4
110/22 111/20
134/17 135/7
136/15 136/19
**States' [1]**
4/6
**stating [6]**
42/16 75/2
75/20 79/14
95/22 96/22
**Station [2]**
10/8 10/10
**status [5]**
127/7 129/9
130/4 133/11
137/23
**statute [1]**

83/2
**stealing [1]**
103/3
**steel [1]**
119/7
**stents [1]**
116/10
**stepped [1]**
14/10
**stepping [1]**
124/13
**steps [8]**  17/2
27/16 54/19
55/2 90/4
99/21 101/2
101/6
**still [19]**
9/20 25/3
27/22 43/3
53/16 59/23
63/17 68/6
68/6 74/13
77/4 84/25
87/9 92/16
111/4 118/5
119/22 119/23
121/21
**stipulate [3]**
65/8 73/9
76/24
**stipulated [11]**
55/5 55/11
56/8 62/11
65/13 66/3
67/22 71/12
72/3 109/13
116/21
**stipulating [2]**
65/9 66/17
**stipulation [3]**
4/17 55/25
73/6
**stipulations
[6]**  55/14
59/19 59/19
65/22 66/2
77/18
**stolen [8]**
64/2 93/14
102/22 124/17
124/20 125/2
125/18 126/5
**stood [2]**
97/15 105/13
118/24
**stop [4]**  89/4
100/17 110/5
131/8

**S**

stopped [1]
101/7

stopping [2]
88/23 112/21

StopTheSteal
[1]  93/17

storm [2]
106/1 121/2

story [1]
56/11

Street [3]
1/16 136/17
136/18

strike [3]
18/22 22/20
25/18

striving [1]
130/5

strongly [2]
105/21 127/4

structure [1]
33/4

students [1]
115/12

sua [1]  78/19

subject [1]
138/4

submissions [1]
53/10

submitted [6]
4/1 4/1 55/13
61/9 129/7
133/7

subsection [9]
74/16 74/17
74/24 75/1
75/12 75/19
79/10 79/12
91/3

subsequent [10]
41/11 44/22
45/25 46/12
52/6 52/8 63/7
68/12 68/16
116/15

subsequently
[6]  60/17
68/22 69/11
69/12 71/9
139/16

substantial [2]
113/24 117/8

suffer [2]
128/17 129/17

suffered [1]
128/10

sufficient [8]
41/19 52/22
60/18 62/23
86/9 87/9
87/22 121/13

sufficiently
[1]  88/2

suggest [5]
41/20 45/13
45/13 45/16
104/21

suggesting [5]
45/16 56/20
68/19 71/6
71/14

suggestion [1]
39/19

suggests [1]
39/18

suit [1]  37/17

Suite [1]  1/21

summary [1]
92/13

supervised [9]
8/15 8/25
114/19 133/19
134/22 134/23
135/12 136/6
136/10

supervisor [2]
40/20 41/3

supplies [1]
115/12

support [5]
57/16 95/24
104/15 114/6
125/19

supported [1]
125/1

supports [4]
33/21 78/6
125/19 126/4

supposed [1]
23/24

supposedly [1]
48/4

suppress [1]
78/17

Supreme [16]
28/7 29/6
45/10 55/7
59/8 64/21
65/16 72/6
76/25 77/11
109/25 111/1
113/18 114/8
124/13 132/21

sure [8]  19/8

32/23 50/23
100/2 120/18
124/3 128/4
135/15

surrender [3]
138/24 139/3
139/7

surround [1]
136/19

surrounded [1]
103/1

survival [1]
134/13

survive [1]
134/13

sustained [1]
128/14

SW [2]  136/18
136/18

swear [1]  6/3

syncope [1]
116/7

synonyms [1]
45/17

system [6]
72/21 72/22
120/23 129/23
129/25 135/23

**T**

tach [1]
116/11

talk [1]  84/17

talked [2]
42/23 63/19

talking [12]
21/21 29/3
37/2 39/20
42/7 47/5
57/23 57/24
76/20 83/2
122/23 122/23

talks [3]
34/22 45/5
79/9

tapes [1]
52/24

targeted [5]
64/5 68/6
103/8 106/11
109/11

teach [4]
123/6 123/7
129/20 129/22

teaching [1]
123/9

tearing [1]
131/17

telegraphing
[1]  99/18

telling [3]
52/11 95/15
99/20

tells [5]
63/24 72/15
125/23 125/24
127/5

tempers [3]
19/20 21/16
41/25

temporarily [1]
110/12

tend [1]  68/19

tender [3]
18/5 123/19
123/19

tenement [1]
126/19

term [2]
115/14 134/1

terms [2]  28/2
28/6

tested [1]
135/21

testified [8]
16/15 24/11
31/12 42/8
50/23 94/10
108/15 128/13

testify [2]
47/19 47/23

testimony [14]
6/4 9/4 9/7
16/13 23/17
42/2 42/5
43/12 47/13
49/21 52/21
55/15 56/9
108/17

testing [1]
135/25

texted [2]
19/23 37/1

that he [1]
51/4

theater [1]
45/12

thereafter [2]
95/13 135/25

thereby [3]
75/24 79/18
81/3

therefore [14]
46/4 53/11
53/12 56/23
59/10 59/16

71/19 71/25
72/16 73/1
73/6 126/25
127/8 135/4

third [6]
36/21 42/10
61/21 61/22
62/6 62/7

THOMAS [2]
1/17 1/18

though [9]
19/9 40/12
60/21 69/9
71/21 72/8
73/16 107/15
128/16

thought [8]
12/25 13/3
26/16 93/7
124/8 124/9
125/25 126/5

thought that
[1]  12/17

threat [2]
88/10 111/8

threatened [7]
70/22 71/1
71/1 92/10
99/17 101/20
106/3

threatening [1]
90/10

threats [7]
86/12 87/13
87/16 88/1
89/24 90/12
90/19

three [8]
40/25 73/16
86/17 113/6
113/11 128/7
133/19 134/23

three-point [2]
40/25 73/16

threw [1]
118/21

throughout [3]
17/24 42/20
104/7

thus [1]  8/2

thwarted [1]
101/20

timeline [2]
44/25 61/25

timeliness [2]
76/13 77/14

timely [4]
75/22 76/5

**T**

timely... **[2]**
79/16 81/2

times **[7]**
37/18 61/10
79/24 86/16
108/12 127/8
128/13

today **[21]**
3/21 9/5 9/7
10/24 18/3
54/4 55/16
59/22 70/6
76/17 89/25
93/14 108/15
108/17 109/9
109/19 114/4
116/22 122/1
123/16 139/19

together **[4]**
12/18 15/14
107/23 122/9

told **[9]**   13/8
18/2 90/3
92/25 93/13
95/7 96/13
98/14 127/9

tolerated **[1]**
132/2

Tom **[1]**   3/14

tomorrow **[8]**
19/16 19/20
20/7 21/6 21/9
21/17 41/24
42/1

tonight **[3]**
19/19 21/16
41/25

took **[20]**   17/1
27/16 27/17
27/18 63/5
63/20 64/18
64/19 71/18
71/18 105/11
120/3 124/20
128/8 128/8
128/10 128/24
129/2 130/9
131/3

tool **[1]**
113/22

tools **[2]**
110/2 110/16

top **[1]**   133/19

tornado **[2]**
104/19 115/7

total **[4]**   12/5

22/7 91/25
134/21

totally **[4]**
27/13 56/21
59/5 71/24

touch **[1]**   15/1

touching **[1]**
87/21

touchscreen **[1]**
14/25

toward **[2]**
49/22 87/20

towards **[6]**
35/16 100/22
109/3 130/18
131/10 135/5

town **[2]**   41/22
41/24

transcript **[2]**
1/9 140/4

transfer **[4]**
92/10 109/11
114/16 134/8

transition **[3]**
109/22 124/21
134/6

trauma **[1]**
128/17

traumatized **[1]**
128/7

travel **[1]**
134/10

travels **[1]**
88/22

Travis **[1]**
94/10

treat **[1]**
104/13

tremendous **[1]**
129/8

trespassing **[1]**
104/24

trial **[55]**
10/15 10/21
13/14 14/22
15/25 33/24
35/12 37/11
37/25 38/8
54/4 54/9
54/16 54/18
54/21 55/3
55/5 57/11
61/12 62/8
62/10 62/11
62/15 62/16
64/15 64/16
64/24 64/25
65/1 65/3

65/13 66/7
67/22 70/5
71/12 75/11
75/25 77/15
77/17 79/19
81/4 81/22
88/16 88/17
89/25 94/9
97/20 100/3
100/12 101/9
104/1 109/9
109/15 112/14
113/4

tried **[4]**
61/10 101/14
118/21 120/4

triggered **[1]**
24/23

troubling **[8]**
72/9 72/13
72/15 72/20
130/13 130/19
130/20 133/13

true **[8]**   17/12
19/14 56/17
58/15 70/9
112/4 115/18
140/4

truly **[1]**
105/5

Trump **[9]**
30/19 44/10
90/8 90/8
96/14 96/16
96/23 96/23
125/9

Trump's **[2]**
95/8 95/12

trust **[3]**
105/11 108/14
114/15

trusted **[1]**
105/12

truth **[5]**   6/4
6/5 6/5 18/1
18/2

try **[12]**   19/8
77/5 88/14
88/17 89/3
91/8 100/17
116/16 124/3
129/11 129/22
129/24

trying **[10]**
22/21 58/2
59/22 67/12
74/13 74/21
80/10 89/20

101/16 101/18

tunnel **[1]**
89/12

turn **[3]**   20/14
32/22 70/17

turned **[2]**
100/21 101/14

twice **[4]**
100/19 108/7
118/20 118/21

two **[44]**   12/10
12/12 22/11
22/11 23/1
26/20 26/24
27/2 34/21
37/1 40/25
43/16 43/16
43/16 47/22
49/10 49/20
54/2 61/20
63/17 64/2
68/10 68/16
71/4 71/15
71/21 73/1
82/1 85/24
88/13 89/9
91/12 91/15
91/17 94/22
97/6 103/5
104/23 106/21
115/18 118/20
119/15 128/7
137/24

two-point **[12]**
40/25 49/10
49/20 54/2
68/10 68/16
71/4 71/15
71/21 73/1
85/24 91/15

type **[7]**   73/9
119/13 121/12
132/3 134/4
135/19 135/20

typical **[2]**
111/11 112/8

**U**

U.S **[15]**   1/24
3/9 17/3 42/19
45/4 49/2
58/22 67/4
78/14 79/24
88/14 103/21
107/1 107/2
108/25

U.S.C **[1]**
121/14

Uh **[2]**   21/3
26/13

ultimate **[2]**
72/6 106/13

ultimately **[13]**
5/14 53/5
55/7 56/4 59/7
64/21 72/2
77/1 77/9
77/10 93/21
94/13 106/5

unable **[1]**
100/8

under **[44]**
33/2 37/4
47/21 47/25
49/24 52/9
52/14 56/12
56/13 56/25
57/3 61/23
63/3 63/13
64/23 69/8
71/14 71/25
74/17 74/24
75/12 76/2
78/8 79/10
81/6 81/22
83/3 87/23
88/7 96/7
108/24 110/20
111/16 112/1
112/7 113/1
113/7 113/13
113/13 113/14
113/16 113/17
114/2 117/13

undercut **[1]**
54/5

underlying **[1]**
113/10

undermines **[1]**
72/20

underneath **[1]**
33/7

understands **[1]**
105/5

understood **[3]**
7/4 22/3 132/3

underwent **[1]**
116/8

unexplainable
**[2]**   116/7
116/11

unfairly **[1]**
106/11

unfortunately
**[6]**   122/22
124/23 124/24

**U**

unfortunately.. . **[3]** 126/6 138/11 138/12

unidentified **[5]** 33/8 36/7 38/12 50/18 55/18

Union **[2]** 10/8 10/10

unique **[1]** 133/12

UNITED **[29]** 1/1 1/3 1/10 3/3 3/8 4/6 6/19 6/24 7/20 8/10 10/2 28/7 40/18 40/21 49/4 49/5 50/5 84/13 89/8 91/8 92/8 106/24 107/4 110/22 111/20 134/17 135/7 136/15 136/19

unknown **[1]** 94/8

unlawful **[1]** 108/11

unlawfully **[1]** 87/7

unless **[3]** 61/24 66/16 121/23

unlike **[2]** 107/24 108/9

unprecedented **[1]** 109/7

unreasonable **[1]** 71/25

unsuccessful **[3]** 60/14 61/3 64/15

unto **[1]** 122/19

unwarranted **[1]** 106/19

up **[57]** 10/17 11/10 11/11 17/2 17/2 18/9 19/20 20/11 21/17 23/11 26/21 27/15 27/16 27/19 27/22 29/13 31/3 35/22 38/5 38/15

42/1 42/17 42/19 42/25 43/1 47/20 47/20 50/24 50/24 51/3 51/25 52/12 54/22 55/5 69/17 85/9 88/25 91/8 96/6 97/16 100/24 101/2 102/20 103/3 104/19 114/7 115/7 117/9 119/21 120/20 124/24 125/10 126/2 126/18 126/25 129/5 137/18

update **[1]** 84/16

upon **[26]** 25/20 52/21 53/23 62/23 63/5 73/14 73/19 73/25 75/1 75/12 75/19 78/13 79/14 80/11 81/23 85/19 91/14 91/16 91/21 117/15 123/24 130/24 133/17 134/6 136/11 138/6

uprising **[1]** 124/15

upward **[4]** 106/25 111/25 112/6 114/5

urging **[1]** 105/14

USAO **[1]** 1/15

USAO-DC **[1]** 1/15

use **[9]** 40/21 57/10 87/3 87/5 89/21 105/24 123/5 135/19 135/20

used **[5]** 13/20 88/12 88/17 106/8 136/3

using **[8]** 87/18 87/18 88/15 94/4 107/25 131/24 133/10 133/11

usually **[1]** 87/5

utmost **[1]** 126/17

**V**

V-tach **[1]** 116/11

vacated **[2]** 65/18 119/23

value **[1]** 99/25

VanBenschoten **[2]** 3/10 98/24

variance **[10]** 92/22 109/7 113/19 113/21 113/25 113/25 116/18 117/18 117/22 121/7

variances **[3]** 106/25 112/11 113/21

various **[2]** 109/10 134/17

vary **[3]** 78/19 114/5 117/19

vast **[1]** 47/15

vastly **[1]** 100/8

vehemence **[1]** 87/6

version **[18]** 82/8 82/10 82/11 82/12 82/16 82/19 83/8 83/24 84/3 84/4 84/4 84/5 84/5 85/6 85/7 85/12 85/12 85/14

viable **[3]** 72/21 77/7 138/1

vice **[6]** 56/2 97/23 100/20 102/2 124/10 124/17

victim **[1]** 57/12

victory **[1]** 100/22

video **[20]** 4/23 35/8 35/21 35/25 38/9 38/16 38/24 39/5

93/19 95/2 96/25 97/12 98/5 100/5 100/10 101/10 101/11 102/5 103/17 103/18

videos **[9]** 4/8 4/9 4/20 4/21 39/2 92/16 115/3 115/3 116/21

view **[6]** 4/9 63/4 63/8 71/22 91/7 130/24

Villaba **[1]** 78/14

violating **[1]** 110/24

violation **[1]** 69/13

violations **[1]** 6/18

violence **[27]** 64/5 86/12 86/13 86/22 87/2 87/4 87/13 87/13 87/16 88/1 88/1 88/10 88/11 88/13 89/3 89/6 89/17 89/19 89/21 89/24 90/12 90/19 91/11 93/21 105/25 113/13 113/14

violent **[10]** 70/8 70/9 87/19 88/16 90/11 90/24 92/8 98/3 104/4 108/6

violently **[1]** 95/25

vocal **[1]** 44/3

vocation **[1]** 105/9

voice **[1]** 132/1

volatile **[1]** 106/7

volition **[1]** 25/23

voluminous **[1]** 3/19

volunteer **[1]**

56/14

vote **[5]** 88/24 92/10 111/16 112/22 117/8

votes **[1]** 125/21

**W**

W-R-I-G-H-T **[1]** 6/13

wait **[1]** 23/11

waiting **[4]** 23/7 23/25 24/6 43/3

waive **[2]** 75/18 138/22

waiving **[1]** 138/21

walked **[4]** 10/8 11/18 17/2 27/15

walking **[1]** 100/22

wall **[1]** 16/20

WALTON **[1]** 1/9

waltz **[1]** 24/20

wants **[5]** 4/9 4/20 4/24 23/1 61/6

war **[2]** 40/6 119/12

warranted **[5]** 109/4 109/8 110/21 112/7 113/21

Warsaw **[1]** 104/5

Washington **[13]** 1/5 1/14 1/16 1/25 10/6 18/10 18/19 18/23 19/2 19/6 19/11 30/16 93/6

watched **[1]** 92/17

watchers **[1]** 59/3

Watson **[4]** 65/14 107/2 113/19 113/23

way **[23]** 40/8 42/25 61/15 65/22 71/12 78/11 85/2 88/23 89/15 89/16 91/11

**W**

**way... [12]**
93/20 100/1
105/17 105/19
107/19 125/8
125/24 126/9
127/10 128/2
131/12 132/7
**ways [1]** 123/7
**weak [2]** 70/23
104/2
**weapon [1]**
116/23
**website [4]**
34/17 103/16
103/18 120/20
**week [4]** 64/16
64/25 77/17
79/25
**weighs [1]**
105/21
**weren't [4]**
45/15 64/1
66/15 70/9
**west [5]** 54/11
54/13 54/15
95/22 96/1
**what did [1]**
14/3
**what's [10]**
7/18 8/7 8/20
21/14 33/21
45/22 68/9
117/13 125/3
129/15
**whatsoever [2]**
122/16 123/13
**wherever [2]**
139/4 139/16
**whipped [1]**
98/1
**white [1]**
30/19
**who's [1]**
121/20
**whole [3]** 6/5
43/14 86/23
**whose [5]** 90/4
99/10 99/21
123/19 123/19
**WIDMAN [6]**
1/12 2/4 2/6
3/8 79/13 80/3
**wife [2]** 89/10
121/20
**WILLIAM [5]**
1/6 3/3 3/16

11/2 92/6
**willing [7]**
57/18 66/10
66/15 68/25
72/3 73/8
109/6
**willingness [3]**
68/13 68/17
105/24
**win [2]** 125/6
125/6
**window [2]**
119/11 121/4
**windows [1]**
101/17
**wing [1]** 119/9
**wins [1]** 125/4
**Wisconsin [1]**
64/3
**witch [1]**
130/11
**witch-hunt [1]**
130/11
**withhold [7]**
62/12 65/4
75/15 78/24
79/22 80/15
82/2
**withholding [2]**
61/22 76/3
**within [3]**
37/6 57/5
139/4
**without [11]**
39/24 41/24
42/16 47/17
71/5 86/11
111/22 115/10
116/9 138/18
139/19
**witness [13]**
2/2 5/23 7/12
8/4 8/17 15/2
15/21 16/5
18/5 30/23
32/15 56/9
56/10
**witnesses [4]**
64/17 64/25
66/9 77/16
**word [1]**
122/22
**words [13]**
13/20 35/16
36/3 36/17
40/2 51/22
52/17 52/25
53/1 53/6

62/15 96/10
100/11
**work [8]** 9/19
9/23 42/25
93/4 110/12
128/12 128/14
128/23
**worked [3]**
42/19 50/24
97/24
**working [1]**
34/25
**world [2]**
129/20 134/11
**worse [2]**
106/8 129/17
**worth [1]**
134/10
**wrecking [2]**
98/8 102/12
**WRIGHT [74]**
2/3 5/23 6/8
6/12 6/13 6/16
6/18 6/22 7/15
7/19 8/7 8/20
9/2 9/2 9/11
9/21 10/15
10/18 10/22
11/2 11/6
13/13 13/15
14/23 15/4
15/16 15/17
15/25 16/12
18/7 18/9 28/2
30/5 30/7 33/9
36/5 36/7
36/11 36/11
36/12 36/14
41/21 41/22
42/5 42/22
47/8 47/10
50/19 50/23
51/1 51/3 51/5
55/16 56/10
90/22 94/16
98/13 98/14
98/17 105/19
107/5 107/5
107/8 107/11
107/14 107/17
107/24 108/1
108/3 108/4
108/9 108/14
120/3 132/16
**Wright's [9]**
8/1 28/19 42/2
43/21 47/13
52/21 107/11

108/17 108/19
**wrist [1]**
90/15
**writes [1]**
110/4
**written [2]**
109/23 114/4
**wrong [15]**
60/8 60/12
63/25 64/4
64/8 66/6
72/14 72/19
74/4 84/6
106/11 122/25
123/11 130/10
134/14
**wrongdoing [1]**
106/10
**wrongful [1]**
45/19
**wrongfulness**
**[1]** 67/20
**wrongly [1]**
61/22
**wrote [1]**
103/7

**Y**

**Yang [4]** 87/3
90/14 90/14
90/17
**year [12]**
16/12 63/18
84/20 103/20
104/18 116/7
132/22 132/23
133/2 133/20
134/19 134/24
**years [8]**
63/17 64/2
103/5 106/9
116/3 133/4
133/19 134/23
**Yep [1]** 43/4
**yesterday [3]**
3/23 3/25 5/4
**York [1]** 1/13
**young [2]**
116/13 116/13

**Z**

**zero [5]** 38/23
39/4 86/6
102/23 106/10
**zero-point [1]**
86/6
**zone [3]**
117/25 118/3

121/9
**zones [1]**
118/5